## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

**HARDWIRE, LLC,**

**Plaintiff,**

**-v-**

**FREYSSINET INTERNATIONAL ET CIE, FREYSSINET, INC., AND ABC CORPS 1-10,**

**Defendants.**

## COMPLAINT

Hardwire, LLC ("**Hardwire**"), by and through its undersigned counsel, hereby files this Complaint against Freyssinet International et CIE ("**Freyssinet International**"), and Freyssinet, Inc. ("**Freyssinet USA**," and collectively with Freyssinet International: the "**Freyssinet Defendants**"), and ABC Corps 1-10, and in support thereof states as follows:

## PARTIES

1.     Hardwire is a limited liability company formed and existing under the laws of the State of Delaware, with its principal place of business at 1947 Clarke Avenue, Pocomoke City, Maryland 21851.

2.     Upon information and belief, Freyssinet International is incorporated under the laws of the Country of France, with a principal place of business located at 1 Bis, rue du Petit Clamart, Bat C, 78148 Velizy Cedex, France.  Freyssinet International is a structural engineering firm that manufactures and installs structural cables, such as those on a cable-stayed bridge.

3.     Upon information and belief, Freyssinet USA is an incorporated entity under the laws of the State of Virginia, with a principal place of business located at 44880 Falcon Place,

Suite 100 Sterling, VA 20166.  Freyssinet USA is the domestic affiliate of Freyssinet International, and manufactures and installs structural cables, such as those on a cable-stayed bridge.

4.      Upon information and belief, ABC Corps. 1-10 are subsidiaries, parents, affiliates, and/or related companies of Freyssinet USA and Freyssinet International that actively participated in the fraudulent scheme alleged herein, and assisted Freyssinet USA and Freyssinet International at all relevant times.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over: (i) Hardwire's Defense of Trade Secrets Acts, 18 U.S.C. § 1836, *et seq.* ("**DTSA**") claim pursuant to 18 U.S.C. § 1836 and 28 U.S.C. § 1331; (ii) Hardwire's Racketeer Influenced and Corrupt Organizations ("**RICO**" claim pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331; and (iii) Hardwire's antitrust claims under 15 U.S.C.A §§ 1, 2, and 14.  The Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367 because the facts underlying Hardwire's state law claims are so related to the facts underlying Hardwire's DTSA and RICO claims that Hardwire's state law claims form part of the same case or controversy as its federal claims.

6.      This Court has personal jurisdiction over the Freyssinet Defendants pursuant to Fed. R. Civ. P. 4(k)(1) and CPLR 302(a)(1) and CPLR 302(a)(3) because the Freyssinet Defendants stole Hardwire's Trade Secrets (defined below) and passed off those Trade Secrets as the Freyssinet Defendants' own in New York (and more specifically in this judicial district), in furtherance of an effort to obtain and ultimately win the right to install cabling and bridge armor on the  Kosciuszko Bridge (the "**K Bridge**").  Indeed, by Freyssinet USA's own admission in papers filed in the Maryland Action (defined below), the Freyssinet Defendants' "use of the []

information would have occurred in New York . . . . ."  By contracting to perform services on the K Bridge in New York, the Freyssinet Defendants purposefully availed themselves of the benefits and protections of New York law.  At all times, Freyssinet Defendants knew, or should have known, that their conduct as it relates to the K Bridge may subject them to suit in the State of New York.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred within Queens and Brooklyn, New York, which are in this judicial district.

## INTRODUCTION

### Background

8.    Hardwire, the leading manufacturer and supplier of protective systems and armor to protect bridges and other critical national infrastructure from terrorist attacks, seeks compensatory, exemplary, treble, and punitive damages, as well as injunctive relief and attorneys' fees, to redress the Freyssinet Defendants' theft and misuse of Hardwire's proprietary and confidential bridge armor solution.

9.    The misconduct at issue commenced in 2014 and the Freyssinet Defendants no doubt believed that they had "gotten away with it," having avoided detection in the ensuing years.

10.    In November 2020, however, Hardwire's former employee (and the Freyssinet Defendants' co-conspirator), Irvin "Skip" Ebaugh produced documents in a related lawsuit (the "**Maryland Action**"), which began as a simple employer/employee dispute between Hardwire and Mr. Ebaugh.

11.     As revealed by Mr. Ebaugh's document production, *and as Mr. Ebaugh has subsequently confirmed under oath*, the Freyssinet Defendants masterminded and orchestrated a scheme whereby they stole Hardwire's Trade Secrets (including Hardwire's Armor Recipes, Integration Designs, and Armor Proposals (all defined below)), and then worked with Mr. Ebaugh to improperly "replicate Hardwire's bridge armor and [] offer a competing product . . . ."

12.     Until Hardwire received Mr. Ebaugh's November 2020 document production, it had no idea that the Freyssinet Defendants used their power, position, and money to deceive Hardwire and to steal and subsequently misuse Hardwire's trade secrets while endangering the public in New York.

13.     To take a step back, and by way of background, in the post-September 11, 2001 world, a necessary component of a bid to perform structural cable work on a new bridge construction and/or a bridge retrofitting project is blast and fire protection.

14.     In that regard, prior to the events at issue, firms like the Freyssinet Defendants that were submitting bids to bridge contractors would partner with Hardwire, and Hardwire would provide a fire and blast protection product that the Freyssinet Defendants could include as a component of their structural cable bids.

15.     For example, in 2012, the Freyssinet Defendants bid to provide bridge cables as a component of the replacement of a New York bridge whose name is withheld for security reasons ("**Bridge Project 1**").  The Freyssinet Defendants' bid included bridge armor that Hardwire would provide.

16.     From 2012 until February 2015, Hardwire believed that Freyssinet intended to use its services and products to offer bridge armor solutions for a variety of bridge cable projects.

17.     However, as Mr. Ebaugh has now confirmed under oath (and as substantiated by his Maryland Action document production):

    a.   Despite representing to Hardwire that the companies would work together, in 2013, the Freyssinet Defendants were anxious to find a bridge armor product that could compete with Hardwire.  In fact, the Freyssinet Defendants made clear to Mr. Ebaugh that they did not want to work with Hardwire (which at that time, was the only legitimate bridge armor supplier in the marketplace) because "Freyssinet did not like the fact that one of Hardwire's investors was Peter Emmons, an owner of Structural Technologies, which is a competitor of Freyssinet in the stay cable market" and in the infrastructure repair business.

    b.   In particular, the Freyssinet Defendants anticipated the New York Department of Transportation ("**NYDOT**") commencing a replacement of the K Bridge, and Defendants intended to bid on the cabling work for that job.  In anticipation of that work, the Freyssinet Defendants engaged with Mr. Ebaugh (who had recently been fired from Hardwire) and sought to combine information to "quickly replicate Hardwire's bridge armor . . . ."

    c.   In furtherance of that effort, the Freyssinet Defendants urged Mr. Ebaugh to form his own company, and then provided him with Hardwire's proprietary Integration Designs and Armor Proposals (which had been provided to the Freyssinet Defendants under the protection of a Nondisclosure Agreement between Freyssinet and Hardwire (the "**NDA**")), for Mr. Ebaugh to use, along with Hardwire's Armor Recipe (which Mr. Ebaugh had stolen from Hardwire) to create a competing product.

18.     Ultimately, and as also documented by Mr. Ebaugh under oath, the Freyssinet Defendants successfully misappropriated Hardwire's trade secrets, as well as other confidential and proprietary information, and then used that stolen information to (a) improperly duplicate Hardwire's bridge armor products and designs and (b) undermine Hardwire in the bridge armor market.

19.     The Freyssinet Defendants then used Hardwire's proprietary testing data, which they fraudulently passed off as their own, to secure the K Bridge job under false pretenses. Because armor was a requirement of the K Bridge project, the Freyssinet Defendants' only chance of winning the multi-million dollar job was to (i) use Hardwire as their bridge armor provider, or (ii) misuse Hardwire's stolen information.  However, because Freyssinet had decided previously that it did not want to use Hardwire as its armor provider, theft and misuse of Hardwire's Trade Secrets was its only option.

20.     The Freyssinet Defendants' misconduct was part of a long-term scheme to monopolize the bridge armor market and preclude competition by using the unlawfully obtained confidential, proprietary, and trade secret information to price Hardwire (and others) out of the market and increase the Freyssinet Defendants' own market share in direct violation of federal anti-trust laws.

21.     Armed with Hardwire's proprietary information and Trade Secrets, the Freyssinet Defendants were able to artificially undercut Hardwire's price on the K Bridge project by unlawfully replicating Hardwire's product at an artificially lower cost.

22.     Worse still, although the Freyssinet Defendants improperly utilized Hardwire's technology at the K Bridge, the Freyssinet Defendants and their co-conspirator, Mr. Ebaugh, (i) lacked the knowledge and expertise to effectively implement that technology, (ii) enacted

multiple, improper cost-cutting measures along with manufacturing quality shortcuts, and (iii) intentionally and fraudulently represented that they had properly tested and qualified the armor for use on the bridge, which they did not.

23.     As a result, the Freyssinet Defendants' armor work at the K Bridge is critically flawed and creates a severe and imminent danger to the public and those that use, travel on, and work on or near the bridge spans.

24.     Thus, the Freyssinet Defendants' wrongful and tortious conduct not only caused substantial harm to Hardwire, it has also recklessly created a substantial and ongoing public safety risk that easily could have, and should have, been avoided.

25.     The K Bridge spans have effectively been left unprotected from terrorist, fire, blast, and cutting threats for years, and today, the armor is barely hanging by common pick-up truck cargo straps.

26.     A criminal investigation into these activities in ongoing.

**Maryland Action**

27.     After discovering the Freyssinet Defendants' misconduct, in December 2020 Hardwire amended its Complaint in the Maryland Action to include claims against the Freyssinet Defendants.

28.     Unable to deny its well-documented wrongdoing, Freyssinet USA[1] instead moved to dismiss for lack of personal jurisdiction, asserting that Hardwire's claims against the Freyssinet Defendants needed to be pursued in New York.

---

[1] Hardwire was unable to serve Freyssinet International in France before final adjudication of Freyssinet USA's motion to dismiss.

29.     Ultimately, on August 26, 2021, the District Court in Maryland granted Freyssinet USA's motion to dismiss based on personal jurisdiction grounds.  Specifically, the District Court in Maryland concluded that it lacked personal jurisdiction over Freyssinet USA because "the work for the K Bridge project was conducted in New York and the [] use of Hardwire's confidential information would have occurred in New York . . . ."

30.     Thus, Hardwire now brings this action against the Freyssinet Defendants in this Court (which unquestionably has personal jurisdiction over the Freyssinet Defendants, whose misconduct occurred just a few miles from the courthouse steps).

31.     Through this action, Hardwire seeks to permanently enjoin the Freyssinet Defendants from any further use or dissemination of Hardwire's technology and trade secrets, in addition to an award of compensatory damages to redress Hardwire's losses, exemplary damages pursuant to the DTSA, treble damages pursuant to the Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), Section 1 and 2 of the Sherman Act, 15 U.S.C.A. § 1, *et. seq.*, attorneys' fees, as well as substantial punitive damages to punish and deter the Freyssinet Defendants' willful and intentional misconduct.

## FACTS PERTINENT TO ALL COUNTS

### Background on Hardwire

32.     Founded in 2000 by George Tunis, Hardwire originally developed proprietary technology for the seismic retrofit of buildings and for infrastructure reinforcement applications.

33.     Over the past two decades, Hardwire has greatly expanded its products and services as a result of its substantial investments in research and product development, testing, fabrication, and tooling.  Hardwire invests millions of dollars a year in furtherance of its business and research.

34.     Today, Hardwire's armor manufacturing facilities in Maryland span over 130,000 square feet and enable the Hardwire team to support a myriad of large-scale armor manufacturing programs.

35.     Hardwire develops, tests, and fields armor to protect against a variety of threats, ranging from small arms to improvised explosive devices to blast and fire.  Hardwire designs and manufactures armor for military and law enforcement vehicles, boats, and aircraft, body armor for United States warfighters and law enforcement personnel, and protective materials for public facilities, schools, and courthouses.

36.     Hardwire also maintains product lines designed to protect our nation's critical infrastructure from terrorist and accidental threats.

37.     Since 2002, Hardwire has invested millions of dollars into developing and maintaining its armor technology, trade secret manufacturing processes, facilities, equipment, and ability to provide infrastructure and bridge armor protection.

38.     Hardwire's efforts include significant work with government entities, bridge engineers, and contractors to develop, test, manufacture, and install turnkey solutions for armoring against fire, cutting, blast, explosive cutting, fragmentation, and ballistic threats resulting from either terrorism or accidents.

39.     Because of Hardwire's unique ability to securely deal with counter-terrorism information, address a myriad of differing threat scenarios, and engineer durable and long-lasting material solutions that perform in complex, vibrating, dynamic environments, from 2005 until the Freyssinet Defendant's misconduct, Hardwire was the industry's go-to, sole armor provider that could offer a viable bridge armor solution.  Hardwire's investments and efforts to maintain this competitive advantage and industry-leading role were hard-earned, and as a result, Hardwire

was continually awarded sole-source contracts for bridge security without the need for competitive procurement.

40.    After the Department of Homeland Security's ("**DHS**") extensive review of Hardwire's bridge and infrastructure solutions, DHS awarded Hardwire the coveted SAFETY Act Designation.

41.    Suffice it to say, Hardwire's Trade Secrets have substantial value to any potential competitor.

### Hardwire's Confidential and Proprietary Technology and Trade Secrets

42.    Hardwire maintains more than twenty patents for various applications including, but not limited to, protective systems for vehicles, aircraft, human bodies, infrastructure, and cables.

43.    Most of Hardwire's proprietary technology, products, and solutions, however, are trade secrets that derive independent economic value from not being generally known or readily ascertainable through proper means, rendering the patent process an ineffective means of protection.  Additionally, national security precludes much of this information from being publicly disclosed.

44.    The nature and type of confidential and proprietary information involved in Hardwire's bridge armor offerings can be broadly described as falling into three (3) categories: (a) Armor Recipes, (b) Integration Designs, and (c) Armor Proposals, each of which is described in more detail below (collectively, the Armor Recipes, Integration Designs, and Armor Proposals are referred to as Hardwire's "**Trade Secrets**"):

a. **Armor Recipes:**

    i.  Hardwire's Armor Recipes are highly confidential, and the product of extensive (and extremely expensive) research and development. The precise formula, as well as the level of protection it provides, are never shared publicly, as this would create vulnerabilities for national infrastructure; simply put, disclosure of the details of the armor recipes and what threats they stop must never get into the hands of a bad actor.

    ii.  The Armor Recipes are the key to stopping various threats. The Armor Recipes must be optimized to provide protection against diverse threats, and the materials, hardware, and configurations that make up the Armor Recipes are specifically selected to do this. Weight, cost, durability, and serviceability are critical components of the Armor Recipes, as the primary task of the armor is to protect the bridges without negatively affecting their function and purpose of providing efficient passage of people and cargo.

    iii.  More specifically, Hardwire's Armor Recipes consist of carefully selected materials which typically comprise an inner core, center (fill) material, an outer cover, and specialty hardware. The materials, thicknesses, coatings, connection between, and order of those materials are all aspects of the Armor Recipes that are proprietary to, and closely guarded by, Hardwire.

    iv.  The Armor Recipes are validated through extensive testing processes and procedures. Both modeling and simulation and live fire testing is utilized to demonstrate and validate the recipe's efficacy. The test methods,

protocols, set-up, and results are highly confidential information. Years of research and development is required to successfully execute this work and develop the Armor Recipes.

v. In addition, a key element of designing the Armor Recipe is addressing manufacturability. The materials utilized in Hardwire's Armor Recipes must be available, cost effective, and producible. The materials chosen and the techniques for manufacturing them are critical to the viability of the solution. Suppliers are established that support the manufacturing of these materials, and those suppliers that provide the raw materials are considered proprietary and trade secret. Lessons learned from previous manufacturing jobs, the selected manufacturing techniques and processes, and the tooling required for successful production are all confidential and carefully guarded by Hardwire.

vi. Knowing Hardwire's Armor Recipes would provide a significant advantage to a competitor and would allow them to recreate Hardwire's solutions without having to incur many millions of dollars in development, testing, and modeling expenses, or spend years of time in development.

b. **Integration Designs:**

i. Hardwire's Integration Designs show the scheme for how the armor should be configured to the bridge, integrated with the surrounding bridge / cable systems, and how the armor pieces overlap to provide the necessary protection. Integration Designs are essentially drawings,

blueprints, and/or engineering configurations showing how the armor is put onto the bridge structure.

ii.  The interface between the armor parts, the cable system, and the bridge is critical, and Hardwire's proprietary attachment methods allow for an aesthetically-pleasing, tamper resistant, sleek look that functions in the highly dynamic bridge environment.  The easy installation of the armor is a competitive advantage to Hardwire.  The methods for rigging, installing, and locking the armor in place without damage to the cable are highly confidential and proprietary to Hardwire.

iii. In conjunction with the Integration Designs and drawings, Hardwire's techniques for prototyping and part fit-up are Trade Secret methods for ensuring that the armor integrates as designed.  Installing perfectly sized, custom-made armor onto a bridge (which is moving and vibrating) is extremely challenging.  Hardwire has developed unique, proprietary, and cost-effective ways to mock-up bridge armor shields (before making parts) to ensure the final parts integrate and fit as designed.  This is a way to ensure the renderings are optimized and the parts integrate and function as intended.

iv.  Indeed, significant engineering, design, and development takes place on bridge projects.   This is expensive, and the novel geometries and integrated solutions developed by Hardwire are proprietary.  Solutions, designs (and the rationale for those designs), and drawings are not public

information.  Hardwire has improved its designs over the years utilizing "lessons learned" on many projects.

c. **Armor Proposals**:

    i. Hardwire's Armor Proposals contain, among other things, Hardwire's pricing, which is highly proprietary to the company.  Having Hardwire's pricing and knowledge of costs for materials, manufacturing, tooling, research and development ("**R&D**"), testing, and bids is a huge advantage for a competitor.

    ii. Knowing the pricing and the pricing methodology allows someone to undercut Hardwire's bid price and win a job.  Additionally, armor pricing is based upon thickness and part length.  Once pricing information is known, it can be applied to other bridge projects as well.

    iii. Having Hardwire's Armor Proposals also gives a party access to past performance and contract data, as these projects are not known to the public.  It gives credibility to a contractor.

    iv. Armor Proposals also contain project-specific technical data that is critical to the execution of the work.  Beyond the Armor Recipe, Renderings and pricing, such project-specific data may include information such as system weights, part thicknesses, part lengths, installation details and methods, materials used, quality plans, performance data, validation plans, delivery details, and construction methods for the project.

45.    To be sure, improperly obtaining any of this information  would provide a huge advantage to a competitor.

46.    If a competitor obtained all three categories of information from Hardwire, it would be fatal to Hardwire's bridge armor business.  Indeed, when these three categories are combined, a competitor has everything it needs to duplicate Hardwire's proprietary armor, configure the armor on a structure, and (wrongfully) compete in the market for bridge armor contracts.

47.    Put differently, a party in possession of Hardwire's Armor Recipes, Integration Designs, and Armor Proposals would know how to make the armor, how to integrate and install it, and how to price the armor to win the manufacturing job.

48.    Consequently, Hardwire takes extensive efforts to protect its Trade Secrets, and other confidential and proprietary information.

49.    For example, and among other things, Hardwire maintains the following significant security protocols:

a.  Hardwire facilities are always locked, including during normal business hours. Access to the facilities is only available through a Hardwire-issued key card (electronic fob).  Visitors may be "buzzed" in through the electronic system, in which case they are required to sign in, present proof of identity and citizenship, and complete a nondisclosure agreement prior to entry.  Once inside, visitors are escorted at all times.

b.  Hardwire keeps classified government information locked in a safe, in an encrypted classified computer, or in an appropriate employee's possession at all times. The safe and classified computers are in a separate office where anyone entering or exiting the room is visible to a number of other employees.

c.  The company's confidential information is stored securely on Hardwire computer equipment, locked within Hardwire facilities, or maintained in an appropriate employee's possession.

d.  Among employees, the dissemination of Hardwire's trade secret information is on a "need-to-know" basis.  In that regard, trade secret information stored on Hardwire's system is not accessible to all employees.  Instead, employees are given network access to folders based on their job function and level of responsibility.

e.  Cameras monitor Hardwire's buildings and grounds 24 hours a day, 7 days a week, through an alarmed system.

f.  At Hardwire's request, the Pocomoke City Police Department makes routine checks of the Hardwire property during and after normal business hours.

50.  The foregoing policies, among others, are set forth in Hardwire's Company Handbook, provided to all employees, in addition to being maintained on Hardwire's intranet site.

51.  Hardwire also maintains a Code of Conduct, which provides, among other things:

> Nonpublic information regarding the Company, its businesses, Covered Persons, customers or suppliers is confidential.  As a Covered Person you are entrusted with such confidential information.  You are only to use such confidential information for the business purposes of the Company for which they were intended.  Confidential Information should not be shared with anyone outside the Company, including customers, suppliers, family or friends, or other Covered Persons who do not need the information to carry out their duties, except when disclosure is authorized by the CEO or legally mandated.

52.    In addition, each Hardwire employee signs an Employee Agreement, acknowledging their obligation to keep Hardwire's trade secrets and other confidential and proprietary information in confidence.

53.    Furthermore, third parties working with Hardwire are required to execute nondisclosure agreements, like the NDA, pursuant to which they agree to maintain the strict confidentiality of Hardwire's Trade Secrets and other confidential and proprietary information.

### Hardwire's Employment of Mr. Ebaugh

54.    Mr. Ebaugh began working for Hardwire on or about June 1, 2002.

55.    Mr. Ebaugh's initial role with the company required him to establish and maintain Hardwire's IT system.  At all times during his employment, Mr. Ebaugh was one of two system administrators, affording him access to Hardwire's entire computer network and facilities.

56.    Throughout his time at Hardwire, Mr. Ebaugh's role expanded and grew, with Ebaugh eventually being promoted to serve as Vice-President and Program Manager for Hardwire's bridge security division.

57.    As a condition of and in connection with his continued employment with Hardwire, on November 1, 2007, Mr. Ebaugh signed a "Confirmation and Acceptance" of Hardwire's Company Handbook, as described above.

58.    Furthermore, as a condition of and in connection with his continued employment with Hardwire, on July 28, 2009, Mr. Ebaugh signed Hardwire's Employment Agreement, which provides, among other things:

> During [Mr. Ebaugh's] employment with [Hardwire] and solely as a result of such employment, Employee will be given access to, will become familiar with, and will acquire knowledge of the Company, its technology, Customers, operations, pricing methods, as well as other Confidential Information of the Company and its Customers. Employee recognizes that he will become a primary

contact with the Company's Customers and will develop close relationships with, gain special knowledge of, and engage the loyalty of said Customers. This Confidential Information, as well as the Company's goodwill of its Customers, ha[s] been and will continue to be developed through the Company's investment of substantial time, effort and money. Employee recognizes that disclosure or use by him of Confidential Information in competition with the Company would be greatly prejudicial and detrimental to the Company and would cause it to suffer immediate and irreparable injury. Employee further recognizes that he is in a position to unfairly convert the Company's business, technology, Customer accounts and its goodwill for his own use or for use by other persons and entities which are in competition with the Company, and that this would be greatly prejudicial and detrimental to the Company, and would cause it to suffer immediate and irreparable injury.

See Employment Agreement, Recitals, ¶ B.

59.    The Employment Agreement further provides:

**Non-Disclosure of Confidential Information**. It is imperative that all Confidential Information be held in strictest confidence. Confidential Information shall not be copied, electronically transferred (including but not limited to downloaded in any form, emailed, sent through the internet, or otherwise electronically copied or sent) or removed from the Company's premises or deleted without the specific authorization of the Company. At no time, either during Employee's employment or after the termination of his employment, shall Employee, directly or indirectly disclose, reveal or use for himself or others, or aid others in obtaining, any Confidential Information, other than as may be required in the performance his duties for and as expressly authorized by the Company.

Id., ¶ 3.

60.    Furthermore, the Employment Agreement contains a limited restrictive covenant that provides:

A.  During Employee's employment and for a one (1) year period following termination of Employee's employment with the Company, Employee shall not, on behalf of himself, or in any

capacity whatsoever for any entity or person, other than the Company, directly or indirectly, contact, solicit, market, sell to, consult with or perform any services whatsoever for and/or in conjunction with any Customer with whom Employee has had any contact during his employment with the Company, with respect to any product or service that relates to the Business of the Company, and further, Employee shall not encourage, induce or urge any Customer to cease doing business with the Company.

B. This prohibition against indirectly contacting, soliciting, marketing or selling to any Customers means that Employee shall not provide information to any entity or person regarding any Customer; introduce any entity or person to any Customer; advise, suggest or encourage any Customer that it should do business with any entity or person other than the Company, participate in the supervision and management of any of the accounts of or relating to any Customer; participate in the consultation of any Customer; participate in the development or implementation of any strategies and decisions affecting any Customer; and in any way, state or imply to any Customer that doing business with any entity or person during the restrictive period will inure to Employee's present or future benefit.

Id., ¶ 4.

61. In Mr. Ebaugh's capacity as a system administrator, he had unrestricted access to Hardwire's confidential and proprietary information, trade secrets, and financial data.

62. Moreover, in his role as Vice-President and Program Manager for Hardwire's bridge security division, Mr. Ebaugh had sufficient background, training, and experience to understand the significance and propriety of Hardwire's Armor Recipes and Integration Designs, as well as in-depth knowledge and understanding of Hardwire's test devices and testing methodology, threat information, manufacturing processes, pricing models, and subcontractor information. Mr. Ebaugh is not an engineer, and he acquired all of this knowledge and information during his tenure as a Hardwire employee.

## Mr. Ebaugh's Work with Freyssinet While Employed by Hardwire

63.     During Mr. Ebaugh's tenure at Hardwire, he was involved in Hardwire's efforts to develop and provide bridge armor (including fire and blast protection) to bridge manufacturing and construction companies.  Beginning in 2012, this included the Freyssinet Defendants.

64.     The Freyssinet Defendants are affiliates within the global "Freyssinet" structural engineering firm that manufactures and installs structural cables, such as those on a cable-stayed bridge.  Firms like the Freyssinet Defendants bid to obtain the cable installation work on new bridge projects.

65.     Freyssinet is a subsidiary of the powerful construction conglomerate, Vinci. Vinci is Europe's biggest construction and concessions firm.  Vinci has as trailing 12-month revenue of $57 billion and market capitalization of $56 billion.

66.     As noted above, in the post-September 11, 2001 world, a necessary component of a bid for such structural cable work is blast and fire protection.  In that regard, firms like the Freyssinet Defendants would partner with Hardwire, and Hardwire would provide a fire and blast protection product that the Freyssinet Defendants could include as a component of structural cable bids.

67.     Hardwire and the Freyssinet Defendants anticipated that Hardwire would provide bridge armor services for the Freyssinet Defendants to include with its bridge cable proposals for bridge projects.

68.     In that regard, during Mr. Ebaugh's final months at Hardwire, he was involved in negotiating the terms of an exclusive Technical Cooperation and Commercial Agreement ("**TCCA**") between Freyssinet and Hardwire, whereby Hardwire would integrate its bridge armor product onto a generic Freyssinet structural cable, such that going forward, the two parties

could be ready to quickly respond to opportunities to bid on structural cable work as new bridge construction projects came to market.

69.    In furtherance of those efforts, Mr. Ebaugh caused Hardwire to enter the NDA with Freyssinet International.

70.    Under the NDA, Freyssinet International acknowledged that in connection with its work with Hardwire it would receive access to Hardwire's proprietary and confidential information.

71.    By signing the NDA, Freyssinet International agreed to protect and not disclose Hardwire's confidential and proprietary information for a period of no less than five (5) years.

72.    The NDA further provides that the prohibition on disclosure extended to Freyssinet International's "directors, officers, employees, agents, and advisors" who may receive the confidential information only after they "have been advised of and agreed to the restrictions on disclosure and use contained in this [NDA.]"

73.    Shortly after execution of the NDA, Ebaugh, on behalf of Hardwire, also entered into a Memorandum of Understanding ("**MOU**") with Freyssinet International pursuant to which it was agreed that "Freyssinet [would] not enter into other Agreements or MOUs with any other parties offering blast and/or ballistic protection characteristics . . .. "

74.    The MOU was executed by Drew Micklus, the Chief Operating Officer of Freyssinet USA, as the "local representation" of Freyssinet International.

75.    At all relevant times, Freyssinet USA, and in particular Mr. Micklus, was acting as the agent and representative of Freyssinet International and facilitating the negotiation and execution of the NDA and MOU.

76.    In fact, Mr. Micklus was always the "point of contact" for both Freyssinet USA and Freyssinet International, and was certainly aware of the contents, obligations, and requirements under the NDA and MOU.

77.    According to Mr. Ebaugh, during his time at Hardwire he developed a "close working relationship" with Mr. Micklus.

**Hardwire's Termination of Mr. Ebaugh**

78.    In late 2012 and early 2013, Mr. Ebaugh's attitude around the office became increasingly negative.    Despite Hardwire's efforts to address Mr. Ebaugh's attitude and demeanor, the situation became untenable, such that on February 25, 2013, Hardwire terminated Mr. Ebaugh from his employment with Hardwire.

79.    Specifically, at 9:45 a.m. on February 25, 2013, Mr. Ebaugh was taken to a first-floor conference room to meet with Hardwire's CEO, Mr. Tunis, and HR Director, Ryan Wendell.    Upon entering the room, Mr. Tunis advised Mr. Ebaugh that it would be Mr. Ebaugh's last day of employment.    In response, Mr. Ebaugh exclaimed "I'm out" and ran upstairs to his office.

80.    Mr. Tunis followed Ebaugh to his office, and Mr. Ebaugh began yelling at Mr. Tunis and physically coming into contact with him.    Mr. Ebaugh's angry outbursts continued for several minutes until Mr. Ebaugh finally left Hardwire's facility.    At the time of his departure, Mr. Ebaugh refused to comply with Mr. Tunis' requests that Mr. Ebaugh leave his notebook behind and/or let Hardwire review the notebook before his departure.

81.    Mr. Ebaugh also took a Hardwire thumb drive with him as he was leaving the building.    At the time, Hardwire was unaware of the thumb drive's contents.    As set forth below, Hardwire subsequently learned that Mr. Ebaugh repeatedly and systemically downloaded

Hardwire's confidential data and trade secrets onto the thumb drive in anticipation of his termination or resignation.

82.    Consistent with Hardwire's policy, immediately after Mr. Ebaugh's separation, Mr. Ebaugh's access to Hardwire's buildings and network were terminated.  Mr. Ebaugh's computer was also examined, at which time Hardwire learned that most of Mr. Ebaugh's company e-mails (including his personal storage table or .pst file) and files had been erased before, and likely in anticipation of, his termination or resignation.  During that computer review, Hardwire learned that Mr. Ebaugh's computer had been essentially wiped clean by Mr. Ebaugh.

83.    Mr. Ebaugh's computer was taken by Hardwire's other system administrator and maintained in a desk drawer for the next two years without use except to determine what files may still exist on the computer.

84.    After Mr. Ebaugh refused to respond to post-termination inquiries from Hardwire, on March 5, 2013, Hardwire's counsel sent a letter to Mr. Ebaugh, reminding him of his post-employment obligations and restrictive covenants, as well as his obligation not to disclose Hardwire's confidential and proprietary information.  Counsel also reminded Mr. Ebaugh of his obligation to complete a security clearance debriefing form and demanded the return of any Hardwire materials that were in Mr. Ebaugh's possession.

85.    Ultimately, on March 17, 2013, Mr. Ebaugh signed and returned (i) the security clearance debriefing form, in which he acknowledged his obligation to never "divulge, publish, reveal (by writing, spoken word, conduct or otherwise) any classified information or activity to any unauthorized person," and (ii) the Hardwire thumb drive.

86.    Hardwire reviewed the thumb drive after it was returned.  At first glance, it appeared to contain no files and little useful information, and it did not appear that Mr. Ebaugh misappropriated confidential files or trade secrets.

87.    As Hardwire came to learn, however, Mr. Ebaugh, through his experience as IT director for Hardwire, intentionally manipulated the thumb drive prior to its return and Hardwire's review of its contents.

88.    In fact, and as Hardwire discovered years later, Mr. Ebaugh had stolen confidential and proprietary materials, including Hardwire's Trade Secrets, from Hardwire.

**Hardwire's Relationship with the Freyssinet Defendants Following Mr. Ebaugh's Termination**

89.    After Mr. Ebaugh's termination, the Freyssinet Defendants stopped responding to Hardwire's communications about proposed collaborations and never signed the TCCA.

90.    It therefore appeared to Hardwire that the Freyssinet Defendants had diminishing interest in a formal agreement with Hardwire with respect to collaboration on bridge projects.

91.    Around the same time, Mr. Ebaugh changed his LinkedIn profile to reflect a new company, "Phase 2 Infrastructure Protection."

92.    Hardwire was not familiar with this entity, and it appeared to be Mr. Ebaugh's own venture.  (Note the company name on Mr. Ebaugh's LinkedIn profile was eventually changed to Infrastructure Armor ("**IA**").)

93.    Rather, as a result of Mr. Ebaugh's LinkedIn postings, in or around September 2013, Hardwire suspected that Mr. Ebaugh may try to work with a bridge contractor, Kiewit, to work on infrastructure projects.  Thus, Hardwire contacted Kiewit to advise of Mr. Ebaugh's non-compete obligations.

94.     Meanwhile, because the Freyssinet Defendants had ceased responding to Hardwire's overtures about forming an exclusive relationship, in the summer of 2013, Hardwire established a different partner, Structural Technologies ("**ST**"), with whom it would collaborate for bridge protection projects.  ST is associated with VSL International ("**VSLI**"), another bridge cable manufacturer and installer.

95.     Notably, however, this new collaboration was not exclusive and did not preclude Hardwire / ST from also working with Freyssinet (or other cabling companies) on bridge jobs.

96.     Stated differently, Hardwire had every intention and desire to continue trying to work with the Freyssinet Defendants (or other cabling companies) in the event that such companies received cabling work on any bridge projects.

97.     In fact, Hardwire wanted to maintain its working relationship with the Freyssinet Defendants and continued to make efforts to work with the companies.

98.     As such, in or around December 2013, Hardwire provided the Freyssinet Defendants with an initial proposal for the armor shielding contract on a new project for which bids were soon being accepted—the K Bridge project.

99.     The proposal was provided pursuant to the NDA and Hardwire anticipated that the Freyssinet Defendants and Hardwire would work together in bidding that specific construction project, as well as other projects going forward.

100.    Proposals were also subsequently updated and provided to Freyssinet in July and November 2014 for the K Bridge.

101.    Meanwhile, Hardwire heard nothing further about Mr. Ebaugh's new venture until mid-2014, after Ebaugh's non-compete had ended (one year after his termination or February 25, 2014).

102.    At the time, Hardwire suspected that Ebaugh may be working to establish a competing venture.

103.    Hardwire had no reason to believe, or any basis to know, that it was the Freyssinet Defendants that were using Mr. Ebaugh as a pawn in its nefarious plot to steal Hardwire's technology and push Hardwire out of the bridge armor market.

104.    However, as later discovered by Hardwire in the Maryland Action, it was at the Freyssinet Defendants' urging and with their support (financial and otherwise) that Mr. Ebaugh established a new company, IA, to directly compete with Hardwire by using Hardwire's products, technology, and other trade secrets.

**Precursor to Freyssinet's Misappropriation of Hardwire's Trade Secrets on the K Bridge**

105.    In May 2014, the New York State Department of Transportation ("**NYDOT**") awarded a contract to build a replacement of the first span of the K Bridge to a design-build team comprised of Skanska AB, Kiewit, ECCO III, and HNTB Corporation.

106.    The K Bridge project was handled in two separate phases, the first span and the second span of the bridge.  The first span was handled by the team referenced above.

107.    After obtaining the contract, the design-build team needed to retain the services of, among other things, a company to manufacture and install structural cables for the first span of the K Bridge.

108.    Whether directly, or through use of a subcontractor, the company selected to install the structural cables needed to have those cables properly secured with armor, such as that offered by Hardwire.  Specifically, the winning contractor was required to provide third-party, qualified test data on K Bridge armor production parts within 120 days of contract award.

109.    The two prime candidates to win the cabling portion of the job were the Freyssinet Defendants and VSLI's licensee VSL. The armor shielding would be sourced through one of these companies.

110.    The Hardwire/ST team collaborated to bid on the armor protection and cable construction for the first span of the K Bridge job through VSL.

111.    However, not wanting to lose the opportunity to work with the Freyssinet Defendants if they were to win the cabling contract, and at Freyssinet's requests, Hardwire also submitted a proposal to the Freyssinet Defendants (pursuant to the NDA) to supply the armor and fire protection for the first span of the K Bridge project.

112.    Hardwire ultimately lost the opportunity, as the Freyssinet Defendants won the cabling work and chose not to use Hardwire for the armoring.

113.    At the time, Hardwire suspected, and its investigation at that time reflected, that Hardwire lost the opportunity as a result of Mr. Ebaugh and IA's wrongful conduct.

114.    Discovery in the Maryland Action, however, painted a much different picture.

### 2013

115.    The Freyssinet Defendants began to implement their illicit scheme with Mr. Ebaugh in early 2013, immediately after he was terminated as a Hardwire employee.

116.    Notwithstanding the Freyssinet Defendants' awareness that Mr. Ebaugh had been terminated from Hardwire (and, in fact, that he remained unemployed), Mr. Micklus remained in constant contact with Mr. Ebaugh throughout 2013.

117.    As Hardwire came to learn, during the time that Hardwire believed that the Freyssinet Defendants had simply become nonresponsive about collaborating with Hardwire, the

Freyssinet Defendants were, in fact, working with Mr. Ebaugh to lay the groundwork on the plan to defraud Hardwire and misappropriate Hardwire's trade secrets.

118.    More specifically, and as confirmed and stated in Mr. Ebaugh's sworn testimony (and substantiated through his document production):

a.    "In the Spring or Summer of 2013, Mr. Micklus began suggesting to me that Freyssinet may be interested in hiring me directly to deliver, or placing me with a third-party company through which I could deliver, bridge armor that could compete with Hardwire's offerings."

b.    In particular, Mr. Micklus was aware that "the New York Department of Transportation ("NYDOT") would be commencing a replacement of the K Bridge in New York in the coming months, and that Freyssinet would be seeking to be awarded the cabling work for that job."

c.    "Mr. Micklus made very clear that Freyssinet did not want to work with Hardwire.  Mr. Micklus did not make any promises but led me to believe that if I could deliver an equivalent bridge armor product at a competitive price, that he would cause Freyssinet to purchase bridge armor from me, rather than Hardwire."

d.    "Mr. Micklus indicated that Freyssinet did not like the fact that one of Hardwire's investors was Peter Emmons, an owner of VSL, which is a competitor of Freyssinet in the stay cable market."

119.    The Freyssinet Defendants were, of course, aware that Mr. Ebaugh did not have his own bridge armor product to provide and, as Mr. Ebaugh himself attested, "a sophisticated international business entity in the structural engineering business [like Freyssinet] would have been aware that it takes years to develop both an armor formula and an armor design that will

28

meet the rigorous protection requirements, testing qualifications, and long term service life that are imposed by the NYDOT."

120.    Thus, there was absolutely no way for Mr. Ebaugh to deliver (or for the Freyssinet Defendants to independently develop) a bridge armor product in time to bid on the K Bridge job without stealing from Hardwire.

121.    And, in fact, that's precisely what Mr. Ebaugh and the Freyssinet Defendants sought out to do.  As confirmed by Mr. Ebaugh, "[b]etween Freyssinet and myself, we were able to combine information to quickly replicate Hardwire's bridge armor and deliver a bridge armor product that would compete with Hardwire's bridge armor."

122.    Put simply, and described in more detail below, Mr. Ebaugh brought the stolen Hardwire Armor Recipe to the table while Freyssinet brought the misused Hardwire Integration Designs and Hardwire Proposals to the table.   Together, they had all the information and Trade Secrets needed to cut Hardwire from the market.

123.    The Freyssinet Defendants' efforts included trying to obtain as much information from Hardwire as possible.  For example, and as confirmed in sworn testimony by Mr. Ebaugh, "Mr. Micklus advised that he needed to obtain as much information as possible from Hardwire before Hardwire found out that Freyssinet was going to exclusively work with [Mr. Ebaugh] to develop bridge armor."

124.     On one phone call in particular between Mr. Ebaugh and Mr. Micklus, Mr. Micklus stated something to the effect of: "we need to get as much information as we can from Hardwire now, because once Hardwire finds out we are working with you, Hardwire will no longer share information with us."

125.    In May 2013 and into early 2014, Mr. Micklus begin responding (albeit sporadically) to Hardwire again, suggesting that the Freyssinet Defendants remained interested in working with Hardwire.

126.    As Hardwire subsequently learned during the Maryland Action, this was nothing more than an effort by Mr. Micklus to obtain information from Hardwire that he could then improperly use and/or pass along to Mr. Ebaugh.

127.    Meanwhile, the Freyssinet Defendants kept up the ruse of pretending to work with Hardwire, despite their obvious intention to steal from Hardwire and recreate its products with Mr. Ebaugh.

128.    In early December 2013, for example, Mr. Micklus specifically requested a quotation from Hardwire for the K Bridge job.

129.    At the same time, however, Mr. Micklus coordinated a meeting between his supervisors at Freyssinet and Mr. Ebaugh to discuss how best to move forward with their scheme to steal Hardwire's technology and recreate its products. Specifically, on Friday, December 6, 2013, Mr. Ebaugh met with Mr. Micklus along with Manuel Peltier (currently the CEO of Soletanche Freyssinet SAS and then the CEO of Freyssinet International) and Erik Mellier (Freyssinet International's Major Projects Director) to finalize their fraudulent plans.

130.    Ironically, as members of Freyssinet's Governance Board, Mr. Peltier and Mr. Mellier would be charged with compliance with Vinci's (Freyssinet's corporate owner) principles, which includes "Comply with ethical principles." However, these individuals clearly and intentionally disregarded the Vinci Code of Ethics and Conduct.



131.    Indeed, the Freyssinet Defendants had long since decided that they did not want to work with Hardwire because Peter Emmons held a minority interest in the company.

132.    That same day of the Freyssinet leadership meeting, on December 6, 2013, an unknowing Hardwire responded to Mr. Micklus' request and submitted a confidential quote to provide bridge armor for the first span of the K Bridge under NDA.

**2014**

133.    Mr. Micklus and Mr. Ebaugh were at all times careful to try and "keep up appearances."

134.    Mr. Ebaugh and Freyssinet were both well aware of Ebaugh's noncompete period with Hardwire, which extended until February 25, 2014.  However, for Mr. Ebaugh's part, by his own admission under oath, "[a]lthough [he] was mindful of [his] non-compete agreement with Hardwire, [he] was not concerned about sharing Hardwire's armor formula with Freyssinet after [his] non-compete agreement expired."

135.    Moreover, "to expedite the development of a competing bridge armor product once [Mr. Ebaugh's] non-compete period with Hardwire ended, [he] heeded Mr. Micklus' advice to gather as much information as possible so as to hit the ground running at the end of February 2014 (when [Mr. Ebaugh's] non-compete period was set to expire)."

31

136.    Furthermore, despite the fact that Mr. Micklus and Mr. Ebaugh had been laying the groundwork on their new scheme for months (and had a full team meeting with Mr. Mellier and Mr. Peltier two months earlier), on February 25, 2014, Mr. Micklus sent Mr. Ebaugh an e-mail indicating that he had that date calendared as the "end of [Mr. Ebaugh's] non-compete clause with Hardwire."

137.    Although Mr. Micklus and Mr. Ebaugh feigned concern for Mr. Ebaugh's non-compete clause, they had no concern whatsoever for Mr. Ebaugh's confidentiality obligations, nor for the Freyssinet Defendants' obligations under the NDA.

138.    And despite Mr. Micklus purportedly reaching out on February 25, 2014 to "start" a discussion with Mr. Ebaugh, the two met the very next day in person.  As Mr. Ebaugh has confirmed, on "February 26, 2014, [he] met with Michael Louis and Drew Micklus at Freyssinet's office in Virginia to discuss the launch of [his] new company, which would be engaged by Freyssinet to deliver fire and blast protection to include in Freyssinet's bid for the cabling work on the K Bridge."

139.    Around that same time, and at Mr. Micklus' direction, Ebaugh reviewed with Freyssinet a draft TCCA and Non-Disclosure Agreement that were **identical** to the agreements that Hardwire had previously negotiated with the Freyssinet Defendants (the only significant difference being that Hardwire's name was replaced with IA throughout the documents).

140.    As noted above, and as stated under oath by Mr. Ebaugh, "Mr. Micklus was aware that it would be extremely difficult for IA, as a brand-new company, to quickly deliver a bridge armor product 'from scratch.'  Thus, at every opportunity, Mr. Micklus sought to assist in expediting [Mr. Ebaugh's] delivery of competing bridge armor technology."

141.    According to Mr. Ebaugh, for example, "on March 3, 2014, Mr. Micklus e-mailed [Mr. Ebaugh] some of the bridge armor renderings that [the Freyssinet Defendants] had previously received from Hardwire. These show how the Hardwire armor is installed and fits onto the Freyssinet stay cable system."

142.    By way of another example, in early March 2014, just before the K Bridge project was formally announced, another bridge project in California ("**Bridge Project 2**") was being developed.

143.    Freyssinet had bid for the cabling work on Bridge Project 2 and had been requesting information from Hardwire to include in that bid.

144.    According to Mr. Ebaugh, "as Freyssinet was preparing to bid on the K Bridge project, Mr. Micklus offered to provide [Mr. Ebaugh] with information obtained from Hardwire in connection with its bid to provide bridge armor services on [the Bridge Project 2]."

145.    Any information that Mr. Micklus received from Hardwire concerning Bridge Project 2 would be highly confidential and it was in violation of the NDA to provide such information to Mr. Ebaugh.

146.    Nevertheless, "Mr. Micklus received Hardwire's bid information for [Bridge Project 2] and subsequently provided the details from Hardwire's proposal to [Mr. Ebaugh]."

147.    According to Mr. Ebaugh, once he received Hardwire's proprietary information from the Freyssinet Defendants, he "was able to more expeditiously take Hardwire's armor formula to material suppliers and [Mr. Ebaugh's] manufacturer (Vectorworks) to duplicate Hardwire's armor."

148.    The efforts to steal information from potential bridge manufacturers continued as Mr. Ebaugh and the Freyssinet Defendants worked together. For example, "[o]n March 14,

2014, [Mr. Ebaugh] e-mailed Mr. Micklus a list of information to gain from other competitors, including elements such as pricing, materials, manufacturing methods, and test data." A true copy of Mr. Ebaugh's March 14, 2014 e-mail is attached as **Exhibit A**.

149.    According to Mr. Ebaugh, "[i]t was understood that Freyssinet and IA would use that information to ensure that [their] bid for the K Bridge project was better in all respects than the competition."

150.    On May 9, 2014, Freyssinet and IA finalized and entered into their own Technical Cooperation and Commercial Agreement (the "**IA Exclusivity Agreement**").  As noted above, the IA Exclusivity Agreement was nearly identical to the one that Freyssinet had negotiated with Hardwire but never signed.

151.    That same day, an NDA was entered into between IA and the Freyssinet Defendants.  The NDA used was nearly identical to the one that Freyssinet had negotiated with Hardwire.

152.    The IA Exclusivity Agreement provides that IA will be the exclusive supplier to the Freyssinet Defendants for protective armor shielding.  Specifically, Section 3.1 of the IA Exclusivity Agreement provides that:

> During the term, Freyssinet and its Affiliates (as defined herein) appoint IA as its exclusive supplier:
>
> (i)    on a worldwide basis including the USA for threat protection products, technology and services for cable stayed structures and shall purchase all of its requirements for threat protection products, technology and/or services from IA for cable stayed structures (including, but not limited to, IA stay production and IA stay technology); and
>
> (ii)    in all territories other than the USA for threat protection products, technology and/or services for non-cable stayed structures and shall purchase all of its requirements for threat protection products, technology and/or services from IA for

non- cable stayed structures (including. but not limited to, IA non-stay products and IA non-stay technology); all on terms to be negotiated in good faith by the Parties.

153.    Thus, as of May 9, 2014, the Freyssinet Defendants[2] were contractually bound to use IA as its exclusive supplier when bidding on bridge construction projects.  This would include the K Bridge project.

154.    Under this IA Exclusivity Agreement, IA would demonstrate stay cable protection on generic Freyssinet cable systems and execute testing on prototype parts.  The agreement specified that Ebaugh would execute milestones, funded by Freyssinet, demonstrating the viability of the armor shielding product(s) for Freyssinet's cable system(s).  IA would be paid for the execution of this work.  Significantly, the original intent of this IA Exclusivity Agreement was to execute prototype testing.  This would essentially prove out the first articles (i.e. Hardwire's armor concepts stolen by Ebaugh) but it was never intended to qualify an armor system for one particular production job.  Stated differently, the IA Exclusivity Agreement was not specific to the K Bridge.

155.    On May 18, 2014, just days after entering the IA Exclusivity Agreement, Mr. Ebaugh bragged that the "agreement essentially makes IA Freyssinet's sole/exclusive manufacturer and Freyssinet IA sole/exclusive buyer in the stay cable markets."

156.    Mr. Ebaugh further explained at that time that pursuant to the IA Exclusivity Agreement, IA and the Freyssinet Defendants sought to obtain a "large project in NYC which

---

[2] Section 10 of the IA Exclusivity Agreement provides that "affiliate" includes any "any other entity; (a) in which FREYSSINET directly or indirectly controls at least fifty percent (50%) of the registered capital or rights to vote; or (b) which FREYSSINET directly or indirectly controls at least fifty percent (50%) of the registered capital or rights to vote of such; or (c) of which an entity as mentioned in b) above controls directly or indirectly at least fifty percent (50%) of the registered capital or rights to vote."

has been successfully secured by the Kiewit/Skanska team who are favorable to Freyssinet products" and their "main competition is VSL who is aligned with Hardwire."

157.    Accordingly, as of May 2014, IA Parties and Freyssinet Defendants all had the understanding—and were, in fact, contractually bound—that they would bid the K Bridge project together, and if Freyssinet won the cabling job, then IA would be the armor provider.

158.    At no time prior to IA Parties' production of documents in the Maryland Action was Hardwire aware of the existence of the IA Exclusivity Agreement.

159.    After signing the IA Exclusivity Agreement, Mr. Micklus began including Mr. Ebaugh on internal meetings with the Freyssinet team.

160.    Moreover, Mr. Micklus took many steps to expedite IA's ability to deliver bridge armor that would replicate Hardwire's product.

161.    On June 17, 2014, for example, Mr. Micklus forwarded Mr. Ebaugh an e-mail from his internal Freyssinet team that included two (2) drawing files.  The drawings contained Hardwire's confidential Integration Designs showing how Hardwire's armor integrated on a Freyssinet cable system.  "Hardwire Blast Protection" was specifically shown in these Freyssinet CAD drawings.  A true copy of Mr. Micklus' June 17, 2014 e-mail (with the confidential drawings removed) is attached as **Exhibit B**.

162.    Also, on June 17, 2014, Mr. Micklus forwarded Mr. Ebaugh an e-mail from his internal Freyssinet team that included eleven (11) attachments that were created by Hardwire and showed the Hardwire Integration Designs on a typical, generic Freyssinet cable structure.

163.    Later that day, Mr. Ebaugh forwarded those attachments to Vectorworks and directed it to—quite ironically—"keep these drawings and concepts Confidential." A true copy

of Mr. Ebaugh's June 17, 2014 e-mail (with the confidential drawings removed) is attached as **Exhibit C**.

164.    Notably, with the Integration Designs from Hardwire, Freyssinet only had part of the information necessary to truly duplicate Hardwire's bridge armor.  Mr. Ebaugh had the other part of the key information, *i.e.*, the Armor Recipes.  During their work together, Hardwire never shared the details of the Armor Recipes (for example, elements such as material configuration, internal geometry, component thicknesses) with the Freyssinet Defendants.  With those pieces of misappropriated information together, the co-conspirators were literally in a position to duplicate Hardwire's bridge armor (as Hardwire suspected prior to November 2020 that Mr. Ebaugh had been doing on his own).

165.    Mr. Ebaugh confirmed that with the "drawings provided by Freyssinet, [he] began working with Vectorworks to develop models and recreate the drawings.  Now with both the Hardwire integration drawings from Freyssinet and armor formula, [Mr. Ebaugh] was in a position to be able to transition to the manufacturing process more quickly."

166.    As confirmed by Mr. Ebaugh, "[a]n example of this is reflected in [Mr. Ebaugh's] June 19, 2014 e-mail exchange with Vectorworks," a copy of which is attached as **Exhibit D**.

167.    Of significance, Vectorworks was a manufacturing subcontractor with which Ebaugh had worked during his tenure as a Hardwire employee.  Vectorworks became Ebaugh's bridge armor manufacturing partner in his IA endeavors.

168.    The Freyssinet Defendants and Mr. Ebaugh's efforts continued over the next few weeks and months.  For example, "on July 9 and 10, 2014, Mr. Micklus and [Mr. Ebaugh] exchanged e-mails concerning an in-person meeting to work on pricing and the overall proposal.  During that exchange, Mr. Micklus informed [Mr. Ebaugh]: 'FYI Zach and Ed Fyfe want to call

me on Fri AM.  I said we should speak at 11AM so you can listen is as a fly on the wall.'  [Mr. Ebaugh] responded and asked, 'What are the chances of you pushing your meeting with Fyfe to a time next week when you have numbers from Hardwire?'"  A true copy of the July 9-10, 2014 e-mail exchange is attached as **Exhibit E**.

169.    Indeed, throughout that time period, per Mr. Ebaugh, Mr. Micklus was sharing information the Freyssinet Defendants "received from others submitting bids for armor with [IA] in order to improve [their] bid for the cabling work on the K Bridge project."

170.    For example, on July 15, 2014, Mr. Micklus forwarded Schirmen Technologies' proposal to Mr. Ebaugh.  Schirmen Technologies was another armor shielding competitor, albeit one that was not in a position to win the K Bridge job.  A true copy of Mr. Micklus' July 15, 2014 e-mail is attached as **Exhibit F.**

171.    The next day, Mr. Micklus sent Mr. Ebaugh excerpts from a previous draft of Freyssinet's K Bridge proposal, which included Hardwire's drawings / renderings and Hardwire's past experience.  Mr. Micklus told Mr. Ebaugh to use that as "a template and make it easier to cut/paste into our proposal on Friday".  Thus, the Freyssinet Defendants were literally instructing IA Parties to "cut/paste" Hardwire's confidential and proprietary information so that the Freyssinet Defendants could pass it off as though it was their own.

172.    Worse still, Micklus continued on that they "should pad the Appendix with enough technical data to give SKE confidence that we know what we are doing."  A true copy of Mr. Micklus' July 16, 2014 e-mail to Mr. Ebaugh is attached as **Exhibit G**.

173.    This, of course, was a tacit admission by Freyssinet that IA did not, in fact, "know what [they were] doing" but, rather, were simply "pad[ding]" their bid on the K Bridge project to

garner additional time to steal more of Hardwire's proprietary information and allow IA Parties to attempt to reproduce the technology at an artificially reduced price.

174.    Mr. Ebaugh confirmed under oath that "at that point, the goal was to ensure that the [Freyssinet Defendants'] bid would be competitive in all respects with that of its competitors, including any competitor that may be using Hardwire for bridge armor (and thus would be able to offer Hardwire's extensive experience as a selling point)."

175.    That same day, Mr. Micklus, Mr. Ebaugh, and Fabien Tesson (of Freyssinet) exchanged emails on limiting the scope (referred to as "LS") of the K Bridge price by not disclosing to the NYDOT their intention to move the dampers and transition on the K Bridge so Freyssinet could "enhance [their] ability to gain margin." A true copy of that July 16, 2014 e-mail exchange is attached as **Exhibit H**.

176.    Mr. Ebaugh also responded to Mr. Micklus on Schirmen's proposal (referenced at Paragraph 167 above), asking Mr. Micklus to verify lengths in comparison. A true copy of Mr. Ebaugh's July 16, 2014 e-mail is attached as **Exhibit I**.

177.    Indeed, notwithstanding the Freyssinet Defendants' exclusive arrangement with IA, as well as their misuse of Hardwire's trade secrets in furtherance of that arrangement, the Freyssinet Defendants continued to make Hardwire believe that the Freyssinet Defendants were interested in working with Hardwire.

178.    In this regard, in early July 2014, months after the IA Exclusivity Agreement was entered, Hardwire and Drew Micklus, the Chief Operating Officer of Freyssinet USA, had discussions concerning the K Bridge project.

179.    On or around July 17, 2014, at the Freyssinet Defendants' request, Hardwire provided the Freyssinet Defendants with its "Stay Cable Protection Proposal" in connection with the K Bridge project (the "**Hardwire Proposal**").

180.    The Hardwire Proposal was provided to Freyssinet USA as the representative and agent of Freyssinet International.

181.    The Hardwire Proposal contains, among other information, Hardwire's pricing, product weight, thickness, and length, installation and manufacturing methods, testing parameters and locations, delivery details, and the general scope of services to be provided.

182.    The Hardwire Proposal was subject to the terms of the NDA and was conspicuously marked with a confidentiality tag that provided: "Confidential: Any unauthorized use or distribution is prohibited."

183.    Hardwire assumed, based upon the multiple agreements and conversations, that the Freyssinet Defendants were approaching the business relationship in good faith and were seriously considering working with Hardwire on the K Bridge project.

184.    However, discovery in the Maryland Action revealed that the Freyssinet Defendants once again breached the NDA with Hardwire and provided the IA Parties with proprietary information from the Hardwire Proposal.

185.    Providing the Hardwire Proposal to the IA Parties was in direct violation of the NDA, and in furtherance of Defendants' efforts to steal Hardwire's confidential information and underbid Hardwire.[3]

---

[3]Quite remarkably, as noted previously, this was not the only proposal provided to IA Parties, which likely violated further nondisclosure agreements with third parties.  In this regard, an email produced by IA Parties shows that on July 15, 2014, Drew Micklus—the Chief Operating Officer of Freyssinet USA—shamelessly forwarded the scope of work and quote

186.    For example, in email correspondence obtained during the Maryland litigation, dated July 30, 2014, Mr. Ebaugh, on behalf of IA, proclaimed:

> It is quite evident that Hardwire has continued to take advantage of their relationship with Freyssinet. **Their proposal to Freyssinet was clearly inflated substantially and their dialogue with you not sincere**. I will be at your DC office Friday morning to see what we can do with our proposal to become more competitive.

187.    Clearly, the only thing that was "not sincere" was Freyssinet Defendants' sham discussions with Hardwire that induced them to disclose confidential and proprietary information through misrepresentations and the intentional concealment of material information.

188.    The existence of the IA Exclusivity Agreement and intention to use IA as the supplier was material information, the concealment of which Freyssinet Defendants knew was critical to further their unlawful and bad faith scheme.

189.    In that same correspondence, Mr. Ebaugh further confirmed the contractual commitment between Freyssinet Defendants and IA Parties and the need to obtain the K Bridge project, stating:

> Infrastructure Armor has made a commitment to Freyssinet and for it to be successful we need to get a "first" job together. This is it.  I want to make sure that all of the decision makers will be available, both from France and US, in order to do this Friday morning.  It is my understanding that we will likely be providing a revised quotation on Monday at the latest.

190.    As it turns out, the communications between Freyssinet Defendants and Hardwire at or around this time were intended only to lure Hardwire into the false belief that the Freyssinet Defendants intended to conduct business with them in order to obtain an Armor Proposal from

---

drafted by Schirmen Technologies, another armor shielding competitor, albeit one that had no past performance and was not a viable option to award the work.

Hardwire.  The Freyssinet Defendants had no intention to conduct business with anyone other than Mr. Ebaugh and Infrastructure Amor.

191.    On Friday, July 18, 2014, Mr. Ebaugh spent the day at Freyssinet's office working on a K Bridge armor proposal with Mr. Micklus.  A copy of an e-mail sent by Mr. Ebaugh to Mr. Micklus on that date (without the confidential attachment), is attached hereto as **Exhibit J**.

192.    Mr. Ebaugh's proposal to Freyssinet, which was to be used to support Freyssinet's bid to win the K Bridge, uses Hardwire's rendering (drawing), showing how the armor is integrated onto the stay cable.  The proposal also references Mr. Ebaugh's experience at Hardwire under the "Stay Shield Installation Fixtures" section, representing that Mr. Ebaugh was "responsible for the production and installation of over 10,000 shielding components."  The "Testing" section also details "Previous Testing" that is purported to have been completed but was actually Hardwire's data.

193.    As confirmed by Mr. Ebaugh, "[a]s Mr. Micklus was well aware, as of July 19, 2014, neither IA nor [Mr. Ebaugh] had completed any of the testing reflected in the proposal."

194.    Instead, the use of Hardwire's test data was done to "pad" the information in Freyssinet's proposal to make it appear as though it had the past performance and test data needed to meet the aggressive schedule and demanding performance required by NYDOT.  In reality, Freyssinet and IA had neither.

195.    Subsequently, in an email dated July 21, 2014—five (5) days after receiving the proposal excerpts—Mr. Ebaugh advised Vectorworks that "Freyssinet and IA have submitted our quote for the K Bridge."

196.   Indeed, on July 22, 2014, Mr. Ebaugh submitted IA's final proposal to the Freyssinet Defendants.  As confirmed by Mr. Ebaugh under oath, "[t]hat final proposal still contained Hardwire's information, data, and testing results, and attempted to pass that information, data, and testing off IA's own."  A true copy of Mr. Ebaugh's July 22, 2014 e-mail (without attachment) is attached as **Exhibit K.**

197.   During that time, despite the IA Exclusivity Agreement—which, again, Hardwire was never aware existed until IA Parties produced it in the Maryland Action—Freyssinet Defendants led Hardwire to believe that it was interested in working with Hardwire on the K Bridge project and, in fact, induced Hardwire to provide it with bid proposals, trade secrets, and confidential information <u>after</u> the IA Exclusivity Agreement was entered.

198.   Indeed, Mr. Micklus continued to solicit a proposal from Hardwire, notwithstanding Freyssinet's exclusive arrangement with IA.  The Freyssinet Defendants shared proprietary and confidential information from Hardwire's proposal with Mr. Ebaugh.

199.   An e-mail exchanged between Mr. Micklus and Mr. Ebaugh concerning Hardwire's proposal is attached as **Exhibit L**.

200.   After receiving Hardwire's proposal, Mr. Ebaugh confirmed that he and Freyssinet "continued to revise IA's proposal and update [the] pricing to make it more competitive for submission to SKE."

201.   The Freyssinet Defendants were also complicit in Mr. Ebaugh's use of Hardwire's testing data as his own to try and secure the K Bridge job.

202.   For example, on August 7, 2014, Mr. Ebaugh sent a detailed e-mail to Mr. Micklus and Michael Louis, with a copy to Fabien Tesson, detailing some concerns Mr. Ebaugh had raised about the need to pass future testing, and the importance of HNTB "selling" the

solutions and results to the Owner (NYDOT).  In Mr. Ebaugh's e-mail, he referred and compared to previous Hardwire testing results.  Mr. Ebaugh had a relationship with HNTB, so Mr. Micklus encouraged him to use it to ensure the armor, when finally tested, "passed" for the K Bridge.

203.   Just a few days later, on August 9 and 10, 2014, Mr. Micklus and Mr. Ebaugh exchanged e-mails on a presentation being prepared concerning IA's armoring capabilities for the K Bridge.  A true copy of Mr. Micklus' August 10, 2014 e-mail (without the attachment), is attached hereto as **Exhibit N**.[4]

204.   As noted above, and as Mr. Micklus was certainly aware (and as Mr. Ebaugh confirmed under oath), because IA was a brand-new company, it did not have an existing armor product and had not completed any testing.  Thus, IA's marketing materials contained information that had been prepared and developed by Hardwire.

205.   For example, Mr. Ebaugh confirmed that "Mr. Micklus was well aware that the testing information reflected in IA's marketing materials did not reflect tests actually performed by IA and, in fact, that those tests were actually performed by Hardwire on Hardwire's products."

206.   The IA presentation is labeled "Proprietary and Company Confidential Information" and contains Hardwire's pictures and shows Hardwire's previous technical results.

207.   None of the foregoing information was ever communicated to Hardwire.  Rather, Hardwire was under the impression that the Freyssinet Defendants were maintaining confidentiality under the NDA and were still considering Hardwire as a potential supplier on the K Bridge project.

---

[4] Exhibit M intentionally skipped.

208.    For instance, in August 2014, Drew Micklus advised Hardwire during a phone conversation concerning the shielding contract that Hardwire was "ahead of anyone else" because of its track record and superior product.  Mr. Micklus further advised Hardwire that the Freyssinet Defendants were waiting to select an armor shielding contactor until after it secured the K Bridge project—a representation Hardwire now knows was false considering the IA Exclusivity Agreement was entered in May 2014.

209.    Around the same time, in August 2014, Kiewit, as part of the design-build team for the K Bridge, told the VSL/Hardwire/ST team that its price was not competitive.  As a result:

a.    Hardwire continued its dialogue with the Freyssinet Defendants, believing that it could still obtain the armor work if the Freyssinet Defendants obtained the cable work.

b.    VSL/Hardwire/ST reduced their bid price.

210.    Concurrently and in the weeks that followed, Hardwire contacted the Freyssinet Defendants again to inquire about the status of its armor proposal.  On September 12, 2014, Hardwire attended a meeting at Freyssinet USA's Virginia office to discuss Hardwire's Proposal, the K Bridge project, and its business relationship going forward.  Although the Freyssinet Defendants did not outright reject Hardwire's K Bridge proposal, during this meeting on September 12, 2014, the Freyssinet Defendants advised that they had been dealing with Mr. Ebaugh, who had entered the infrastructure protection business (but in no way indicated that an exclusive relationship existed or that Freyssinet Defendants were misusing Hardwire's information and data with IA).

211.    Instead, during this meeting, the Freyssinet Defendants, again, misrepresented to Hardwire that it was still being considered for the shielding contract.  Again, it was unknown to Hardwire at the time that IA and Freyssinet Defendants were in an exclusive partnership.

212.    Shortly after this meeting, the Freyssinet Defendants advised Hardwire that they had been awarded the K Bridge project, but still did not advise of the IA Exclusivity Agreement.

213.    Moreover, at the Freyssinet Defendants' request, the Hardwire team provided the Freyssinet Defendants with a subsequent and final proposal for a reduced price for the K Bridge project in or around November 2014.  Upon information and belief, this proposal was also shared with IA Parties to further reduce their "final proposal" on the K Bridge project.

214.    After the September 2014 meeting and the revised proposal in November 2014, contact between the Freyssinet Defendants and Hardwire began to slowly diminish until February 2015 when the Freyssinet Defendants advised Hardwire, for the first time, that they were not awarding Hardwire the shielding contract on the K Bridge project.  The Freyssinet Defendants ignored all communications from Hardwire requesting the name of the company who received the contract.

**Issues With The Ebaugh/Freyssinet Proposal**

215.    As background, IA's initial proposal for bridge armor to the Freyssinet Defendants was predicated on a concept that Mr. Micklus and Mr. Ebaugh had discussed, i.e., that the transitions for the cables would be placed below the bridge deck.  This was intended to provide an area of cost savings to both IA and the Freyssinet Defendants, as it would reduce the amount of armor that needed to be provided.

216.    Throughout August and September 2014, it became clear that SKE would not agree to a design modification to place the transitions below deck.

217.    According to Mr. Ebaugh, "[a]s a result of this change, the profit margin available to Freyssinet and IA was significantly reduced."

218.    On September 24, 2014, Mr. Ebaugh e-mailed Mr. Micklus to formally rescind Mr. Ebaugh's initial proposal.  According to Mr. Ebaugh, "[t]his upset Mr. Micklus and the Freyssinet team because they had offered a price to SKE for the K Bridge project that was based on [his] proposal, and Freyssinet did not have an armor recipe until [he] provided them with one. [Mr. Ebaugh] made clear, however, that [he] was 'committed to working with Freyssinet to develop and implement the most cost-effective solution.'"  A true copy of Mr. Ebaugh's September 24, 2014 e-mail is attached as **Exhibit O**.

219.    Meanwhile, on September 4, 2014, Mr. Ebaugh e-mailed Mr. Micklus to advise that he was developing a test plan for the K Bridge.  A true copy of Mr. Ebaugh's September 4, 2014 e-mail is attached as **Exhibit P**.

220.    Mr. Ebaugh confirmed that the Freyssinet Defendants understood "as of that date, neither IA nor [Mr. Ebaugh] had tested any of the armor solutions that had been included in the Freyssinet proposal that was submitted to SKE for consideration."

221.    According to Mr. Ebaugh's sworn testimony, "[o]n September 11, 2014, at Mr. Micklus' request, [Mr. Ebaugh] sent him a list of questions to ask "other suppliers" at upcoming meetings, including requests to obtain technical information and costs from other vendors."  A true copy of Mr. Ebaugh's September 11, 2014 e-mail is attached as **Exhibit Q**.

222.    Ebaugh stated under oath, "Here again, this was an effort to stay competitive despite the cost issues that were arising with our bid, and the fact that the transitions could not be placed below deck."

### Failure to Test their K Bridge Production Parts

223.   A critical element of winning the K Bridge armor production contract was the ability to deliver qualified, tested armor designs within 120 days of contract award.  The ability to expediently demonstrate that the protection system met all safety and protection requirements was paramount to whoever won the job for the NYDOT.

224.   In September of 2014, Mr. Micklus and Mr. Ebaugh exchanged numerous e-mails about the needed testing on the armor that they were purporting to create and develop (using Hardwire's stolen technology) for SKE for the K Bridge.

225.   For example, on September 19, 2014, Mr. Micklus and Mr. Ebaugh had an e-mail exchange about the test plan and seeking areas where costs can be reduced/minimized.

226.   The next day, Mr. Ebaugh responded to some of Mr. Micklus' prior comments, and made clear that many of the proposals he was making had already been discussed with HNTB, who was one of the key engineering firms on the project.

227.   On September 21, 2021, Mr. Ebaugh e-mailed Erik Mellier (Freyssinet's Technical Director and Governance Board Member) directly to obtain testing information on fire protection, including the technology, engineering, testing, pricing parameters, etc.  Mr. Ebaugh made clear to Mr. Mellier that "for this project [K Bridge] we do not have the luxury of any time for R&D," and so to expedite it would be helpful for the Freyssinet Defendants to share any information that it had in its possession.

228.   On September 25, 2014 Mr. Ebaugh sent a revised testing plan to Mr. Micklus.

229.   That same day, Mr. Micklus sent the revised test plan to Robin Lee at HNTB.  A true copy of Mr. Micklus' e-mail is attached as **Exhibit R**.

230.    The next day, Mr. Ebaugh e-mailed Robin Lee of HNTB, writing: "I am concerned that as currently worded it requires previous testing of a bridge protection shielding system.  Does this work.  This testing can be waived in lieu of data provided by the intumescent manufacturing validating material performance."   Mr. Ebaugh utilized his relationship with HNTB to try to save the Freyssinet Defendants money and shortcut the required testing.  A true copy of Mr. Ebaugh's September 26, 2021 e-mail is attached as **Exhibit S**.

231.    Meanwhile, IA and the Freyssinet Defendants began negotiating the need for changes on the K Bridge proposals that were made, including the allocation of the increased costs.  Mr. Ebaugh sent his proposed markup to the prior proposal to Mr. Micklus on October 14, 2014.  A true copy of Mr. Ebaugh's October 14, 2014 e-mail is attached as **Exhibit T**.

232.    Between October 10 and 20, 2014, Mr. Ebaugh provided raw material information to the Freyssinet Defendants to see if they could locate a French company to manufacture the materials at a lower cost.

233.    On October 27, 2014, Mr. Ebaugh e-mailed the Vectorworks team to describe extensive meetings that had taken place between himself and Freyssinet concerning the IA Exclusivity Agreement and the K Bridge.  Mr. Ebaugh indicated to Vectorworks that IA would be proceeding with the testing outlined in the IA Exclusivity Agreement and set forth details on what that would entail.  A

234.    The next day, Mr. Ebaugh e-mailed the Vectorworks team with a detailed test plan and schedule, as Mr. Ebaugh needed Vectorworks' help in manufacturing the test articles.

235.    Meanwhile, Mr. Ebaugh started to grow suspicious that the Freyssinet Defendants sought to use the technical information developed under the IA Exclusivity Agreement for its own uses, separate and apart from the K Bridge.

236.    Recall that under the IA Exclusivity Agreement, IA would demonstrate stay cable protection on generic Freyssinet cable systems and execute testing on prototype parts.  Of significance, the intent of this IA Exclusivity Agreement was to execute prototype testing only.  This would essentially prove out the first articles (i.e., Hardwire's armor recipes stolen by Ebaugh) but it was never intended to officially qualify an armor system for one particular production job.  As such, the IA Exclusivity Agreement was not specific to the K Bridge.

237.    On November 26, 2014, and over the next week, Mr. Ebaugh was engaged with an e-mail exchange with Freyssinet about whether the testing required for the K Bridge was covered under the payable milestones in the IA Exclusivity Agreement.  Regardless, Mr. Ebaugh made plain in his e-mail to Freyssinet that only prototypes were being manufactured / tested, and that IA was neither manufacturing nor testing the finished parts that would be installed on the K Bridge.

238.    Mr. Ebaugh's exchanges with Freyssinet continued over the next week.  For example, an e-mail exchange culminating on November 11, 2014, is attached at **Exhibit U**.

239.    Of critical importance, the Freyssinet and IA team all knew that in order to be compliant with the NYDOT contract, third-party, independent qualification testing of the protection system production designs was required.  However, at the end of 2014, those production designs did not even exist for Freyssinet and IA.  Instead, IA and Freyssinet conceived and executed a fraudulent scheme to test prototype parts which did not use K Bridge production materials or designs and pass it off as "official" testing.

240.    For example, on November 28, 2014, Freyssinet sent Mr. Ebaugh an e-mail confirming its understanding that IA's tests would include a "simulate[d]" (i.e., fake) seam, rather than an actual seam.

241. In reality, the parts installed on the K Bridge have multiple seams running down the length of the interior and exterior of the materials. It is well known in both fire and blast testing that seams create significant vulnerabilities if not properly configured and addressed. However, on the parts tested for the K Bridge, IA and Freyssinet intentionally eliminated these vulnerabilities, essentially cheating the tests.

242. On December 1, 2014, Mr. Mellier, the technical director for Freyssinet and Freyssinet Governance Board Member responded to an ongoing e-mail chain, but made clear that the Freyssinet Defendants were aware that testing the seam performance of the armor was "critical" and should be validated before actually going on a bridge.

243. The next day, Mr. Ebaugh responded to Mr. Mellier and Mr. Micklus and, among other things, made clear that there were not samples produced to complete seam testing and that if such testing was needed that additional samples would be needed at a greater cost.

244. On December 8, 2014, Mr. Ebaugh participated in a conference call with the Freyssinet team to "resolve" all the testing issues.

245. Erik Mellier followed up with notes from the call, confirming that he was the ultimate authority on what needed to be done.

246. Ultimately, it was decided that Ebaugh would perform one round of blast and cutting testing to be paid under the IA Exclusivity Agreement and that this set of tests would also serve as the "qualification" for the K Bridge project. Of importance, Freyssinet knew that critical technical details, such as seams and specific geometries, were not present on the prototype test articles, and in no way was this testing being executed on production parts that would be used on the K Bridge. However, project schedule was tight and live fire testing is

expensive, and as such, Freyssinet decided to use the prototype tests as the submission for K Bridge.

247.    In subsequent exchanges, Mr. Micklus makes clear to Mr. Ebaugh that they needed to complete certain tests to "show we meet what HW [Hardwire] has done for [Bridge Project 1]."

248.    On December 11, 2014, Mr. Micklus e-mailed to confirm the tests that were approved to be performed on January 14 and 15, 2014.

249.    Critically, both Mr. Micklus and Mr. Mellier absolutely understood that these tests would not include seams and, in fact, that the products being tested were not representative of what would be installed on the K Bridge.  The materials and geometry details, which are absolutely critical to real-life performance, were different on the prototype parts versus what was put on the bridge, and this was no doubt very clear to Freyssinet.  Irrespective of this, it was all based on the Hardwire stolen technology.

250.    On December 22, 2014, Mr. Micklus sent a memo to Peo Halvarsson at Skanska, making clear that he would personally witness the blast testing to take place on January 14 and 15, 2015.  Mr. Micklus indicated that the testing was for K Bridge qualification.  As of that date, however, Mr. Micklus understood the samples being tested were not representative of what was being installed on the K Bridge.

251.    While the testing was in its final planning stages, and in furtherance of his efforts to duplicate Hardwire's armor (thus fulfilling the Freyssinet Defendants' plans and completing his payable milestones under the IA Exclusivity Agreement), on January 1, 2015, Mr. Ebaugh entered onto Hardwire's property without permission and took photographs of some of Hardwire's bridge armor.  Mr. Ebaugh's photographs focused on certain attachment methods and

design features for Hardwire's bridge armor. These pictures provided critical details Ebaugh had previously been missing from the files taken at the end of his employment tenure and would eventually be incorporated into the final K Bridge production design.

252.    At the time, Hardwire did not know Ebaugh had taken these photographs. As discussed further below, Hardwire became aware of these photographs when they were returned to Hardwire (as Hardwire property) by the FBI following a raid on Ebaugh's house in 2016.

253.    On January 14 and 15, 2015, Mr. Ebaugh performed blast and "qualification" testing on the bridge armor product that IA had developed pursuant to the IA Exclusivity Agreement. To again be clear, and as was always well-known to Freyssinet, this testing was not performed with parts representative of those that would be installed on the K Bridge. This is the only blast testing that IA ever performed.

254.    That same day, Mr. Micklus forwarded Mr. Ebaugh a Texas Bridge ("**Bridge Project 3**") Armor Terrorism specification from Kiewit (which Ebaugh had not yet been cleared to receive, violating security protocols) and suggested they could discuss they we were both in Arkansas. Bridge Project 3 was a different project on which the Freyssinet Defendants intended to submit a bid.

255.    On January 16, 2015, after execution of the blast and cutting tests, Mr. Ebaugh sent a summary e-mail to the Freyssinet team advising that this part of the testing was complete. Note that fire testing, as discussed further below, was also pending completion. Mr. Ebaugh plainly noted that the system details were not yet finalized.

256.    On January 21, 2015, Mr. Ebaugh sent a draft summary presentation for the K Bridge testing to Mr. Micklus and other members of the Freyssinet team.

257.    After reviewing the K Bridge test summary results, Mr. Mellier responded on January 22, 2015, writing: "Thank you Skip for this high quality document.  I have a Freyssinet board meeting tomorrow, I'll make a brief communication about these spectacular results…. Together, we shall now put all efforts in optimizing and detailing our protection in order to successfully deliver the K Bridge, with high quality and on budget."  Notably, Mr. Mellier was aware on that date that the testing was not properly executed on samples representative of what was being installed on the bridge.  After all, he himself had made clear that it would be irresponsible to install armor that was not properly tested on a bridge.  A true copy of Mr. Mellier's January 22, 2015 e-mail is attached hereto as **Exhibit V**.    As of this date, the entire Freyssinet International Board was on notice.

258.    On January 29, 2015, IA submitted an updated proposal for the K Bridge.

259.    On February 5, 2015, IA provided an updated design document to Freyssinet, as well as updated pricing.

260.    Subsequently, on March 22, 2015, Mr. Ebaugh provided an updated test report on the blast testing to Freyssinet.  Notably, the report makes clear that "solid pipe was used for the inner liner of the test articles" which, as Freyssinet was aware, was not representative of the actual armor configuration.  Additionally, to a trained eye, the pictures contained in the report clearly show the differences in material and geometry in comparison to what is installed on the K Bridge.  Irrespective of this, all of the technology was based on Hardwire trade secrets.

261.    In addition to blast testing, fire / thermal testing was also performed.  Similar to the blast and cutting testing, part of the K Bridge project requirement specified that independent, third-party testing was to be completed such that the fire protection performance could be validated.

262.    However, Mr. Ebaugh only performed in-house testing at his manufacturing partner's location (Vectorworks) on prototype parts.  Similar to the blast testing, no thermal testing was conducted on the final K Bridge armor part configurations.  The testing that was performed in January and March 2015 was not independently executed and no unbiased witness was present.  This test data was provided to Freyssinet, like the blast test results.

263.    On March 4, 2015, Mr. Ebaugh e-mailed the Vectorworks CEO, advising that the Freyssinet Defendants had requested a test report showing "independent" fire test results.  Thus, Mr. Ebaugh requested Vectorworks' letterhead so he could put IA's fire test report on their letterhead to "retain its 'independence.'"  Vectorworks responded and was happy to provide the letterhead.  A true copy of the March 4, 2015 e-mail exchange is attached as **Exhibit W**.

264.    Of significance, Freyssinet was absolutely aware that Vectorworks was not independent from IA.  Communications show that Mr. Micklus and others worked directly with members of the Vectorworks team and arranged / made visits to the Vectorworks manufacturing facility in Florida.

265.    On May 20, 2015, IA submitted fire testing reports that were put on the "independent" Vectorworks letterhead as one of the K Bridge / IA Exclusivity Agreement submissions.  The "independent" report was authored by Mr. Ebaugh with the name of a Vectorworks employee listed.  The report notes that testing was performed on January 19, 2015 on the blast shielding configuration and on March 16, 2015 on the thermal shielding configuration.

266.    The report on Vectorworks letterhead was submitted to Freyssinet.  Subsequently, Freyssinet submitted this to SKE and HNTB for the K Bridge project.  Although it was well known that Vectorworks was Mr. Ebaugh's partner and manufacturing arm for bridge armor, Mr.

Ebaugh's use of Vectorworks as an "independent" test site (indeed, it was not) was not questioned by any party. Additionally, the fact that prototype configurations (not production designs) were tested was also never questioned. Freyssinet knew the final production parts were never tested in their K Bridge configurations. The test report was accepted.

267. Ultimately, testing was an area where the Freyssinet Defendants and IA ended up saving significant money in the K Bridge project by limiting the scope and never evaluating or validating the production detailed design.

268. It is well documented by Hardwire that:

a. IA had never done any testing at the time of its K Bridge proposal submission with Freyssinet, and this was well-known by all parties involved. However, Freyssinet and Ebaugh represented they had extensive data and previous test results for "their" armor designs when in reality, the data was stolen from Hardwire. The proposal data and past performance was stolen and then fraudulently presented as Freyssinet / IA's.

b. The shield designs, materials, and configurations used on the K Bridge by IA and Freyssinet were not what was actually tested. The test prototypes did not represent the production design nor did they incorporate the final materials, seams, hardware, and connection plates used in the production parts on the bridge. Regardless, all configurations were based on the stolen Hardwire Trade Secrets.

c. Multiple material solutions used by Ebaugh and Freyssinet on the K Bridge were never tested at all.

d. The IA / Freyssinet fire testing was not performed by an independent party. However, it was intentionally misrepresented by Ebaugh and Freyssinet as being done by an independent, unbiased party when it was actually performed by Ebaugh himself with his manufacturing partner, VectorWorks with whom he was sharing profits on the project.

e. The test articles used were made with completely different manufacturing processes than the production parts. Limited-to-no quality monitoring was in place during production with no way to validate consistency between what was tested and what was actually installed. Quality issues were intentionally concealed.

### Hardwire Grows Suspicious of Mr. Ebaugh

269.    While this was going on, in late 2014 / early 2015, Hardwire's suspicions about Mr. Ebaugh continued to increase. In or around February 2015, Freyssinet Defendants advised Hardwire that it had awarded the multi-million-dollar contract for the armor work for the K Bridge to another company. Hardwire learned thereafter that this other company was IA.

270.    Also in late 2014/early 2015, Hardwire learned that Mr. Ebaugh communicated with Hardwire's suppliers about using Hardwire's molds, dies, and designs for his own independent needs.

271.    Around the same time, Hardwire learned that Mr. Ebaugh commissioned bridge armor qualification testing from one of Hardwire's subcontractors, K2 Solutions, Inc., for IA. This was the January 2015 blast testing described above.

272.    At no time prior to the production of discovery in the Maryland Action, however, was Hardwire aware of Freyssinet International's blatant breach of the NDA and the Freyssinet

Defendants' joint conspiracy with Ebaugh to suppress competition and misappropriate Hardwire's confidential and proprietary information.

273.    In fact, just the opposite is true—Freyssinet Defendants purposefully concealed their breach of the NDA, which intentionally masked their unlawful scheme with the IA Parties.

274.    By way of example only, on or around February 15, 2016, Freyssinet Defendants notified Hardwire that it was in receipt of a grand jury subpoena for documents related to IA Parties. In that correspondence, Freyssinet Defendants confirmed the existence and enforceability of the NDA and "provid[ed] [Hardwire] with this notice consistent with the NDA."

275.    Thus, Freyssinet Defendants were aware of the enforceability of the NDA and implied it had abided by its terms. As it turns out, this was entirely and intentionally false which was discovered in November 2020.

276.    As if there was any doubt to the above, additional correspondence produced by IA Parties make plain that they were receiving Hardwire's confidential and proprietary information throughout the K Bridge project's bidding, and were apparently promised future work by Freyssinet Defendants if they were able to reproduce Hardwire's product at a reduced cost.

277.    For instance, on December 5, 2016 in connection with a proposal provided by Mr. Ebaugh to Freyssinet Defendants for a separate bridge project, Mr. Ebaugh commented: "My pricing on the K bridge was 43% lower than Hardwire."

278.    A similar email correspondence took place on February 24, 2017 in connection with a separate bid proposal wherein Mr. Ebaugh, again, commented that IA Parties' "pricing was good enough to better [Hardwire] by nearly 50% at that time."

279.    Multiple times in 2014, Freyssinet Defendants provided Integration Designs from Hardwire to IA / Mr. Ebaugh.

## Hardwire Contacts The FBI

280.    As noted above, although Hardwire was in the dark about the Freyssinet Defendants' involvement in the misconduct, Hardwire had grown increasingly suspicious about Mr. Ebaugh in early 2015 and, therefore, contacted the Federal Bureau of Investigation ("**FBI**") to report the possibility that Mr. Ebaugh stole and thereafter misappropriated sensitive materials — including information related to national security infrastructure issues and United States Department of Defense contract information — and was actively using Hardwire's trade secrets and other confidential information.

281.    Hardwire also retained Omnivere, LLC ("**Omnivere**"), a forensic computing firm, to examine the Hardwire computer previously utilized by Mr. Ebaugh.  Omnivere recovered very few of the deleted files from Mr. Ebaugh's computer.  Omnivere also determined that a thumb drive was connected to Mr. Ebaugh's computer less than an hour before he was notified of his termination.

282.    Based on the interactions between Ebaugh and Mr. Tunis in the days leading up to Mr. Ebaugh's termination, it appeared that Ebaugh downloaded Hardwire's trade secrets onto the thumb drive in anticipation of his termination or resignation and with the intent of stealing Hardwire's trade secrets.

283.    On March 25, 2015, Hardwire turned over Mr. Ebaugh's computer and Omnivere's report to the FBI.  A federal investigation ensued, including a January 2016 raid of Ebaugh's home/IA's headquarters by the FBI.

284.    Ultimately, the FBI has determined that:

     a.     Mr. Ebaugh was in possession of more than 27,000 computer files from Hardwire including technical data, bridge armor designs, engineering drawings, production/manufacturing/installation methods for bridge armor, pricing information, Hardwire financial records, contracts, and security sensitive information about bridges across the U.S.

     b.     On January 1, 2015, Mr. Ebaugh trespassed onto Hardwire's private property. He then took pictures over and/or through the privacy fence on the property (clearly trespassing on Hardwire's property). Via his trespassing and an elevated position, he took photographs of Hardwire's proprietary technology and hardware. Mr. Ebaugh's photographs clearly appear to have focused on certain attachment methods and design features for bridge armor that constitute part of Hardwire's protected trade secrets. These exact features were design elements that were missing from the 27,000 stolen electronic files. Critically—Mr. Ebaugh has admitted to trespassing onto Hardwire's property and taking these photographs.

     c.     Mr. Ebaugh transmitted and otherwise utilized Hardwire's confidential pricing information, testing costs, and related information to improperly obtain a competitive advantage in the bidding process for the K Bridge job.

285.    Hardwire sought to assist the FBI and other government agencies with ongoing investigations and, to the fullest extent possible, tried to avoid anything that could impair those investigations, including filing a civil lawsuit. To avoid interfering with law enforcement, but to preserve Hardwire's rights, in February 2016, Hardwire entered into an agreement with Mr. Ebaugh and IA to toll the statute of limitations on Hardwire's claims. That tolling agreement was extended but expired on February 3, 2020.

**Defendants' Continued Misuse of Hardwire's Confidential and Proprietary Information
On The First Span of The K Bridge**

286.    On June 9, 2015, Freyssinet sent the purchase order for the K Bridge armor to IA.

287.    Over the next few months, IA began production of the shielding products as set forth in the purchase orders.

288.    On November 30, 2015, in response to a Freyssinet inquiry concerning the strength of the seams, Mr. Ebaugh reiterated that "testing of seams was not part of the approved test plan."  Mr. Ebaugh further noted that it was "A little late in the game to be brin[g]ing up these issues," considering that production was well underway.  A true copy of Mr. Ebaugh's November 30, 2015 e-mail is attached as **Exhibit X**.

289.    Of significance, no such testing took place, even despite Freyssinet's obvious concern and knowledge that the K Bridge parts may not have the performance "advertised."  On June 14, 2016, IA began shipping parts to Freyssinet for installation on the K Bridge.  A copy of Mr. Ebaugh's June 14, 2016 e-mail confirmation is attached as **Exhibit Y**.

290.    The armor used by the Freyssinet Defendants utilized Hardwire's Armor Recipe, as well as its Integration Designs (and of course, Freyssinet Defendants had utilized Hardwire's Proposal to obtain the job).  Indeed, the armor installed incorporates Hardwire's Armor Recipes and Integration Designs, including attachment methods, Integration Designs, installation tooling, and specific design features necessary to defeat the various threats.  Unfortunately for NYDOT, because the information was stolen, the armor implementation was flawed because IA and Freyssinet did not fully understand the engineering rationale behind the recipe and design and the galvanic interaction between the materials and components.

291.    Defendants continued to use Hardwire's Trade Secrets, and other confidential and proprietary information throughout the development and construction of the first span of the K Bridge.

292.    Freyssinet Defendants' misuse of Hardwire's Trade Secrets continued throughout their work on the first span of the K Bridge, which was completed in April 2017.

293.    On April 27, 2017, the first span of the K Bridge opened to the public.

294.    On July 21, 2017, Mr. Micklus e-mailed Mr. Ebaugh a "letter of intent" to work with IA on Phase 2 of the K Bridge.  A true copy of Mr. Micklus' July 21, 2017 e-mail is attached as **Exhibit Z**.

295.    Working with the Freyssinet Defendants, Mr. Ebaugh and IA continued to publicly disclose that the K Bridge is outfitted with blast and fire protection.  This information is available on various public websites, violating the K Bridge project security protocol.[5]

### Defendants' Continued Misuse of Hardwire's Confidential and Proprietary Information On The Second Span of The K Bridge

296.    As alluded to above, protective armor shielding is a critical aspect of bridge infrastructure construction and can often be the determining factor for who is awarded the contract for bridge construction.

297.    Recall that because of Hardwire's ability to securely deal with counter-terrorism information, address a myriad of differing threat scenarios, and engineer durable and long-lasting material solutions that perform in complex, vibrating, dynamic environments, from 2005 until

---

[5] See e.g.
http://www.freyssinet.com/freyssinet/wfreyssinet_en.nsf/0/53574A4D01DC20F2C12584190037E403/$file/BRIDGE%2095.PDF and https://www.vinci.com/vinci.nsf/en/news-update/pages/freyssinet_cables_for_the_new_kosciuszko_bridge_in_new_york_united_states_of_america_062017.htm) and
http://www.freyssinet.com/freyssinet/wfreyssinet_en.nsf/0/C933AEA8E7CA848AC12585830058D036/$file/FREYSSINET_2019_EN.PDF.

the Freyssinet Defendant's misconduct, Hardwire was the industry's go-to, sole armor provider that could offer a viable bridge armor solution. During this same period, Freyssinet Defendants' market share in armor in the United States was essentially nonexistent, yet, as stay cable armor jobs were approaching, Freyssinet Defendants sought to gain access to armor technology.

298. However, when the second span of the K Bridge was ready for construction, the NYDOT decided to sole source the stay cable system and shielding (armor) to the Freyssinet/IA/Ebaugh team. This was purely for aesthetic reasons to ensure the two bridge spans looked the same. The decision precluded Hardwire from even bidding on the multi-million-dollar armor project for the second span.

299. Tellingly, the K Bridge contract provides that the stay cable shielding would be provided by IA, with Hardwire's address listed. On May 5, 2017, Mr. Ebaugh asked that this be corrected to his IA address in Ocean City, MD.

300. In July 2017, the Freyssinet Defendants were notified that they could proceed with the cable and armor work on the second span of the K Bridge. Throughout the construction on the second span of the K Bridge, Hardwire's Amor Formulas (stolen by Mr. Ebaugh) and Hardwire's Integration Designs (stolen by the Freyssinet Defendants) continued to be used.

301. Construction on the second span of the K Bridge began in mid-2017 and the bridge was opened to the public on August 29, 2019. During that entire time, Defendants continued using Hardwire's Trade Secrets, including Armor Recipes and Integration Designs.

302. As Defendants' work on both phases of the K Bridge progressed, Hardwire came to learn of IA and Mr. Ebaugh's critically flawed implementation and installation of Hardwire's bridge armor technology. These failings create a severe and imminent threat to public safety, the implications of which cannot be overstated.

303.    Indeed, although Defendants utilized Hardwire's stolen technology, they failed to implement critical details in the manufacturing and installation of the shields, or properly test the product.

304.    For example, and without limitation, IA and Mr. Ebaugh used a specific type of metal in the interior of the parts for the K Bridge.  They failed, however, to paint them in accordance with NYDOT specifications.  Those unpainted parts come into direct contact with concrete (cementitious material), which causes aggressive corrosion, significantly reduces the strength of the cementitious material, and, ultimately, will result in part failure.  IA and Mr. Ebaugh's failure to properly paint their parts before use on the K Bridge is inexcusable and creates an extremely dangerous, but entirely avoidable, hazard, where parts could fall off the K Bridge or the cables could fail.

305.    Similarly, IA and Mr. Ebaugh improperly used an inferior galvanized steel throughout their work, which is already resulting in corrosion (i.e., visible rust and zinc oxide).  This steel is touching other dissimilar metallic parts embedded within the cementitious materials as well as the inner metallic core, creating hot spots for corrosion and, again, potentially imminent failure of critical bridge components, including studs, covers, connection plates, and cables.  In fact, after a short period of time, aggressive corrosion became visible on the K Bridge armor parts and operational spans.



Significant corrosion at the end of the part (white zinc oxide).



Steel fiber in the concrete is corroding, swelling, and fracturing the cementitious material.

These photos were taken in a public location prior to installation on the second span of the K Bridge on July 25, 2019.



Parts are crumbling from corrosion.



Corrosion showing clear electrical contact between dissimilar metals.

These photos were taken in a public location prior to installation on the second span of the K Bridge on July 25, 2019.



These photos were taken of the armor installed on the K Bridge spans in July 2019 and January 2020.  Corrosion is already evident on the exterior of the parts.  Even worse, the interior corrosion cannot be seen.



Straps added due to splitting and delaminating parts are rusting.

(February 2021)

Aggressive corrosion continues to spill out of the armor parts which have been double-banded due to splitting and delamination.

306.    Even more disturbing is the fact that much of the armor is rotating, severely splitting, delaminating, and is in danger of falling off.  Not only does this present a clear and present danger, but the armor is not providing its intended protection.  The large seam created through the severe delamination and separation of the parts leaves significant vulnerabilities for the bridge cable.  This is counter to the entire purpose of armoring the bridge in the first place.  Examples of these issues are reflected in the following photographs.  As a result of this significant safety issue, Mr. Ebaugh tied nylon cargo straps around the parts in hopes of keeping them from falling.





**Severe delamination**



Photos of the K Bridge shielding taken in November 2020. The splitting of the parts continues to grow at an alarming rate. Straps have been used around the shields.



(February 2021)

The armor has been double-banded and a sensor (circled) has been added to monitor the part.



The armor continues to split open and is in danger of falling off. Bands have been added.    (February 2021)

307.    When asked about such issues, Freyssinet Defendants stated, "this looks serious" and that the displacement of parts was "considerable" and was "a very surprising discovery and difficult to explain."

308.    Moreover, Mr. Ebaugh and IA failed to adhere to the NYDOT's Standard Specification Books and Standard Sheet Books (USC) for all highway construction contracts,

which requires specific coatings, thicknesses, inspection, and repair techniques be followed.  The specifications are in place to guard the public from harm resulting from improper storage, damage, or, more critically, improper design of dissimilar materials. Although Freyssinet, IA and Mr. Ebaugh utilize Hardwire's technology (including, but not limited to, material types, thicknesses, geometry, and joint details), their substandard installation and work harms Hardwire and needlessly exposes the public, NYDOT workers, and first responders who utilize the K Bridge to an avoidable safety risk.

309.    Even more egregious, as discovered through the Maryland Action, the Freyssinet / IA team enacted multiple, improper cost-cutting measures along with manufacturing quality shortcuts in their design and production of the parts.  The poor quality and safety issues visible on the bridge spans are a direct artifact of this.

310.    Needless to say, part failure on the K Bridge will have catastrophic results and could have been avoided if Hardwire's technology had been utilized and installed by the appropriate experts and engineers.  Remedying this situation will be extremely costly for the NYDOT and U.S. DoT.

311.    Worse yet, Freyssinet International published a technical paper at an international conference and posted the publication on its website that publicly discloses that the K Bridge has armor protection installed and explicitly describes the level of protection, the armor performance, and potential threats to the bridge.

312.    Freyssinet International's paper contains photographs from IA that reveal test methods, how to place specific threats around the cable, and the aftermath of the test.  Suffice it to say, these public photographs (redacted examples below) reveal critically sensitive security

information and constitute a clear violation of security and confidentiality protocols associated

with the K Bridge project.[6]



313.    Thus, not only do Freyssinet and IA lack the appropriate expertise to safely use

Hardwire's technology, the Freyssinet Defendants have demonstrated a total disregard for the

safeguarding of critical security information.  This erodes the trust of customers who expect their

armor provider to provide discrete, long-lasting, and safe protection, damaging Hardwire and the

entire bridge armor business.

---

[6] The publication could previously be found at the following links but has been removed since
Hardwire called attention to the seriousness of the situation:
http://www.freyssinet.com/freyssinet/wfreyssinet_en.nsf/0/50B4932708705C26C12583E700365
7F4/$file/STAY%20CABLE%20HARDENING%20NEW%20DEVELOPMENTS%20ON%20
BLAST,%20FIRE%20AND%20ICE%20PROTECTION.PDF and https://www.fib-
international.org/vmfiles/FIBPRO-0046-2018-E-5th-fib-Congress-in-Melbourne.pdf (pages 2879
- 2890)).

**Freyssinet Defendants' Continued Misuse of Hardwire's Confidential and Proprietary Information**

314.    Documents obtained in this case thus far demonstrate that the Freyssinet Defendants have continued to misuse Hardwire's trade secrets separate and apart from, and even after the completion of both phases of the K Bridge.

315.    For example, in 2016, using Hardwire's stolen Trade Secrets, Freyssinet and Mr. Ebaugh caused Hardwire to lose a sole source contract for another very large, multi-million-dollar New York-based bridge project.

316.    Prior to IA's emergence on the bridge armor scene, Hardwire had worked with the Port Authority of New York and New Jersey (the "**Port Authority**") and an engineering firm (Ammann & Whitney) on this bridge since 2008.

317.    In working on this project, Hardwire had always understood that it would receive a sole source contract for that bridge work.  At that time, Hardwire was the only company in the world to successfully install suspender rope armor that protected the cables from multiple threats and did not corrode.

318.    Unbeknownst to Hardwire at the time, however, on July 11, 2016, Mr. Ebaugh e-mailed the Port Authority and advised that he could provide an armor solution that incorporates the services and design that Hardwire had offered, but at a significant cost savings, and referenced his work on the K Bridge.

319.    Mr. Ebaugh subsequently met with the Port Authority and made a pitch predicated on Hardwire's Trade Secrets.

320.    On July 12, 2016, *one day* after Mr. Ebaugh sent his e-mail, the Port Authority advised Hardwire that it had "changed direction regarding sole sourcing the Hardwire suspender

sleeves." The Port Authority explained that the it could not justify that "no one other than Hardwire" could armor a bridge. Therefore, the armor project was bid as a larger construction job.

321. Furthermore, Mr. Ebaugh met with the four potential contractors for that project (American Bridge Company, Schiavone Construction Co. LLC, Tutor Perini Building Corp., and Kiewit) and, using Hardwire's Trade Secrets offered a suspender rope armor solution for the project.

322. Hardwire also met with these contractors regarding the project and were told that Mr. Ebaugh and IA had presented Hardwire's solution as their own.

323. Ultimately, the Port Authority ended up creating and using its own design instead of Hardwire's.

324. As Mr. Ebaugh stated in sworn testimony, Freyssinet was "the only reason that I had a viable bridge armor business, and funded my entrance into the industry." Without Freyssinet's egregious acts and malicious intent to harm Hardwire's business (and therefore Mr. Emmons), Mr. Ebaugh would never have been in the position to ruin the sole source award.

325. Moreover, discovery exchanged in the Maryland Action indicates that the Freyssinet Defendants and Mr. Ebaugh continued their efforts to undermine Hardwire's bidding and work on numerous projects, including:

 a. The K Bridge Spans 1 and 2, as noted above.

 b. In September 2016, the IA / Freyssinet team bid on a project in Texas. In connection with that bid, in which Hardwire's confidential and proprietary information was used, Mr. Ebaugh again compared his pricing to Hardwire's pricing for the K Bridge (which he should not have had in his possession).

 c. In November and December 2016, the IA / Freyssinet team was working on bids for a project in Washington, DC. In connection with that work

Mr. Ebaugh provided a proposal for the Freyssinet Defendants' use, which utilized Hardwire's Armor Recipes and Integration Designs. Moreover, Mr. Ebaugh again compared the armor pricing against the Hardwire Proposal.

d.    In June 2017, IA and Freyssinet USA used Hardwire's Armor Recipes in connection with an international project in the Middle East.

e.    In early to mid-2018, in connection with a proposal for a northern international bridge, Defendants again utilized Hardwire's Armor Recipes and Integration Designs and, once again, used Hardwire's pricing information in formulating their proposals.

f.    In 2019, Mr. Ebaugh, supported by Freyssinet, caused significant issues with a family of bridge projects in New York, resulting in unusual security protocols and procurement methods that caused Hardwire to lose the business.

g.    Indeed, the Defendants were working so closely together, than in March of 2018, Freyssinet USA reached out to Mr. Ebaugh to discuss their pricing on the various projects they had worked on thus far.[7]

326.    The Freyssinet Defendants' actions have had a substantial impact on interstate commerce and have suppressed competition—by utilizing confidential and proprietary information in an unlawful way, the Freyssinet Defendants have increased their market share at the expense of Hardwire and others in an anticompetitive way.

327.    The Freyssinet Defendants were aware that a substantial part of their efforts to harm Hardwire would be carried out in New York (and, in this judicial district), and that those efforts would cause substantial harm to Hardwire.

## COUNT I
### (Violation of Defense of Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, Against Defendants)

328.    Hardwire repeats and realleges the preceding paragraphs of the Complaint as if fully set forth at length herein.

---

[7] The specific names of the projects are not included for confidentiality / security reasons.

329. As detailed above, Hardwire's Trade Secrets fit into three broad categories, including Armor Recipes, Integration Designs, and Armor Proposals.

330. As set forth above, Hardwire has taken reasonable efforts to maintain the secrecy of its Trade Secrets. For example, Hardwire requires its employees to sign employment agreements that obligate them to maintain the confidentiality of Hardwire's Trade Secrets, both during their employment and after their termination or resignation. Separately, Hardwire maintains an Employee Handbook and Employee Code of Conduct that set forth detailed policies designed to protect Hardwire's Trade Secrets.

331. Hardwire also maintains the security of its facilities and network, including limiting building and network access and utilizing security measures where possible to minimize the risk of any Trade Secrets being disclosed.

332. Furthermore, Hardwire requires third parties with whom Hardwire works with, including outside contractors and subcontractors, to sign nondisclosure agreements, like the NDA, which obligate the third parties to maintain the confidentiality of Hardwire's Trade Secrets.

333. Hardwire's confidential information and Trade Secrets derive independent economic value from not being generally known or readily ascertainable through proper means.

334. To be sure, improperly obtaining any of Hardwire's Trade Secrets from Hardwire would provide a huge advantage to a competitor.

335. If a competitor obtained all three categories of Trade Secrets from Hardwire, it would be fatal to Hardwire's bridge armor business. Indeed, when these three categories are combined, a competitor has the everything it needs to build Hardwire's proprietary armor, configure the armor, and (wrongfully) compete in the market for bridge armor.

336.    Because of Hardwire's substantial investment in its trade secrets, at all times prior to Mr. Ebaugh and IA's misappropriation and misuse of Hardwire's Trade Secrets, Hardwire was the only company that had provided bridge armor protection.

**The Freyssinet Defendants**

337.    Hardwire undertook reasonable efforts to maintain the secrecy of its confidential, proprietary and trade secret information throughout its contact with Freyssinet Defendants.

338.    For instance, at all relevant times herein, all documentary information containing confidential and proprietary information was provided to the Freyssinet Defendants pursuant to the NDA, which required the Freyssinet Defendants to maintain the secrecy of the information.

339.    Indeed, the NDA expressly provides that all "agents" of Freyssinet International—which included Drew Micklus (who, in fact, negotiated the NDA) and Freyssinet USA– were required to agree to the nondisclosure obligations contained within the NDA.

340.    After entering the NDA with the Freyssinet Defendants, Hardwire gave the Freyssinet Defendants access to its Trade Secrets.

341.    On multiple occasions, the Freyssinet Defendants misappropriated Hardwire's Trade Secrets by forwarding Hardwire's confidential and proprietary Integration Designs to Mr. Ebaugh.

342.    For example, on March 3, 2014, Mr. Micklus e-mailed Mr. Ebaugh some of the bridge armor renderings that he had previously received from Hardwire. These showed how the Hardwire armor was installed and fit onto the Freyssinet stay cable system.

343.    Furthermore, on May 27, 2014—well within the period covered by the NDA— Freyssinet International's Cable Structures Division Manager sent Hardwire's proprietary

Integration Designs to Drew Micklus at Freyssinet USA.  In total, the May 27 e-mail contained 11 attachments, which are confidential and proprietary Integration Designs created by Hardwire.

344.    Indeed, although the documents appear to originate with Freyssinet International in the e-mail chain, the metadata on the attachments confirms that the files were created by Hardwire employee Tim Keller on July 12, 2012.

345.    On June 17, 2014, Drew Micklus forwarded the e-mail, including the attached Integration Designs, to Mr. Ebaugh, who then forwarded the documents to IA's manufacturer, Vectorworks.

346.    Ironically, Mr. Ebaugh's cover email requests that Vectorworks "[p]lease keep these drawings and concepts Confidential."

347.    On the same day, June 17, 2014, Mr. Micklus also forwarded Mr. Ebaugh an e-mail from his internal Freyssinet team that included two (2) drawing files. The drawings contained Hardwire's armor protection integrated on a Freyssinet cable system. "Hardwire Blast Protection" was specifically shown in these Freyssinet CAD drawings.

348.    On July 16, 2014, the Freyssinet Defendants misappropriated Hardwire's trade secrets by emailing Mr. Ebaugh excerpts from a proposal that contained Hardwire Integration Designs (renderings and drawings) and proprietary information.

349.    Indeed, as detailed above, and as was unknown to Hardwire until it received discovery in the Maryland Action, the Freyssinet Defendants actively worked with Mr. Ebaugh and IA to misappropriate and misuse Hardwire's trade secrets from 2014 through the present.

350.    In furtherance of that conspiracy, the Freyssinet Defendants misappropriated additional Trade Secrets several weeks after their March 3 and June 17 dissemination of Hardwire's Integration Designs.

351.    By way of background, the Freyssinet Defendants and IA Parties entered the IA Exclusivity Agreement in or around May 2014.    Pursuant to this agreement, Freyssinet Defendants were contractually obligated to use IA as its exclusive supplier for armor shielding technology, which included its work on the K Bridge project.

352.    Nevertheless, Freyssinet Defendants concealed the existence of the IA Exclusivity Agreement and led Hardwire to believe that it was considering providing Hardwire with the contract for armor shielding on the K Bridge Project.    This concealment and fraudulent representation continued for over 9 months—all the way until February 2015.  As stated in sworn testimony by Mr. Ebaugh, "During that time period, I was aware that Mr. Micklus had continued to solicit a proposal from Hardwire, notwithstanding Freyssinet's exclusive arrangement with IA."

353.    As noted above, for example, in connection with Hardwire's prior dealings with the Freyssinet Defendants, Hardwire had provided the Freyssinet Defendants with its confidential and proprietary Integration Designs.

354.    The Freyssinet Defendants understood the Integration Designs were subject to and protected from disclosure by the terms of the NDA.

355.    In separate incidents, in July 2014 and November 2014, at the Freyssinet Defendants request, Hardwire provided the Freyssinet Defendants with the Hardwire Proposal.

356.    Hardwire provided documents, such as the Proposal, with confidential tags reading: "Confidential: Any unauthorized use or distribution is prohibited."

357.    As detailed herein, Freyssinet Defendants disseminated critical proprietary information from the Hardwire Proposal to the IA Parties to suppress competition by facilitating IA Parties attempt to recreate Hardwire's technology at a lower cost.

358.   Freyssinet Defendants, with IA, also utilized Hardwire's test data and results and performance in their proposals to win the K Bridge job.  Without this, the Freyssinet Defendants never would have won the K Bridge cable job.

359.   Defendants' willful and malicious misappropriation, misuse, and dissemination of Hardwire's trade secrets continues to this day and has caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire.

<b><u>The IA Parties</u></b>

360.   Hardwire gave Mr. Ebaugh appropriate access to Hardwire's confidential information and Trade Secrets during his employment with Hardwire from June 1, 2002 until February 25, 2013.

361.   In connection with and as a condition of his continued employment with Hardwire, Mr. Ebaugh signed the Employment Agreement on July 28, 2009, which, among other things, prohibited him from revealing or using Hardwire's confidential information and trade secrets other than as required in the performance of his employment duties.

362.   Furthermore, the Employment Agreement required Mr. Ebaugh to return Hardwire's property, including its confidential information and Trade Secrets, upon the termination of his employment.

363.   Notwithstanding Mr. Ebaugh's obligations to maintain the confidentiality of Hardwire's Trade Secrets, upon Mr. Ebaugh's termination from Hardwire, Mr. Ebaugh acquired Hardwire's Trade Secrets by improper means, including: (i) through his theft of a notebook and a thumb drive containing over 27,000 confidential files; and (ii) by trespassing on Hardwire's property to take photographs of Hardwire's hardware.

79

364.    Mr. Ebaugh then formed a competing venture, IA, to use Hardwire's own Trade Secrets to wrongfully compete with Hardwire.

365.    Using IA, Mr. Ebaugh then teamed with the Feyssinet Defendants to steal Hardwire's products, pass them off as IA's own, and undermine Hardwire in the market.

366.    In connection with that process, Ebaugh and the Freyssinet Defendants misappropriated and misued Hardwire's Trade Secrets and disseminated them to a number of third parties.

367.    Furthermore, the Freyssinet Defendants willfully and intentionally used, and continue to use Hardwire's Trade Secrets in connection with bridge armoring jobs.  For example, IA and the Freyssinet Defendants dissmeninated and used Hardwire's Trade Secrets to complete work on the first phase of the K Bridge job, which was completed in 2017.

368.    IA and the Freyssinet Defendants also disseminated and used Hardwire's Trade Secrets to complete work on the second span of the K Bridge job, which was completed in August 2019.  They continue to use the Trade Secrets to this day in connection with repairs of defective installations on the K Bridge.

369.    The Freyssinet Defendants and IA armor product(s) utilized on the K Bridge jobs utilized many of Hardwire's Trade Secrets.

370.    Freyssinet Defendants also continued to use and disclose Hardwire's confidential and proprietary information and Trade Secrets —including by sharing the Trade Secrets with general contractors, suppliers, manufacturers, and other third parties—in connection with efforts to win other bridge armor jobs, causing substantial damage to Hardwire.

371.    Indeed, as detailed herein, Freyssinet Defendants disclosed and used Hardwire's Trade Secrets in: (i) September 2016 in connection with a bridge project in Texas; (ii) November

and December 2016 for a bridge project in Washington D.C.; (iii) June 2017 in connection with a bridge project in the Middle East; and (iv) in mid-2018 in connection with a northern international bridge project.

372.    In other words, and as fully detailed herein, Defendants unauthorized use and disclosure of Hardwire's Trade Secrets was not limited to the K Bridge Project.  Defendants have unlawfully continued to use and disclose Hardwire's Trade Secrets in order to unlawfully compete with them in the market.

373.    Freyssinet Defendants' willful and malicious misappropriation, misuse, and dissemination of Hardwire's trade secrets continues to this day and has caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire.

**WHEREFORE**, Hardwire demands judgment against the Freyssinet Defendants and ABC Corps 1-10, jointly and severally, for damages in an amount in excess of $39,600,000 to be proved at trial, exemplary damages pursuant to the DTSA, plus attorneys' fees, post-judgment interest, and such other and further relief as this Court may deem proper.

<u>**COUNT II**</u>
**(Violation of Maryland Uniform Trade Secrets Act, Md. Code Ann. Comm. Law § 11-1201**
***et seq.* Against Defendants)**

374.    Hardwire repeats and realleges the preceding paragraphs of the Complaint as if fully set forth at length herein.

375.    As detailed above, Hardwire's Trade Secrets fit into three broad categories, including Armor Recipes, Integration Designs, and Armor Proposals.

376.    As set forth above, Hardwire has taken reasonable efforts to maintain the secrecy of its Trade Secrets.  For example, Hardwire requires its employees to sign employment agreements that obligate them to maintain the confidentiality of Hardwire's Trade Secrets, both

during their employment and after their termination or resignation. Separately, Hardwire maintains an Employee Handbook and Employee Code of Conduct that set forth detailed policies designed to protect Hardwire's Trade Secrets.

377. Hardwire also maintains the security of its facilities and network, including limiting building and network access and utilizing security measures where possible to minimize the risk of any Trade Secrets being disclosed.

378. Furthermore, Hardwire requires third parties with whom Hardwire works with, including outside contractors and subcontractors, to sign nondisclosure agreements, like the NDA, which obligate the third parties to maintain the confidentiality of Hardwire's Trade Secrets.

379. Hardwire's confidential information and Trade Secrets derive independent economic value from not being generally known or readily ascertainable through proper means.

380. To be sure, improperly obtaining any of Hardwire's Trade Secrets from Hardwire would provide a huge advantage to a competitor.

381. If a competitor obtained all three categories of Trade Secrets from Hardwire, it would be fatal to Hardwire's bridge armor business. Indeed, when these three categories are combined, a competitor has the everything it needs to build Hardwire's proprietary armor, configure the armor, and (wrongfully) compete in the market for bridge armor.

382. Because of Hardwire's substantial investment in its trade secrets, at all times prior to the Freyssinet Defendants' misappropriation and misuse of Hardwire's Trade Secrets, Hardwire was the only company that had provided bridge armor protection.

**The Freyssinet Defendants**

383.    Hardwire undertook reasonable efforts to maintain the secrecy of its confidential, proprietary and trade secret information throughout its contact with Freyssinet Defendants.

384.    For instance, at all relevant times herein, all documentary information containing confidential and proprietary information was provided to the Freyssinet Defendants pursuant to the NDA, which required the Freyssinet Defendants to maintain the secrecy of the information.

385.    Indeed, the NDA expressly provides that all "agents" of Freyssinet International—which included Drew Micklus (who, in fact, negotiated the NDA) and Freyssinet USA– were required to agree to the nondisclosure obligations contained within the NDA.

386.    After entering the NDA with the Freyssinet Defendants, Hardwire gave the Freyssinet Defendants access to its Trade Secrets.

387.    For example, and without limitation (and as elaborated upon above):

    a.  On March 3, 2014, he Freyssinet Defendants misappropriated Hardwire's trade secrets when Mr. Micklus e-mailed Mr. Ebaugh some of the bridge armor renderings that he had previously received from Hardwire. These showed how the Hardwire armor was installed and fit onto the Freyssinet stay cable system.

    b.  On June 17, 2014, the Freyssinet Defendants misappropriated Hardwire's trade secrets by forwarding Hardwire's confidential and proprietary Integration Designs to Mr. Ebaugh in Maryland.

    c.  On July 16, 2014, the Freyssinet Defendants misappropriated Hardwire's trade secrets by emailing Mr. Ebaugh excerpts from a proposal that contained Hardwire Integration Designs and proprietary information.

388.   Indeed, as detailed above, and as was unknown to Hardwire until it received discovery in the Maryland Action, the Freyssinet Defendants actively worked with Mr. Ebaugh and IA to misappropriate and misuse Hardwire's trade secrets from 2014 through the present.

389.   By way of background, the Freyssinet Defendants and IA Parties entered the IA Exclusivity Agreement in or around May 2014.   Pursuant to this agreement, Freyssinet Defendants were contractually obligated to use IA as its exclusive supplier for armor shielding technology, which included its work on the K Bridge project.

390.   Nevertheless, Freyssinet Defendants concealed the existence of the IA Exclusivity Agreement and led Hardwire to believe that it was considering providing Hardwire with the contract for armor shielding on the K Bridge Project.   This concealment and fraudulent representation continued for over 9 months—all the way until February 2015.   As stated in sworn testimony by Mr. Ebaugh, "During that time period, I was aware that Mr. Micklus had continued to solicit a proposal from Hardwire, notwithstanding Freyssinet's exclusive arrangement with IA."

391.   As noted above, for example, in connection with Hardwire's prior dealings with the Freyssinet Defendants, Hardwire had provided the Freyssinet Defendants with its confidential and proprietary Integration Designs.

392.   The Freyssinet Defendants understood the Integration Designs were subject to and protected from disclosure by the terms of the NDA.

393.   Nevertheless, on May 27, 2014—well within the period covered by the NDA—Freyssinet International's Cable Structures Division Manager sent Hardwire's proprietary Integration Designs to Drew Micklus at Freyssinet USA.   In total, the May 27 e-mail contained 11 attachments, which are confidential and proprietary Integration Designs created by Hardwire.

394.    Indeed, although the documents appear to originate with Freyssinet International in the e-mail chain, the metadata on the attachments confirms that the files were created by Hardwire employee Tim Keller on July 12, 2012.

395.    On June 17, 2014, Drew Micklus forwarded the e-mail, including the attached Integration Designs, to Mr. Ebaugh in Maryland, who then forwarded the documents to IA's manufacturer, Vectorworks.

396.    Ironically, Mr. Ebaugh's cover email requests that Vectorworks "[p]lease keep these drawings and concepts Confidential."

397.    On the same day, June 17, 2014, Mr. Micklus also forwarded Mr. Ebaugh an e-mail from his internal Freyssinet team that included two (2) drawing files. The drawings contained Hardwire's armor protection integrated on a Freyssinet cable system. "Hardwire Blast Protection" was specifically shown in these Freyssinet CAD drawings.

398.    In a separate incident, in July 2014 and then again in November 2014, at the Freyssinet Defendants request, Hardwire provided the Freyssinet Defendants with the Hardwire Proposal.

399.    Hardwire provided documents, such as the Proposal, with confidential tags reading: "Confidential: Any unauthorized use or distribution is prohibited."

400.    As detailed herein, the Freyssinet Defendants disseminated the Hardwire Proposal to the IA Parties to suppress competition by facilitating IA Parties attempt to recreate Hardwire's technology at a lower cost.

401.    The Freyssinet Defendants' willful and malicious misappropriation, misuse, and dissemination of Hardwire's trade secrets continues to this day and has caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire.

## The IA Parties

402.    Hardwire gave Mr. Ebaugh appropriate access to Hardwire's confidential information and Trade Secrets during his employment with Hardwire from June 1, 2002 until February 25, 2013.

403.    In connection with and as a condition of his continued employment with Hardwire, Mr. Ebaugh signed the Employment Agreement on July 28, 2009, which, among other things, prohibited him from revealing or using Hardwire's confidential information and trade secrets other than as required in the performance of his employment duties.

404.    Furthermore, the Employment Agreement required Mr. Ebaugh to return Hardwire's property, including its confidential information and Trade Secrets, upon the termination of his employment.

405.    Notwithstanding Mr. Ebaugh's obligations to maintain the confidentiality of Hardwire's Trade Secrets, upon Mr. Ebaugh's termination from Hardwire, Mr. Ebaugh acquired Hardwire's Trade Secrets by improper means, including: (i) through his theft of a notebook and a thumb drive containing over 27,000 confidential files; and (ii) by trespassing on Hardwire's property to take photographs of Hardwire's hardware.

406.    Mr. Ebaugh then formed a competing venture, IA, to use Hardwire's own Trade Secrets to wrongfully compete with Hardwire.

407.    Using IA, Mr. Ebaugh then teamed with the Feyssinet Defendants to steal Hardwire's products, pass them off as IA's own, and undermine Hardwire in the market.

408.    In connection with that process, Defendants misappropriated and misued Hardwire's Trade Secrets and disseminated them to a number of third parties.

409.     Furthermore, the Freyssinet Defendants willfully and intentionally used, and continue to use Hardwire's Trade Secrets in connection with bridge armoring jobs.  For example, the Freyssinet Defendants dissmeninated and used Hardwire's Trade Secrets to complete work on the first phase of the K Bridge job, which was completed in 2017.

410.     The Freyssinet Defendants also disseminated and used Hardwire's Trade Secrets to complete work on the second span of the K Bridge job, which was completed in August 2019. They continue to use the Trade Secrets to this day in connection with repairs of defective installations on the K Bridge.

411.     The Freyssinet Defendants armoring on the K Bridge jobs utilized many of Hardwire's Trade Secrets.

412.     The Freyssinet Defendants also continued to use and disclose Hardwire's confidential and proprietary information and Trade Secrets —including by sharing the Trade Secrets with general contractors, suppliers, manufacturers, and other third parties—in connection with efforts to win other bridge armor jobs, causing substantial damage to Hardwire.

413.     Indeed, as detailed herein, Freyssinet Defendants disclosed and used Hardwire's Trade Secrets in: (i) September 2016 in connection with a bridge project in Texas; (ii) November and December 2016 for a bridge project in Washington D.C.; (iii) June 2017 in connection with a bridge project in the Middle East; and (iv) in mid-2018 in connection with a northern international bridge project.

414.     In other words, and as fully detailed herein, Defendants unauthorized use and disclosure of Hardwire's Trade Secrets was not limited to the K Bridge Project.  Defendants have unlawfully continued to use and disclose Hardwire's Trade Secrets in order to unlawfully compete with them in the market.

415.    The Freyssinet Defendants and/or their co-conspirators have caused Hardwire to lose their sole source status, resulting in the loss of substantial projects.  Freyssinet's activities seriously limited Hardwire's ability to participate in other large bridge armor jobs due to security lockdowns.

416.    As detailed herein, the Freyssinet Defendants disseminated Hardwire's confidential, proprietary, and trade secret information in furtherance of their unlawful scheme to deprive Hardwire of the fruits of its labor and in an attempt to suppress competition by facilitating IA Parties attempt to recreate Hardwire's technology at a lower cost.

417.    The Freyssinet Defendants' willful and malicious misappropriation, misuse, and dissemination of Hardwire's trade secrets continues to this day and has caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire.

418.    Freyssinet also spread critical design vulnerabilities in bridge armor to domestic and foreign terrorists causing irreparable harm to the United States of America.

419.    The Freyssinet Defendants' actions violated Md. Code Ann. Comm. Law, Trade Regulation § 11-1201 *et seq*. and have caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire.  Hardwire is entitled to damages under § 11-1203 and 11-1204.

**WHEREFORE**, Hardwire demands judgment against the Freyssinet Defendants and ABC Corps 1-10, jointly and severally, for damages in an amount in excess of $39,600,000 to be proved at trial, exemplary damages in the amount of twice the compensatory damage award, damages on account of the unjust enrichment caused by the misappropriation that is not otherwise computed in the actual loss, plus attorneys' fees, post-judgment interest, and such other and further relief as this Court may deem proper.

**COUNT III**

**(Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, Against the Freyssinet Defendants)**

420.     Hardwire repeats and realleges the preceding paragraphs of the Complaint as if fully set forth at length herein.

421.     As detailed herein, the Freyssinet Defendants, along with the IA Parties, operated in a long-term association that exists for criminal and wrongful purposes; to wit, to misappropriate Hardwire's Trade Secrets in order to suppress competition, harm Hardwire, and unlawfully line their own pockets through the use of Hardwire's confidential and proprietary information.

422.     Hardwire has learned that since at least 2014, the Freyssinet Defendants, along with Mr. Ebaugh, have functioned as a cohesive unit to victimize Hardwire through the misappropriation of its Trade Secrets.  This unlawful association has continued for at least seven years and has caused Hardwire substantial harm.

423.     As described herein, the Freyssinet Defendants are engaged in, and their activities affect, interstate commerce.

424.     At all time, the Freyssinet Defendants conducted their business affairs in interstate commerce.

425.     In connection with a plan which is ongoing, and as fully detailed herein, the Freyssinet Defendants conducted and continue to conduct the affairs through illegal acts and have committed numerous and continuous predicate acts of racketeering activity, as defined in 18 U.S.C. § 1961(1), on multiple occasions and in violation of the DTSA, 18 U.S.C. § 1832 among other laws and described herein.

426.    Furthermore, upon information and belief, in violation of 18 U.S.C. 1341, Freyssinet Defendants, and each of them, transmitted writings, documents, and things in connection with the fraudulent scheme detailed herein through the U.S. Postal Service and/or one or more private commercial interstate carrier(s) or parcel service(s).

427.    Upon information and belief, in violation of 18 U.S.C. 1343, Freyssinet Defendants transmitted writings, documents, pictures, and things by means of wire, including but not limited to, telephone, email, and/or facsimile, in furtherance of the fraudulent schemes detailed herein.

428.    Upon information and belief, in violation of 18 U.S.C. 1962(a), Freyssinet Defendants utilized the income and profits derived from the pattern of racketeering described herein to fund and operate IA for the illegal purpose of, among other things, unlawfully competing against Hardwire.

**Mr. Ebaugh's Employment, Theft of Trade Secrets, and Creation of IA**

429.    Hardwire disclosed its Trade Secrets to Mr. Ebaugh while Mr. Ebaugh was an employee of the company and only after Mr. Ebaugh expressly promised to keep Hardwire's Trade Secrets confidential.

430.    Mr. Ebaugh was aware that he was to be imminently terminated by Hardwire or intended to resign therefrom.  In anticipation thereof, Mr. Ebaugh downloaded 27,000 files containing Hardwire's confidential information and Trade Secrets onto a thumb drive.

431.    Within minutes of being advised of his termination, Mr. Ebaugh ran to his office and took the thumb drive and a notebook, which he then stole from Hardwire's office upon his departure.

432.    Mr. Ebaugh subsequently downloaded the files from the stolen thumb drive onto his personal computer.

433.    At the Freyssinet Defendants' urging, Mr. Ebaugh then formed IA, a separate and distinct legal entity from Mr. Ebaugh, for the purpose of using Hardwire's confidential information and Trade Secrets to compete with Hardwire for bridge armor projects.

434.    Mr. Ebaugh uses Hardwire's Trade Secrets in the conduct of IA's business affairs.

435.    Pursuant to 18 U.S.C. § 1962(c), IA constitutes the enterprise through which Mr. Ebaugh carries out his illegal activities, as described above.

436.    For over six years and in connection with a plan which is ongoing, Mr. Ebaugh conducted the affairs of IA through illegal acts and committed numerous and continuous predicate acts of racketeering activity, as defined in 18 U.S.C. § 1961(1), on multiple occasions and in violation of the DTSA.

**Freyssinet Defendants Obtain Trade Secrets and Enter the IA Exclusivity Agreement**

437.    In June 2012, Hardwire and Freyssinet International entered the NDA.

438.    Over the course of the next few years, Hardwire provided Freyssinet Defendants with Trade Secrets, confidential, and proprietary information pursuant to the NDA and general understanding the Freyssinet Defendants were considering, in good faith, to contract with Hardwire on the K Bridge project and other projects.

439.    Indeed, at multiple points after June 2012, Hardwire provided the Freyssinet Defendants with its Integration Designs.

440.    In similar respects, and as fully detailed above, throughout 2013—2015, Hardwire:

a.    Provided the Freyssinet Defendants with the Hardwire Proposal;

b. Offered pricing to Freyssinet Defendants associated with specific bridge project scopes of work;

c. Engaged in multiple conversations, meetings, and correspondence with the Freyssinet Defendants concerning the K Bridge Project and Hardwire's Trade Secrets; and

d. Relayed the technical aspects of Hardwire's Armor Recipes and Integration Designs to the Freyssinet Defendants under the guise the Freyssinet Defendants were considering Hardwire for the bridge armor shielding on the K Bridge Project.

441.    Pursuant to the NDA, the Freyssinet Defendants were prohibited from disclosing Hardwire's Trade Secrets.

442.    Hardwire reasonably believed the Freyssinet Defendants were complying with their contractual obligations.

443.    Hardwire, however, learned through discovery conducted in the Maryland Action, the Freyssinet Defendants wholly ignored the requirements under the NDA and had no real intention of working with Hardwire because "Freyssinet did not like the fact that one of Hardwire's investors was Peter Emmons, an owner of Structural Technologies, which is a competitor of Freyssinet in the stay cable market." Rather, the Freyssinet Defendants' actions were all a ruse to obtain Hardwire's Trade Secrets so that the Defendants could garner an unlawful financial benefit.

444.    In fact, discovery has confirmed that in May 2014, Defendants entered the IA Exclusivity Agreement in May 2014, a material fact that was at all times concealed by Defendants from Hardwire.

445.    The IA Exclusivity Agreement provided that IA would be the Freyssinet Defendants' exclusive supplier for protective armor shielding.

446.    In furtherance of the IA Exclusivity Agreement, Hardwire has learned that the Freyssinet Defendants and IA Parties have utilized, and are continuing to utilize, Hardwire's confidential and proprietary information in connection with the K Bridge project and other construction projects around the country.

447.    In fact, Freyssinet Defendants and IA Parties freely exchanged Hardwire's Trade Secrets among each other through the use of electronic mail and other wires, such as telephone. Furthermore, Freyssinet Defendants and the IA Parties transmitted Hardwires Trade Secrets through electronic and interstate means when bidding on the K-Bride Project, as well as several other bridge projects, as detailed herein. .

448.    Defendants willfully and intentionally caused, and continues to cause, IA to use and disclose Hardwire's trade secrets, as detailed below, in connection with IA's work on bridge armoring jobs and in furtherance of bids provided by the Freyssinet Defendants for bridge infrastructure projects throughout the country and internationally.

**The K Bridge Project**

449.    On May 27, 2014—well within the period covered by the NDA—Freyssinet International's Cable Structures Division Manager sent Hardwire's proprietary Integration Designs to Drew Micklus at Freyssinet USA.

450.    Recently discovered evidence establishes that just three (3) weeks later, in June 17, 2014, Drew Micklus disclosed the Integration Designs to Mr. Ebaugh, who was in Maryland, by way of email transmission in breach of the NDA and in violation of law.  Mr. Ebaugh then forwarded the documents to IA's manufacturer, Vectorworks, which is located in Florida.

451.    This was not the only information provided to IA Parties. In fact, in email correspondence dated July 16, 2014 establishes that the Freyssinet Defendants sent Hardwire information and drawings to IA Parties from previously submitted proposals "in Word so [IA Parties] can use as a template and make it easier to cut/paste into [Freyssinet Defendants/IA Parties] proposal on Friday."

452.    Over the next five (5) years, through and including 2019, the Freyssinet Defendants used and disclosed Hardwire's Armor Recipes, Integration Designs, and Armor Proposals—through emails, telephone calls, and other interstate means— to complete its work on the K Bridge Project.

453.    Specifically, the Freyssinet Defendants first utilized the Armor Proposals, Integration Design, and Hardwire's test data / results to obtain the contracts on the K Bridge Project.

454.    Thereafter, the Freyssinet Defendants completed the first phase of the K Bridge Project in 2017.  To accomplish this work, the Freyssinet Defendants used and disclosed the Armor Recipes and Integration Designs.

455.    The Freyssinet Defendants later obtained the contract for the second phase of the K Bridge Project, which was completed in 2019.  To complete the work on the second phase, Defendants, yet again, used and disclosed Hardwire's Armor Recipes and Integration Design without Hardwire's authorization through electronic and other interstate means.

456.    Without authorization, Defendants transmitted the proposals for the second phase of the K Bridge Project containing Hardwire's Armor Recipes and Integration Designs through, upon information and belief, both electronic means (such as emails) and by way of the U.S. Postal Service (or a similar private commercial interstate carrier or parcel service).    The

intentional transmission of Hardwire's Trade Secrets was in furtherance of Defendants fraudulent scheme and intended to unlawfully compete with Hardwire.

457.     In fact, photos obtained from the construction of the second phase of the K Bridge confirm that the Freyssinet Defendants utilized Hardwire's Armor Recipes, albeit incorrectly causing substantial damage and potential risk the public, which Freyssinet Defendants are still trying fix.

458.     In completing all of the work on the K Bridge armoring project, which again continues through the present, the Freyssinet Defendants used, disclosed, and disseminated Hardwire's Trade Secrets, including the Armor Proposals, Armor Recipes, and Integration Designs.

459.     Upon information and belief, in furtherance of their fraudulent scheme, Freyssinet Defendants regularly transmitted Hardwire's Trade Secrets by way of telephone and email.

460.     Quite simply, the Freyssinet Defendants have attempted to recreate Hardwire's products.

461.     After misappropriating Hardwire's Trade Secrets, Freyssinet Defendants used the profits obtained from phase 1 of the K Bridge Project to continue to fund their unlawful scheme in order to suppress competition.

### The Freyssinet Defendants' Unlawful Enterprise With The IA Parties Is Ongoing

462.     The Freyssinet Defendants' scheme to misappropriate and use Hardwire's Trade Secrets did not end with the K Bridge.  Rather, the Freyssinet Defendants continue to utilize Hardwire's Armor Recipes, Armor Proposals, and Integration Designs.

463.     Indeed, Freyssinet Defendants are using their illegally obtained profits to fund further projects pursuant to the Exclusivity Agreement.

464.    For instance, in September 2016, the Freyssinet Defendants submitted a bid for a project in Texas. Upon information and belief, the bid was submitted by way of email and through an interstate carrier, such as the U.S. Postal Service.  That bid contained Hardwire's Trade Secrets, including, without limitation, use of Hardwire's pricing and cost information, which was stolen from Hardwire's Proposal. The transmission of Hardwire's Trade Secrets in this bid was done without Hardwire's authorization.

465.    Months later, in November and December 2016, the Freyssinet Defendants, yet again, submitted bids using Hardwire's Trade Secrets.  Upon information and belief, the bids were submitted by way of email and through an interstate carrier, such as the U.S. Postal Service. This time, the Freyssinet Defendants sought to obtain a contract for a project in Washington, D.C. The transmission of Hardwire's Trade Secrets in these bids was done without Hardwire's authorization.

466.    In June 2017, the Freyssinet Defendants, again, used Hardwire's Trade Secrets, and in particular Hardwire's Recipes, in connection with a bid project in the Middle East. Upon information and belief, the bids were submitted by way of email and through an interstate carrier, such as the U.S. Postal Service.  The transmission of Hardwire's Trade Secrets in this bid was done without Hardwire's authorization.

467.    Similarly, in 2018 in connection with a proposal for a northern international project, the Freyssinet Defendants once more utilized Hardwire's Armor Recipes and Integration Designs and, once again, used Hardwire's pricing information in formulating their proposals. Upon information and belief, the bid submitted in connection with this project was done by way of email and through an interstate carrier, such as the U.S. Postal Service.  The transmission of Hardwire's Trade Secrets in this bid was, once again, done without Hardwire's authorization.

468.    Thus, Freyssinet Defendants have continuously transmitted Hardwire's Trade Secrets—through means such as email, telephone, and interstate carriers—without authorization. Defendants transmission of Hardwire's Trade Secrets was undertaken in furtherance of their fraudulent scheme.

469.    Of course, these revelations have just recently been uncovered through discovery in the Maryland Action.

470.    Based upon email correspondence and information Hardwire has obtained and reviewed to date, however, upon information and belief, the Freyssinet Defendants are continuing, to this day, their unlawful use of Hardwire's Trade Secrets and confidential and proprietary information, including pricing information, and continue to disclose said Trade Secrets in connection with its efforts to win other bridge armor jobs projects throughout the country.

471.    Each proposal and bid is primarily done by means of wire or interstate carrier—Freyssinet Defendants transmits this information through telephonic, electronic, and/or with an interstate carrier (such as the U.S. Postal Service) to contractors, project owners, suppliers, manufacturers, and other third-parties in connection with actual and potential work on bridge projects.

472.    Each of the predicate acts—including, without limitation, violations of 18 U.S.C. 1341 (mail fraud), 18 U.S.C. 1342 (wire fraud), and 18 U.S.C. 1832 (theft of trade secrets) – perpetrated by the Freyssinet Defendants was in furtherance of their fraudulent scheme and misappropriation of trade secrets, and was performed by them while participating in the conduct of the affairs of an enterprise, namely, the Freyssinet Defendants, through a pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(c).

473.    As a direct and proximate result of the pattern of racketeering activity, by and through each of the unlawful acts recited herein, the Freyssinet Defendants have caused and will continue to cause ongoing irreparable harm and substantial monetary damages to Hardwire.

**WHEREFORE**, Hardwire demands judgment against the Freyssinet Defendants and ABC Corps 1-10, jointly and severally, for treble damages, in an amount in excess of $39,600,000 to be proved at trial, punitive damages, plus post-judgment interest, and injunctive relief as follows:

a.    Enjoining the Freyssinet Defendants, as well as their affiliates, successors, assigns, and all others acting by or through their, from using, disclosing, transferring, or possessing, in whole or in part, Hardwire's confidential and proprietary information and/or trade secrets.

b.    Enjoining the Freyssinet Defendants, as well as their affiliates, successors, assigns, and all others acting by or through them, from using, disclosing, transferring, or possessing, in whole or in part, any information or data, including without limitation, armor recipes and technology, information about test devices and testing methodology, threat information, manufacturing processes, pricing models, and subcontractor information originally obtained, in whole or in part, from Hardwire or its facilities or networks.

c.    Enjoining the Freyssinet Defendants, as well as their affiliates, successors, assigns, and all others acting by or through him, from using, disclosing, transferring, or possessing, in whole or in part, any armor recipes and technology, test devices and testing methodology, manufacturing processes, pricing models, and subcontractor information created by relying upon or otherwise derived from Hardwire's confidential and proprietary information and/or trade secrets.

d.      Directing the Freyssinet Defendants to return to Hardwire any and all of Hardwire's confidential and proprietary information and trade secrets in Defendants' possession, custody, or control.

e.      Directing the Freyssinet Defendants to return to Hardwire any and all data and information that contains, is based on, or utilizes, in whole or in part, any information or data obtained from Hardwire or its facilities or networks, including Hardwire's confidential and proprietary information and/or trade secrets that are in the Freyssinet Defendants' possession, custody, or control.

f.      Directing the Freyssinet Defendants to provide Hardwire with access to their computers, networks, servers, e-mail accounts, phones, and other data storage devices and spaces, for purposes of allowing a forensic consultant of Hardwire's choosing to confirm compliance with the foregoing directives.

g.      Directing the Freyssinet Defendants to certify under oath that they have fully complied with the foregoing directives.

## COUNT IV
### (Tortious Interference with Prospective Advantage and Business Relationships Against Defendants)

474.    Hardwire repeats and realleges the preceding paragraphs of the Complaint as if fully set forth at length herein.

475.    The Freyssinet Defendants have engaged in a course of conduct that has unlawfully interfered with Hardwire's business relationships through illegitimate means.

476.    Through their collective efforts, the Freyssinet Defendants have misappropriated Hardwire's "secret sauce"—through the unlawful possession, use, and disclosure of Hardwire's

Armor Recipes, Integration Designs, and Armor Proposals—to intentionally cause Hardwire harm.

477.    Upon Mr. Ebaugh's termination from Hardwire, he intentionally stole a thumb drive and notebook, owned by Hardwire, containing over 27,000 of Hardwire's files consisting of Hardwire's confidential information and trade secrets.

478.    In June 2012, Freyssinet International entered the NDA with Hardwire.

479.    After entering the NDA, Hardwire provided Freyssinet International with its Trade Secrets.

480.    In direct violation of the NDA, Hardwire has learned those Trade Secrets were provided by the Freyssinet Defendants to IA Parties.

481.    For example, the Freyssinet Defendants provided IA Parties with the Integration Designs in March and June 2014.  The Freyssinet Defendants provided this information to allow IA Parties to try and recreate Hardwire's product to be used on the bridge proposal for the K Bridge Product.

482.    In fact, at the time the Freyssinet Defendants disseminated Hardwire's Integration Designs, the Freyssinet Defendants had already entered the IA Exclusivity Agreement, which required IA to be the exclusive supplier of armor shielding to the Freyssinet Defendants.

483.    Unfortunately, the Integration Designs were not the only information that the Freyssinet Defendants unlawfully shared with IA Parties to further their exclusivity arrangement.

484.    Rather, on July 16, 2014, the Freyssinet Defendants also provided IA Parties with previous proposal excerpts that contained highly confidential information from Hardwire, and instructed IA Parties to "cut/paste" the information into a separate proposal with IA Parties'

letterhead so that Defendants could submit a separate proposal for the K Bridge Project utilizing Hardwire's Trade Secrets.

485.    Furthermore, Freyssinet Defendants shared proprietary data from Hardwire's Armor Proposal submitted on July 17, 2014 with IA Parties.

486.    Thereafter, with IA, Freyssinet Defendants intentionally used Hardwire's confidential information and Trade Secrets, including its pricing information, to wrongfully compete with Hardwire for bridge armor contracts and to steal Hardwire's customers.

487.    Defendants also intentionally used Hardwire's confidential information and Trade Secrets in connection with their work on bridge armor subcontracts, including IA's subcontracts for the K Bridge projects.

488.    Before Mr. Ebaugh and IA began competing with Hardwire, Hardwire was the only company that provided this type of protection for bridge projects and was therefore awarded sole-source contracts without the need for competitive procurement.

489.    Prior to the Exclusivity Agreement, Freyssinet Defendants had virtually no presence in the bridge armor market.  As a result, Freyssinet established a relationship with Hardwire.  However, upon secretly deciding that it no longer wanted to work with Hardwire, Freyssinet Defendants entered the IA Exclusivity Agreement, and began to fraudulently obtain and use Hardwire's Trade Secrets, to suppress Hardwire and increase their own market share by working with IA Parties to replicate Hardwire's product while simultaneously undercutting their costs and pricing.

490.    As a result of Freyssinet Defendants' misappropriation of Hardwire's trade secrets and support of IA's establishment of a competing business, however, Hardwire was required to

bid for bridge armor projects against IA and Freyssinet Defendants even though they were using Hardwire's own technology.

491.    Moreover, Freyssinet Defendants misused Hardwire's confidential pricing information to obtain a competitive advantage against Hardwire in the bidding process.

492.    IA ultimately was awarded the contract to provide bridge armor on the K Bridge projects, thereby depriving Hardwire of that multi-million-dollar economic opportunity.

493.    At that time, no other entities could provide the bridge armor needed for the K Bridge projects.  Thus, absent Freyssinet Defendants' tortious conduct, Hardwire would have been retained to provide bridge armor on the projects.

494.    In fact, after Hardwire lost the bid on the K Bridge Project, it was forced to compete with IA and/or the Freyssinet Defendants on various other construction projects throughout 2016, 2017, 2018, and 2019.

495.    Hardwire lost the opportunity to provide bridge armor on the K Bridge projects and was deprived of revenue for the use of its trade secrets for bridge armor projects by Freyssinet Defendants.

496.    Hardwire lost the opportunity to be awarded the large sole source contract for another large suspender rope project in the New York area (bridge not named for security purposes).

497.    Freyssinet Defendants' actions and inferior, poor and unsafe implementation of Hardwire's trade secrets result in the loss of customer trust for armor products and Hardwire, as armor is no longer seen as a way to protect a bridge.  On the contrary, it is seen as a way to harm the bridge.

498.     Freyssinet Defendants' actions were intentional, willful, without justifiable cause, and calculated to cause the aforementioned economic damage to Hardwire's business.

499.     Freyssinet Defendants acted maliciously and without justification in stealing and/or using Hardwire's trade secrets and intended to cause Hardwire the aforementioned damages.

500.     Freyssinet Defendants' actions have caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire including, but not limited to, lost profits, other consequential damages, and harm to reputation.

**WHEREFORE**, Hardwire demands judgment against Freyssinet Defendants and ABC Corps 1-10, jointly and severally, for damages in an amount in excess of $39,600,000 to be proved at trial, punitive damages, post-judgment interest, and such other and further relief as this Court may deem proper.

## COUNT V
### (Unfair Competition Against Defendants)

501.     Hardwire repeats and realleges the preceding paragraphs of the Complaint as if fully set forth at length herein.

502.     Hardwire invested substantial time and resources in developing its confidential information and trade secrets, which include armor recipes, technology, knowledge of test devices and testing methodology, threat information, manufacturing processes, pricing models, and subcontractor information.

503.     After Ebaugh promised and assured Hardwire that he would not disclose the company's confidential information and trade secrets, Hardwire shared this information to Ebaugh for use in connection his employment.

504.    Ebaugh's multiple promises to maintain the secrecy of Hardwire's trade secrets, upon which Hardwire relied to its detriment, were fraudulent.

505.    Indeed, prior to his termination, Ebaugh downloaded over 27,000 files containing Hardwire's confidential information and trade secrets from his office computer to a thumb drive with the intention to steal the data from Hardwire if he were to be terminated.

506.    Upon his termination from Hardwire, Ebaugh stole the thumb drive from Hardwire and then copied the improperly downloaded data onto his personal computer.

507.    In furtherance of the fraudulent scheme, Ebaugh then established IA, a competing venture in the bridge armoring business.

508.    Before Ebaugh and IA began competing with Hardwire, Hardwire was the only company that provided this type of protection for these bridge projects and, therefore, Hardwire was awarded sole-source contracts without the need for competitive procurement.

509.    In addition, Freyssinet Defendants engaged in a series of fraudulent actions, representations, and omissions in order to obtain Hardwires' Trade Secrets, which Freyssinet Defendants then used to directly compete with Hardwire and work with IA Parties to recreate Hardwire's products at a lower cost.

510.    In June 2012, Freyssinet International entered the NDA with Hardwire.  Hardwire has just learned in November 2020, however, that the Freyssinet International was breaching the NDA and disclosing Hardwire's Trade Secrets.

511.    For example, in connection with Hardwire's prior dealings with the Freyssinet Defendants, Hardwire had provided the Freyssinet Defendants with its confidential and proprietary Integration Designs.

512.    The Freyssinet Defendants understood the Integration Designs were subject to and protected from disclosure by the terms of the NDA.

513.    Nevertheless, on May 27, 2014—well within the period covered by the NDA—Freyssinet International's Cable Structures Division Manager sent Hardwire's proprietary Integration Designs to Drew Micklus at Freyssinet USA.  In total, the May 27 e-mail contained 11 attachments, which are confidential and proprietary Integration Designs created by Hardwire.

514.    Indeed, although the documents appear to originate with Freyssinet International in the e-mail chain, the metadata on the attachments confirms that the files were created by Hardwire employee Tim Keller on July 12, 2012.

515.    On June 17, 2014, Drew Micklus forwarded the e-mail, including the attached Integration Designs, to Ebaugh in Maryland, who then forwarded the documents to IA's manufacturer, Vectorworks.

516.    Also on June 17, 2014, Mr. Micklus forwarded Mr. Ebaugh another e-mail from his internal Freyssinet team that included two (2) drawing files. The drawings contained Hardwire's armor protection integrated on a Freyssinet cable system. "Hardwire Blast Protection" was specifically shown in these Freyssinet CAD drawings

517.    Unfortunately, the Integration Designs were not the only information that the Freyssinet Defendants unlawfully shared with IA Parties to further their exclusivity arrangement.

518.    Rather, on July 16, 2014, Freyssinet Defendants also provided IA Parties with previous proposal excerpts that contained highly confidential information from Hardwire, and instructed IA Parties to "cut/paste" the information into a separate proposal with IA Parties' letterhead so that Defendants could submit a separate proposal for the K Bridge Project utilizing Hardwire's Trade Secrets.

519.    IA and the Freyssinet Defendants also utilized Hardwire's stolen test data to secure the K Bridge job by fraudulently representing that they had completed testing and had performance data on the proposed armor solutions.

520.    Furthermore, despite having an exclusive business relationship with IA, the Freyssinet Defendants continued to represent that they intended to work with Hardwire, enticing Hardwire to continue to divulge pricing information.  However, Freyssinet never intended to work with Hardwire for the K Bridge.

521.    Because of Freyssinet Defendants' misappropriation of Hardwire's Trade Secrets and pricing models and the establishment of a competing business (IA), however, Hardwire was required to bid for bridge armor projects against IA Parties.  Not having the same development, facilities, and testing costs, IA and Freyssinet Defendants were able to offer lower prices and unfairly compete with Hardwire.

522.    In fact, after Hardwire lost the bid for the first span of the K Bridge Project and subsequently the second span project, Hardwire was forced to compete with IA and Freyssinet Defendants on various other construction projects throughout 2016, 2017, 2018, and 2019.

523.    In bidding on and then working on bridge armoring projects, Freyssinet Defendants wrongfully used and disclosed, and continue to wrongfully use and disclose, Hardwire's confidential information and Trade Secrets.  Hardwire received no revenue from Defendants for their use of its trade secrets in completing bridge armor projects.

524.    Freyssinet Defendants thus damaged or jeopardized Hardwire's business through fraud, deceit, trickery, and unfair methods.  Indeed, as a result of Defendants' counduct, bridge armoring projects, including the K Bridge projects, have been and will be awarded to IA instead of Hardwire.

525.    Freyssinet Defendants' misconduct was calculated to cause the aforementioned economic damage to Hardwire.

526.    Freyssinet Defendants acted maliciously and without justification in stealing and/or using Hardwire's trade secrets and intended to cause Hardwire the aforementioned damages.

527.    Freyssinet Defendants actions caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire.

**WHEREFORE**, Hardwire demands judgment against Freyssinet Defendants and ABC Corps 1-10, jointly and severally for damages in an amount in excess of $39,600,000 to be proved at trial, punitive damages, plus post-judgment interest, and injunctive relief as follows:

a.    Enjoining Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from using, disclosing, transferring, or possessing, in whole or in part, Hardwire's confidential and proprietary information and/or trade secrets.

b.    Enjoining Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from using, disclosing, transferring, or possessing, in whole or in part, any information or data, including without limitation, armor recipes and technology, information about test devices and testing methodology, threat information, manufacturing processes, pricing models, and subcontractor information  originally obtained, in whole or in part, from Hardwire or its facilities or networks.

c.    Enjoining Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from using, disclosing, transferring, or possessing, in whole or in part, any armor recipes and technology, test devices

and testing methodology, manufacturing processes, pricing models, and subcontractor information created by relying upon or otherwise derived from Hardwire's confidential and proprietary information and/or trade secrets.

d.      Directing Freyssinet Defendants to return to Hardwire any and all of Hardwire's confidential and proprietary information and trade secrets in Freyssinet Defendants' possession, custody, or control.

e.      Directing Freyssinet Defendants to return to Hardwire any and all data and information that contains, is based on, or utilizes, in whole or in part, any information or data obtained from Hardwire or its facilities or networks, including Hardwire's confidential and proprietary information and/or trade secrets that are in Defendants' possession, custody, or control.

f.      Directing Freyssinet Defendants to provide Hardwire with access to their computers, networks, servers, e-mail accounts, phones, and other data storage devices and spaces, for purposes of allowing a forensic consultant of Hardwire's choosing to confirm compliance with the foregoing directives.

g.      Directing Freyssinet Defendants to certify under oath that they have fully complied with the foregoing directives; and

h.      Such other and further relief as this Court may deem proper.

### COUNT VI
### (Breach of Contract Against Freyssinet International)

528.    Hardwire repeats and realleges the preceding paragraphs of the Complaint as if fully set forth at length herein.

529.   Hardwire and Freyssinet International entered the NDA on or around June 6, 2012 "to establish a mutual understanding concerning the preservation and safeguarding of such [confidential and proprietary] information."

530.   The NDA defined "Proprietary Information" to including, among other things:

> tangible or intangible information related to a Party's products, processes, methods, ideas, concepts, discoveries, designs, drawings, specifications, techniques, practices, model, diagrams, source code, object code, software, programs, know-how, technical data, research and development, or business and financial data.

531.   Pursuant to the NDA, Freyssinet International agreed that the confidential and proprietary information it would receive under the NDA "shall be used solely for the purpose of pursuing the development, manufacture, and supply of next-generation armor products [with Hardwire] and the adaptation of them with Freyssinet cable systems."   The NDA further provided that "No other use of Proprietary Information is granted without the prior written consent of the disclosing Party."

532.   At all relevant times herein, Hardwire complied with its obligations under the NDA.

533.   After execution of the NDA and over the course of several years, Hardwire provided Freyssinet International with confidential and proprietary information, including, without limitation, its technical designs and pricing information.  However, Freyssinet breached this contract by sharing this data with unapproved third-party competitors.

534.   For example, on March 3, 2014, Mr. Micklus e-mailed Mr. Ebaugh some of the bridge armor renderings that he had previously received from Hardwire. These showed how the Hardwire armor was installed and fit onto the Freyssinet stay cable system.

535.    On May 27, 2014, Freyssinet International provided Drew Micklus, the COO of Freyssinet USA, with Hardwire's Integration Designs.

536.    In total, the May 27 e-mail contains 11 attachments, which are confidential and proprietary and were created by Hardwire.

537.    Hardwire just learned through discovery in the Maryland Action that on June 17, 2014, Drew Micklus forwarded the e-mail, including the attached Integration Designs, to Ebaugh in Maryland, who then forwarded the documents to IA's manufacturer, Vectorworks, in Florida.

538.    Ironically, Ebaugh's cover email requests that Vectorworks "[p]lease keep these drawings and concepts Confidential."

539.    Also June 17, 2014, for example, Mr. Micklus forwarded Mr. Ebaugh an e-mail from his internal Freyssinet team that included two (2) drawing files.  The drawings contained Hardwire's confidential Integration Designs showing how Hardwire's armor integrated on a Freyssinet cable system.  "Hardwire Blast Protection" was specifically shown in these Freyssinet CAD drawings.

540.    On July 16, 2014, Freyssinet Defendants also provided IA Parties with previous proposal excerpts that contained highly confidential information from Hardwire, and instructed IA Parties to "cut/paste" the information into a separate proposal with IA Parties' letterhead so that Defendants could submit a separate proposal for the K Bridge Project utilizing Hardwire's Trade Secrets.

541.    Moreover, on July 17, 2014, Hardwire provided Freyssinet International with the Hardwire Proposal. Hardwire set forth a conspicuous watermark on the footer of the Hardwire Proposal stating "Confidential: Any unauthorized use or distribution is prohibited", thereby bringing it within the purview of the obligations set forth in the NDA.

542.    Again on November 6, 2014, Hardwire provided Freyssinet Defendants with an updated Hardwire Proposal.

543.    All information provided by Hardwire in connection with the K Bridge project, including the information contained in the Proposal, fit within the documents contemplated under the NDA would be safeguarded and protected from disclosure.

544.    At all relevant times herein, Hardwire was communicating with both Freyssinet International and Freyssinet USA, throughout is Chief Operating Officer Drew Micklus, which at all times was acting as an agent for Freyssinet International.

545.    Notwithstanding, Hardwire has just learned through discovery produced in the Maryland Action in November 2020 that the Freyssinet International intentionally violated the NDA and provided IA Parties with the Hardwire Proposal, as well as the Integration Designs.

546.    Moreover, upon information and belief, Freyssinet International was disclosing confidential and proprietary information provided by Hardwire under the NDA to IA Parties to facilitate the Defendants' unlawful scheme to deprive Hardwire of its technical designs and how know and suppress its ability to compete in the market.

547.    As it turns out, Freyssinet International was intentionally concealing its wrongful actions so as to hide from Hardwire that it had disclosed its proprietary and confidential information.

548.    Specifically, Section 8 of the NDA advises that Freyssinet International is under a duty to "notify" Hardwire "immediately" upon any unauthorized use or disclosure of information provided under the NDA.

549.    At no time did Freyssinet International comply with this obligation, choosing instead to intentionally conceal its actions.

550.    Indeed, Freyssinet Defendants confirmed in 2016 the existence and enforceability of the NDA when it advised Hardwire that it was in receipt of a grand jury subpoena related to IA Parties and that certain information requested may have been provided in accordance with the NDA.

551.    This correspondence makes plain that Freyssinet USA understood it was subject to the terms of the NDA, which read in part:

> Freyssinet USA is aware of the Mutual Nondisclosure Agreement between Hardwire LLC and Freyssinet International et CIE dated June 6, 2012 ("NDA").  Out of an abundance of caution, Freyssinet USA is providing you with this notice consistent with the NDA.

552.    Freyssinet International's actions breached the express terms and obligations of the NDA.

553.    Freyssinet International's actions caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire.

**WHEREFORE**, Hardwire demands judgment against Freyssinet International for damages in an amount in excess of $39,600,000 to be proved at trial, plus post-judgment interest and such other and further relief as this Court may deem proper.

## COUNT VII
### (Fraud Against Defendants)

554.    Hardwire repeats and realleges the preceding paragraphs of the Complaint as if fully set forth at length herein.

555.    Discovery provided by the IA Parties in the Maryland Action has revealed the Freyssinet Defendants' fraudulent scheme to induce Hardwire to provide confidential and proprietary information under the false premise that such information would be held as confidential.

556.    As aforesaid, in June 2012, Hardwire and Freyssinet International entered the NDA to facilitate the free exchange of confidential information in connection with the parties' proposed business dealings.  As an example, Hardwire created and provided Integration Designs beginning in July 2012.

557.    Pursuant to the NDA, between 2012 and 2015, Hardwire provided Freyssinet Defendants with various information, including for example, the Integration Designs and Hardwire Proposal for the K Bridge Project.

558.    Throughout this period, Freyssinet Defendants intentionally induced Hardwire to continuously provide confidential and proprietary information and pricing under false pretenses, which were then disclosed to IA Parties.

559.    The Integration Designs, and each of the proposals, as well as the numerous meetings and conversations that took place between the parties, contained confidential and proprietary information concerning Hardwire's pricing and design specifications.  Indeed, the Proposal contained a confidentiality tag reading: "Confidential: Any unauthorized use or distribution is prohibited."

560.    Hardwire has learned through discovery in the Maryland Action that the Freyssinet Defendants' intentionally concealed material information and unlawfully disclosed Hardwire's confidential information to IA Parties.

561.    Specifically, as detailed herein, Freyssinet Defendants and IA Parties entered the IA Exclusivity Agreement in or around May 2014.  Pursuant to this agreement, Freyssinet Defendants were contractually obligated to use IA as its exclusive supplier for armor shielding technology, which included its work on the K Bridge project.

562.    Freyssinet Defendants never disclosed to Hardwire the existence of the IA Exclusivity Agreement.    Rather, Freyssinet Defendants concealed this information and led Hardwire to believe that it was considering providing Hardwire with the contract for armor shielding on the K Bridge Project by, among other things:

    a.  Receiving multiple proposals containing confidential and proprietary information, such as technical design specification and pricing;

    b.  Engaging in multiple conversations concerning the K Bridge Project and suggesting that Hardwire was "ahead" of the other potential bidders given Hardwire's track record and superior products; and

    c.  Attending meetings with Hardwire to review and discuss Hardwire's technical specifications and pricing on the K Bridge project.

563.    Hardwire has come to learn during the Maryland Action, however, that the Freyssinet Defendants never intended to contract with Hardwire.    Instead, Freyssinet Defendants were purposefully obtaining Hardwire's confidential information and disseminating said information to IA Parties to facilitate IA Parties entry in the market and to enable IA Parties' attempt to recreate Hardwire's proprietary products at a reduced rate.    This was done to enable Freyssinet to win multi-million dollar cable construction jobs.

564.    Discovery has revealed that this fraudulent scheme was intended to boost Freyssinet Defendants' market share by scheming with IA Parties to outbid VSL for the K Bridge Project while simultaneously undercutting Hardwire, thereby enabling Freyssinet Defendants to win large cabling jobs.

565.    In fact, *after* entering the IA Exclusivity Agreement, Freyssinet Defendants requested and received Hardwire's Armor Proposals, which it later disseminated to Ebaugh along with the Integration Designs.

566.    At all relevant times herein, Hardwire reasonably relied upon Freyssinet Defendants' representations that it was considering contracting with Hardwire.

567.    Freyssinet Defendants knew, or should have known, that its representations were false when made, or were otherwise made with a reckless indifference for the truth—throughout the period that the Freyssinet Defendants were making these representations, Freyssinet Defendants were contractually bound to work with IA.

568.    Freyssinet Defendants knew, or should have known, that the existence of the IA Exclusivity Agreement and the intention to use IA as the armor shielding supplier was material information that was intentionally concealed from Hardwire.

569.    Freyssinet Defendants made these representations and intentionally concealed material information in order to induce Hardwire into providing them with confidential and proprietary information that they needed but lacked themselves.

570.    But for Freyssinet Defendants' concealment of material information, blatant misrepresentations, and intentional disclosure of Hardwire's confidential and proprietary information, IA Parties would have never been able to undercut Hardwire's proposal.

571.    Freyssinet Defendants' actions caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire.

**WHEREFORE**, Hardwire demands judgment against the Freyssinet Defendants and ABC Corps 1-10, jointly and severally, for damages in an amount in excess of $39,600,000 to be

proved at trial, punitive damages, plus post-judgment interest and such other and further relief as this Court may deem proper.

## COUNT VIII
### (Civil Conspiracy Against Defendants)

572.    Hardwire repeats and realleges the preceding paragraphs of the Complaint as if fully set forth at length herein.

573.    The Defendants engaged in a civil conspiracy to commit fraud on Hardwire and unlawfully obtain, disclose, and misappropriate Hardwire's confidential and proprietary information under false pretenses.

574.    As documented by IA Parties in their discovery provided in the Maryland Action, the Freyssinet Defendants expressed concern that "[its] presentation on security may have been where [they] came up short" for other projects in the past.  Furthermore, after learning that one of Hardwire's investors was Peter Emmons (owner of VSL, a competitor to Freyssinet), Freyssinet had no intention of working with Hardwire (but concealed that fact from Hardwire).

575.    In connection therewith, Freyssinet Defendants inquired as to whether IA Parties were capable of replicating Hardwire's products at a lower price.  As a result of these conversations, in May 2014, Freyssinet Defendants and IA entered the IA Exclusivity Agreement, making IA the exclusive supplier for armor shielding on bridge projects secured by Freyssinet Defendants.

576.    Upon information and belief, IA Parties and Freyssinet Defendants undertook a concerted effort to steal Hardwire's confidential and proprietary information so as to allow Freyssinet Defendants to obtain the K Bridge project and provide the underlying armor shielding contract to IA.

577.    Despite having entered the IA Exclusivity Agreement, Freyssinet Defendants induced Hardwire to provide them with confidential and proprietary information and, thereafter, unlawfully disclosed said information to IA Parties.

578.    Specifically, Freyssinet Defendants induced Hardwire to provide information protected from disclosure under the NDA yet Hardwire has just learned that the Freyssinet Defendants completely disregarded the terms of the NDA.

579.    Having obtained the confidential and proprietary information, IA Parties and Freyssinet Defendants schemed to substantially reduce IA's bid to "virtually nothing" with the sole intention of pricing Hardwire out of the market so as to allow Freyssinet Defendants and IA to obtain the contract on the K Bridge project.

580.    Upon information and belief, the agreement between Freyssinet Defendants and IA Parties included a promise to provide IA with future work if it successfully recreated Hardwire's product and undercut its price.

581.    The Freyssinet Defendants' actions facilitated the misappropriation and disclosure of confidential and trade secret information, which is continuing today.

582.    The Freyssinet Defendants' actions caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire.

**WHEREFORE**, Hardwire demands judgment against the Freyssinet Defendants and ABC Corps 1-10, jointly and severally, for damages in an amount in excess of $39,600,000 to be proved at trial, punitive damages, plus post-judgment interest and such other and further relief as this Court may deem proper.

## COUNT IX
### (Violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1, Against the Freyssinet Defendants)

583.   Hardwire repeats and realleges the preceding paragraphs of the Complaint as if fully set forth at length herein.

584.   15 U.S.C.A. § 1 provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

585.   The IA Exclusivity Agreement and the Freyssinet Defendants' conspiracy to unlawfully obtain Hardwire's confidential and proprietary information constitutes an unreasonable restraint on trade.

586.   Specifically, the Freyssinet Defendants' arrangement constitutes a vertical non-price restraint intended to enhance the Freyssinet Defendants' market share (which consists of both national and international bridge projects) and restrict competitors.   By fraudulently obtaining Hardwire's confidential and proprietary information, the Freyssinet Defendants, along with Mr. Ebaugh and IA, had a unity of purpose and/or common design and understanding to undercut Hardwire's pricing under false pretenses.

587.   Discovery obtained in the Maryland Action has revealed that the Freyssinet Defendants intentionally induced Hardwire to provide information that was otherwise confidential. Thereafter, Freyssinet Defendants provided IA Parties with the information so as to allow IA to recreate Hardwire's proprietary products at a lower cost.   As a result, IA was able to underprice the product without the necessary overhead and costs associated with researching, developing, and testing the products.   Furthermore, IA and Freyssinet Defendants utilized Hardwire's test data in their proposal to win the K Bridge, falsely representing that IA had

previous test data and results when in fact the data was Hardwire's.  This is evident in the product quality delivered to the NYDOT on the K Bridge project.

588.     The Freyssinet Defendants' conspiracy with the IA Parties resulted in an effect on interstate (and international) commerce—a public works project (the K Bridge Project) was provided to the Freyssinet Defendants under false pretenses.

589.     Upon information and belief, the Freyssinet Defendants have agreed to work exclusively on future projects wherein IA will recreate Hardwire's products, using confidential and proprietary information stolen by the Defendants, to undercut Hardwire and restrict competition in the market.

590.     Indeed, the Freyssinet Defendants furthered their exclusive arrangement and utilized Hardwire's Trade Secrets outside of the K Bridge project, including:

a.     In September 2016, the IA / Freyssinet team bid for a project in Texas in which Hardwire's confidential and proprietary information was used;

b.     In November and December 2016, the IA / Freyssinet team was working on bids for a project in Washington, DC.  In connection with that work Ebaugh provided a proposal for the Freyssinet Defendants' use, which utilized Hardwire's Armor Recipes and Integration Designs.

c.     In June 2017, IA and Freyssinet USA used Hardwire's Armor Recipes in connection with a project in the Middle East.

d.     In early to mid-2018, in connection with a proposal for a northern international project, the Freyssinet Defendants again utilized Hardwire's Armor Recipes and Integration Designs and, once again, used Hardwire's pricing information in formulating their proposals.

591.    Furthermore, discovery obtained illustrates that the Freyssinet Defendants scheme is not targeted exclusively towards Hardwire.  Rather, the Freyssinet Defendants have apparently been working in a confederation to steal confidential information from other competitors under the false premise that the Freyssinet Defendants may award them a contract.

592.    For instance, in July 2014, email correspondence confirms that the Freyssinet Defendants were allowing Ebaugh to listen in on confidential calls with competitors in order to steal the information being provided.  Indeed, the Freyssinet Defendants were even providing IA Parties with other proposals (in addition to the Hardwire Proposal) throughout the K Bridge bidding process.

593.    Unbeknownst to Hardwire (or any of the other competitors in the market) the information being received by the Freyssinet Defendants is intended only to enhance its exclusivity agreement with IA—the Freyssinet Defendants are providing IA with all of the confidentially obtained information so as to allow IA to recreate the designs at a price that undercuts competitors, and ultimately enable Freyssinet Defendants to win large cabling jobs.

594.    Because the Freyssinet Defendants and the IA Parties have entered both formal and informal exclusivity agreements, and because they conspired together to steal Hardwire's (and others) technical designs, specifications, and pricing, Defendants have stifled competition in the bridge cable and infrastructure armor markets.

595.    The Freyssinet Defendants' actions are anticompetitive—they are restraining Hardwire (and others) from fairly competing in armor shielding market.

596.    The Freyssinet Defendants have a growing market share within the bridge cable market and, according to discovery obtained, is trying to further increase its market presence within the United States and internationally.

597.    Prior to the IA Exclusivity Agreement, IA had no market share within the armor shielding market.  Indeed, documents and information provided in discovery in the Maryland Action suggests that the IA Exclusivity Agreement and the arrangement established with Defendants was intended to propel IA into the market space, which has barriers to entry and for which Hardwire was the exclusive supplier providing solutions.

598.    The Freyssinet Defendants' desire to increase their market share acted as motivation to undertake this unlawful conspiracy intended to suppress competition.  Indeed, documents obtained in discovery suggest IA Parties acted against their economic interest by making "virtually nothing" on the K Bridge project with the understanding that they were to receive future work and, thus, unlawfully increase their presence in the market and suppress Hardwire (and others).

599.    Under the Freyssinet Defendants' exclusivity arrangement portions of the market are being foreclosed—Freyssinet Defendants' unlawful scheme has resulted in Hardwire, and other competitors, being unable to fairly bid on and obtain armor shielding projects as Freyssinet Defendants have secured pricing and cost information that they are utilizing to win contracts.

600.    As a direct result of the Freyssinet Defendants' actions, Hardwire has lost substantial revenue and profits, including, without limitation, the monetary harm it suffered as a result of losing the K Bridge Project.

601.    The Freyssinet Defendants' actions caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire, as well as causing harm and damage to the market in general.

**WHEREFORE**, Hardwire demands judgment against the Freyssinet Defendants and ABC Corps 1-10, jointly and severally, for damages in an amount in excess of $39,600,000 to be

proved at trial, treble damages and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 15(a), plus post-judgment interest and injunctive relief as follows:

a.      Enjoining the Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from working exclusively under all formal and informal agreements to supply bridge armor shielding technology;

b.      Enjoining the Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from using, disclosing, transferring, or possessing, in whole or in part, Hardwire's confidential and proprietary information and/or trade secrets;

c.      Enjoining the Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from using, disclosing, transferring, or possessing, in whole or in part, any information or data, including without limitation, armor recipes and technology, information about test devices and testing methodology, threat information, manufacturing processes, pricing models, and subcontractor information originally obtained, in whole or in part, from Hardwire or its facilities or networks;

d.      Enjoining the Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from using, disclosing, transferring, or possessing, in whole or in part, any armor recipes and technology, test devices and testing methodology, manufacturing processes, pricing models, and subcontractor information created by relying upon or otherwise derived from Hardwire's confidential and proprietary information and/or trade secrets;

e.      Enjoining the Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from violation 15 U.S.C. § 1; and

f.      Such other and further relief as this Court may deem proper.

## COUNT X
### (Violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, Against the Freyssinet Defendants)

602.    Hardwire repeats and realleges the preceding paragraphs of the Complaint as if fully set forth at length herein.

603.    15 U.S.C. § 2 makes it illegal for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations…."

604.    The Freyssinet Defendants entered the IA Exclusivity Agreement and undertook certain conduct with the intent to monopolize the armor shielding and bridge cable market in the United States (and internationally).

605.    Specifically, the Freyssinet Defendants' arrangement is intended to restrict competition in the market and unlawfully attempt to obtain a monopoly at the expense of Hardwire and others.  By fraudulently obtaining and subsequently using Hardwire's confidential and proprietary information, the Freyssinet Defendants conspired to undercut Hardwire's pricing under the false pretenses, enabling the Freyssinet Defendants to win large cabling jobs.

606.    Discovery obtained in the Maryland Action has revealed that the Freyssinet Defendants intentionally induced Hardwire to provide information that was otherwise confidential. Thereafter, the Freyssinet Defendants provided IA Parties with the information so as to allow IA to recreate Hardwire's proprietary products at a lower cost.  As a result, IA was

able to underprice the product without the necessary overhead and costs associated with researching, developing, and testing the products. This is evident in the product quality delivered to the NYDOT on the K Bridge project.

607. By undertaking these actions, the Freyssinet Defendants furthered their attempt to monopolize the market—the Freyssinet Defendants intend to work exclusively with the IA Parties going forward and utilize Hardwire's confidential and proprietary information to hinder competition.

608. The Freyssinet Defendants' arrangement, if permitted to continue, has an anticompetitive effect in the bridge construction market, which spans across the country (and internationally).

609. Discovery obtained illustrates that the Freyssinet Defendants' scheme is not targeted exclusively towards Hardwire. Rather, the Freyssinet Defendants and the IA Parties have apparently been working in a confederation to steal confidential information from other competitors under the false premise that the Freyssinet Defendants may award them a contract.

610. For instance, in July 2014, email correspondence confirms that the Freyssinet Defendants were allowing Ebaugh to listen in on confidential calls with competitors in order to steal the information being provided. Indeed, the Freyssinet Defendants were even providing IA Parties with other proposals (in addition to the Hardwire Proposal) throughout the K Bridge bidding process.

611. Unbeknownst to Hardwire (or any of the other competitors in the market) the information being received by the Freyssinet Defendants is intended only to enhance its exclusivity agreement with IA—the Freyssinet Defendants are providing IA with all of the

confidentially obtained information so as to allow IA to recreate the designs at a price that undercuts competitors.

612.    The Freyssinet Defendants received armor shielding bids from other competitors which they also provided to IA Parties.  This provided IA Parties with the pricing and technical information for multiple competitors needed to undercut pricing and ensure that IA (and the Freyssinet Defendants) could present a lower final bid proposal for the K Bridge project.

613.    Indeed, the Freyssinet Defendants furthered their exclusivity agreement and utilized Hardwire's Trade Secrets outside of the K Bridge project, including: (i) a project in Texas; (ii) a project in Washington, DC; (iii) a Middle East project; and (iv) a northern international bridge.

614.    The Freyssinet Defendants' collective understanding and arrangement that they will work exclusivity with each other, while the Freyssinet Defendants freely accepted competing bids for the sole purpose of providing those bids to its exclusive partner, IA, stifles the competitive bidding process and is an attempt to create a monopoly in the market.

615.    There are no justifiable grounds for the Freyssinet Defendants' actions and their conduct undermines competitive bidding in this market space.  Had the Freyssinet Defendants truly believed that IA was able to exclusively provide armor shielding that competed with Hardwire so as to exclude Hardwire from working with the Freyssinet Defendants on any bridge project, the Freyssinet Defendants would not have conspired to continuously to induce Hardwire to provide updated proposals and pricing, which were provided to IA Parties for their review and use.

616.    Upon information and belief, and as sworn under oath by Mr. Ebaugh, the K Bridge project was IA's first bridge project, and it was obtained and procured through the unlawful use of confidential and proprietary information.

617.    Upon information and belief, the Freyssinet Defendants have a formal and/or informal agreement to continue to utilize Hardwire's (and others) confidential and proprietary information to obtain a monopoly over competition and increase their market share unlawfully at the expense of others.

618.    If permitted to continue with this arrangement, the Freyssinet Defendants have a dangerous probability of success in achieving monopoly power—the Freyssinet Defendants have armed (and continue to arm) themselves with unlawfully obtained confidential and proprietary information that is being used to exclude competition.

619.    The Freyssinet Defendants' arrangement seeks to create an insurmountable barrier to entry in the market as they are utilizing the competitor's confidential information, including their cost and pricing information, installation mechanisms, and designs, to replicate their competitors bids at lower prices. Put simply, Hardwire and other armor shielding contractors are unable to compete because the Freyssinet Defendants have fraudulently obtained confidential information and are utilizing said information to further their exclusivity arrangement.

620.    As a result of the Freyssinet Defendants' actions, they have conspired, or attempted to conspire, to create a monopoly.

621.    As a direct result of the Freyssinet Defendants' actions, Hardwire has lost substantial revenue and profits, including, without limitation, the monetary harm it suffered as a result of losing the K Bridge Project.

622.    The Freyssinet Defendants' actions caused and will continue to cause ongoing, irreparable harm and substantial monetary damages to Hardwire.

**WHEREFORE**, Hardwire demands judgment against the Freyssinet Defendants and ABC Corps 1-10, jointly and severally, for damages in an amount in excess of $39,600,000 to be proved at trial, treble damages and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 15(a), plus post-judgment interest and injunctive relief as follows:

a.    Enjoining the Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from working exclusively under all formal and informal agreements to supply bridge armor shielding technology in a monopolistic environment;

b.    Enjoining the Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from using, disclosing, transferring, or possessing, in whole or in part, Hardwire's confidential and proprietary information and/or trade secrets;

c.    Enjoining the Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from using, disclosing, transferring, or possessing, in whole or in part, any information or data, including without limitation, armor recipes and technology, information about test devices and testing methodology, threat information, manufacturing processes, pricing models, and subcontractor information  originally obtained, in whole or in part, from Hardwire or its facilities or networks;

d.    Enjoining the Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from using, disclosing, transferring, or possessing, in whole or in part, any armor recipes and technology, test devices

and testing methodology, manufacturing processes, pricing models, and subcontractor information created by relying upon or otherwise derived from Hardwire's confidential and proprietary information and/or trade secrets;

      e.    Enjoining the Freyssinet Defendants, as well as their affiliates, subsidiaries, successors, assigns, and all others acting by or through either of them, from violating 15 U.S.C. § 2; and

      f.    Such other and further relief as this Court may deem proper.


Dated:  December 13, 2021

                           Respectfully submitted,

                           **COLE SCHOTZ P.C.**

                           By: */s/ Michael R. Yellin*
                             Michael R. Yellin, Esq.
                             Arnold P. Picinich, Esq.
                             1325 Avenue of the Americas
                             19th Floor
                             New York, New York 10019
                             Telephone: (212) 752-8000
                             Facsimile: (212) 752-8393

                             -and-

                             Norman L. Pernick, Esq
                             500 Delaware Avenue
                             Suite 1410
                             Wilmington, Delaware 19801
                             (*pro hac vice application forthcoming*)


                           *Attorneys for Plaintiff Hardwire, LLC*