UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

HARDWIRE, LLC,

                Plaintiff,

    -against-

FREYSSINET INTERNATIONAL ET CIE,
FREYSSINET, INC., and ABC CORPS 1-10,

           Defendants.

**<u>MEMORANDUM AND ORDER</u>**

Case No. 21-CV-6870 (FB) (RML)

*Appearances:*
*For the Plaintiff*:
MICHAEL R. YELLIN
ARNOLD P. PICINICH
Cole Schotz P.C.
1325 Ave. of the Americas
Ste. 19th Floor
New York, NY 10019

*For Defendants*:
CLAY C. WHEELER
CHAD D. HANSEN
Kirkpatrick Townsend & Stockton LLP
4208 Six Forks Road, Ste. 1400
Raleigh, NC 27609

**BLOCK, Senior District Judge:**

    Plaintiff Hardwire LLC ("Hardwire") brought this action against

Freyssinet International Et Cie and Freyssinet, Inc. (the "Freyssinet Defendants),

and the remaining ten named defendants (collectively, "Defendants"), alleging

several federal trade secret and business tort claims arising from Defendants'

alleged misappropriation of Hardwire's proprietary bridge cable shielding

technologies. Pending before the Court is Defendants' motion to dismiss each of

Hardwire's claims for failure to state a claim under Federal Rule of Civil

1

Procedure 12(b)(6). For the reasons explained below, Defendants' motion is denied

with respect to all counts aside from Hardwire's claim under section 2 of the

Sherman Antitrust Act, which is dismissed with prejudice.

## I. FACTUAL BACKGROUND

The following facts are taken from the Complaint and papers attached

thereto. Hardwire is a Maryland-based corporation specializing in the development

of protective armor for a variety of public contracting uses, including shielding for

bridge stay cables intended to protect them from terrorist attacks. Freyssinet

International Et Cie is a French engineering firm that manufactures and installs

structural cables, including those used in bridges. Freyssinet, Inc., a Virginia

corporation, is the United States arm of Freyssinet International Et Cie.

Hardwire's allegations center on the three categories of proprietary

information used to develop its stay cable armor: (1) "Armor Recipes," which are

the materials and manufacturing processes needed to create the armor, (2)

"Integration Designs," which dictate how the armor must be configured to a

bridge's cables, and (3) "Armor Proposals," which are construction bids for

specific bridge protection projects. Compl. ¶ 37-44.

Nonparty Irvin Ebaugh ("Ebaugh") worked as Hardwire's program manager

for bridge armor projects before his firing in February 2013. While employed at

Hardwire, Ebaugh worked with the Freyssinet Defendants on construction projects

the companies planned to complete together. As a part of this cooperation, Ebaugh had entered into a mutual nondisclosure agreement ("NDA") and a memorandum of understanding on behalf of Hardwire with Freyssinet International in June 2012. After he was fired but before leaving Hardwire, Ebaugh took a USB drive and notebook containing proprietary data from his office, ignoring Hardwire's request to review them first. Hardwire contacted the Federal Bureau of Investigation to report that Ebaugh may have stolen and misappropriated its trade secrets. Ebaugh's home was raided in an investigation, which revealed that he had taken over 27,000 files from Hardwire's computers and had trespassed onto Hardwire's property to photograph its proprietary technology and hardware.

Ebaugh soon after started a company under the name "Infrastructure Armor." Around the same time, Defendants stopped responding to Hardwire's inquiries about an exclusive working relationship.

In 2014, Hardwire entered into a partnership with two of Defendants' competitors to bid on the stay cables and cable shielding for the Kosciuszko Bridge, a major public bridge project in Queens, New York. Hardwire was informed its bid was not competitive in August 2014. In May 2014, Defendants began working closely with Ebaugh and Infrastructure Armor; they informed Hardwire of their working relationship in September 2014. Defendants soon after told Hardwire that they were awarded the cable and shielding contract for the

Kosciuszko Bridge. Ebaugh's firm, Infrastructure Armor, was subcontracted by Defendants to provide the cable shielding. Hardwire then placed another bid for the work, which was denied. At some point over the next several months, Hardwire learned that Ebaugh had communicated with Hardwire's suppliers regarding the use of Hardwire's molds, dies, and designs. In February 2015, Hardwire learned that Defendants had subcontracted with Ebaugh and Infrastructure Armor to perform the Kosciuszko Bridge cable shielding work.

In addition to losing out on the Kosciuszko Bridge project, Hardwire claims that Defendants have continued to use its trade secrets to compete with it and undercut prices, causing it to lose several other bridge contracts. These include projects in Texas, Washington, D.C., the Middle East, and an unspecified international location between 2016 and 2018. Hardwire also alleges that Defendants fraudulently communicated bids for these contracts that contained Hardwire's trade secrets over mail and e-mail. It declines to give more specific information about the locations or names of these projects, citing security concerns.

Hardwire's Complaint alleges Defendants violated the Defense and Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq., the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann. Comm. Law § 11-1201 et seq., the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961

4

et seq. (against Freyssinet Defendants only), and sections one and two of the

Sherman Antitrust Act, 15 U.S.C. § 1-2 (against Freyssinet Defendants only). It

also alleges claims for breach of contract (against Freyssinet Defendants only),

fraud, civil conspiracy, and state law business torts. Defendants ask that each of

these claims be dismissed because they are untimely and insufficiently pleaded.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A] court may consider the

complaint as well as any written instrument attached to [the complaint] as an

exhibit" in making this determination. *Kalyanaram v. Am. Ass'n of Univ.

Professors at New York Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014)

(internal quotation omitted).[1] A claim is facially plausible when "the plaintiff

pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the grounds of his

---

[1] The Court has federal question jurisdiction over the suit and therefore employs
Second Circuit caselaw where applicable.

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp.*, 550 U.S. at 555. "[T]he proper question is whether there is a permissible relevant inference from all of the facts alleged, taken collectively, not whether an inference is permissible based on any individual allegation, scrutinized in isolation." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (internal quotation omitted).

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 459 (S.D.N.Y. 2020) (quoting *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2nd Cir. 2014)). Because the limitations date is normally "a question of fact," *Schwab v. Philip Morris USA, Inc.,* 2005 WL 2467766, at *1 (E.D.N.Y. Oct. 6, 2005), "a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run," *Fargas v. Cincinnati Mach.*, LLC, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013).

## III. DISCUSSION

### A. Timeliness

The Court first turns to Defendants' arguments that each of Hardwire's claims is time barred. Hardwire filed the instant suit in December 2021. Because Hardwire is not a New York corporation, its state law claims are governed by the shorter of New York's statute of limitations and the statute of limitations of the state where the actions accrued. N.Y. C.P.L.R. § 214(4). Here, the parties agree that the actions accrued in Maryland. For claims where Maryland's statute of limitations apply, so too will its rules for accrual and tolling. *RA Global Servs. v. Avicenna Overseas Corp*, 817 F. Supp. 2d 274, 282 (S.D.N.Y. 2011). Hardwire's federal claims, on the other hand, are governed by the limitations periods supplied by their respective statutes. For the reasons described below, the Court rejects each of Defendants' challenges to the timeliness of Hardwire's claims.

#### 1. Hardwire's DTSA and MUTSA Claims

Hardwire's federal DTSA claims have a three-year statute of limitations that runs from when the alleged misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). This occurs when the plaintiff becomes aware or should have become aware that the secrets "were wrongfully acquired, disclosed, or used." *Zirvi*, 433 F. Supp. 3d at 459 (quotation omitted). The limitations period is not restarted by allegations of

continuing misappropriation. 18 U.S.C. § 1836(d). MUTSA claims are likewise subject to a three-year statute of limitations beginning at the same discovery threshold. Md. Code Ann., Com. Law § 11-1206(a)-(b). Claims under both statutes incorporate the concept of inquiry notice to determine whether a plaintiff should have been aware of the misappropriation.

A "court may determine as a matter of law when a claim should have been discovered only when 'uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.'" *United Res. 1988-I Drilling & Completion Program, L.P. v. Avalon Expl., Inc.*, 1993 WL 17464, at *5 (S.D.N.Y. Jan. 21, 1993) (internal quotation omitted). Accordingly, determining "whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate" on a motion to dismiss, but possible when "the facts needed for determination of when a reasonable [plaintiff] of ordinary intelligence would have been aware" of the action's accrual are present in the Complaint. *LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003) (internal quotations omitted).

Hardwire alleges that Freyssinet, Inc. obtained its trade secrets from Hardwire's bid proposals for the Kosciuszko Bridge and through drawings Hardwire created for Freyssinet International when the two companies were working together. It claims that Freyssinet, Inc. disclosed these secrets to Ebaugh

on March 3, June 17, and July 16 of 2014, and that Defendants used them between 2016 and 2018 during the bidding process, construction, and repairs for the Kosciuszko bridge, and in bids for four other projects.

Defendants contend that the timeliness analysis should focus on the alleged disclosure and not the use of the trade secrets, because their use is "subsumed into a continuing trade secret misappropriation" that would not alter the start date of the statute of limitations period. Mem. in Supp. of Motion to Dismiss, Dkt. No. 39 at 10. They argue that Hardwire should have realized by February 2015 that the secrets it showed Defendants during their time working together—the Integration Designs and Amor Proposals—had been disclosed to Ebaugh by Defendants.

By February 2015, Hardwire knew Defendants and Ebaugh had won the Kosciuszko Bridge contract. Hardwire had provided Defendants with its Integration Designs and Armor Proposals as a part of its bid for the Kosciuszko work beforehand. Hardwire also knew at this time that Defendants and Ebaugh had worked together while Ebaugh was still a Hardwire employee and that they were now working together again after his firing to formulate proposals for the Kosciuszko Bridge. Hardwire was aware that Defendants had no collaborative communication with Hardwire after Ebaugh's firing. Finally, it was aware that Ebaugh knew of the last category of trade secrets, the Armor Recipes, from his

time at Hardwire and that Ebaugh had been in contact with Hardwire's suppliers about using its molds, dies, and designs.

Defendants reason that given this information, Hardwire should have discovered by February 2015 that Ebaugh had been given the Integration Designs and Armor Proposals by Defendants. This is because Defendants needed all three of the Armor Recipes, Integration Designs, and Amor Proposals for a successful bid, and "there was no way" Ebaugh could have developed his own Integration Designs and Armor Proposals in time. Compl. ¶ 119-20.

In response, Hardwire points to allegations in the Complaint suggesting that it had no suspicion of the Freyssinet Defendants until November 2020, when it received discovery from Ebaugh in an earlier lawsuit against him. Compl. ¶ 12. It also disagrees that Ebaugh must have been given the Integration Designs and Armor Proposals from the Freyssinet Defendants—the Complaint alleges that Ebaugh had access to all three secrets when he worked at Hardwire and stole them after his termination by taking a hard drive, notebook, and photos of Hardwire's hardware. *See* Compl., ¶ 363; *see* Compl., ¶ 164 (alleging that Ebaugh was "in a position to duplicate Hardwire's bridge armor . . . on his own."). However, other portions of the Complaint suggest that Hardwire may only have been aware of Ebaugh's possession of the Armor Recipes. *See* Compl. ¶ 17(c) (Defendants "provided [Ebaugh] with Hardwire's proprietary Integration Designs and Armor

Proposals . . . for Mr. Ebaugh to use, along with Hardwire's Armor Recipe (which Mr. Ebaugh had stolen from Hardwire) to create a competing product); Compl. ¶¶ 120-22 (Ebaugh and Defendants "combine[d]" Hardwire's trade secrets that each had "brought . . . to the table").

The Complaint does not show on its face that the clock on Hardwire's trade secrets claims began running in February 2015. What Hardwire should have discovered from the elaborate negative implication weaved by Defendants is a question of fact better suited for a later stage of litigation. Even if Hardwire could have discovered the disclosure as early as February 2015, it is not a foregone conclusion that it would or should have discovered it upon reasonable inquiry. *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 363 (2d Cir. 2013).

**2. Hardwire's RICO claim**

Hardwire's civil claims under the federal RICO statute are subject to a four-year limitations period, which runs from "when the plaintiff . . . discovers or reasonably should have discovered the RICO injury." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012). Under the "separate accrual rule," the statute of limitations is reset by "new and independent injuries." *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F. 3d 56, 59-60 (2nd Cir. 1998). Because Hardwire's suit was filed in December 2021, the limitations period stretches back to December 2017.

Defendants argue that the clock for Hardwire's RICO claim began ticking in February 2015, when Hardwire suffered alleged economic loss stemming from Defendants winning the Kosciuszko Bridge work with Hardwire's misappropriated trade secrets. Specifically, Hardwire's injury can be attributed to Ebaugh's company winning the cable shielding subcontract for the Bridge from Defendants.

In response, Hardwire again insists that it only suspected Ebaugh, not Defendants, because of Ebaugh's broad access to Hardwire's information as an employee. Even after the investigation of Ebaugh by federal law enforcement, suing Ebaugh in Maryland, and subpoenaing Freyssinet, Inc., it took until November 2020 for Hardwire to discover Defendants' conduct. As discussed above, Defendants have not sufficiently established that Hardwire should have discovered that Defendants caused it to lose the Kosciuszko Bridge contract by February 2015.

Hardwire also argues that Defendants' actions caused further injuries after the loss of the Kosciuszko Bridge contracts, including lost contracts in other public works projects between 2016 and 2019, which reset the statute of limitations under the separate accrual rule. Defendants argue that these do not constitute "new and independent injuries" as required by the separate accrual rule because Hardwire does not plead that they injured its business. *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F. 3d 56, 59-60 (2nd Cir. 1998). However, the Complaint alleges that

12

Hardwire lost out on contracts during and after 2017, placing their alleged market share injuries within the four-year statute of limitations. Compl. ¶¶ 314-26; 464-67. These further injuries mean that Hardwire's RICO claim is not time barred as a matter of law.

### 3. Hardwire's Antitrust Claims

Hardwire's federal claims under the Sherman Antitrust Act are subject to a four-year statute of limitations, which runs from the time of the underlying act which "injure[d] a plaintiff's business." 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Res., Inc.*, 401 U.S. 321, 338 (1971). However, "[i]n the context of a continuing conspiracy to violate the antitrust laws," the statute of limitation runs from "the commission of [each] act" that causes injury and could constitute a separate cause of action. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971).

Hardwire alleges that Defendants' misappropriation in connection to the Kosciuszko Bridge project caused them economic harm, including "substantial revenue and profits." Compl. ¶ 621. It also alleges harm stemming from Defendants' conspiracy to obtain and misappropriate Hardwire's trade secrets, which it used in four additional bids between 2016 and 2018, "retraining Hardwire (and others) from fairly competing in [the] armor shielding market." Compl. ¶¶ 590, 595, 601, 621. Because Hardwire pleads a continuing conspiracy of

13

anticompetitive behavior that caused it injuries as recently as 2018, it is impossible to say that Hardwire's antitrust claims have expired as a matter of law.

**4. Hardwire's Claims for Tortious Interference and Unfair Competition**

Hardwire's state law tortious interference and unfair competition claims must be brought within three years of the action's accrual. N.Y. C.P.L.R. § 203(a). Claims are deemed to have accrued on the date the injury occurred, not when it is discovered. *Scroxton v. Town of Southold*, 2010 WL 1223010, at *6 (E.D.N.Y. 2010) (citing N.Y.C.P.L.R. 214[4]; *Am. Fed. Group v. Edelman*, 282 A.D.2d 279 (App. Div. 2001)).

Hardwire's relevant injuries include allegations that it lost out on bridge contracts after 2015 and that Defendants' "inferior, poor and unsafe implementation of" its trade secrets on the Kosciuszko Bridge caused "the loss of customer trust for armor products" generally, further affecting Hardwire's business. Compl. ¶¶ 314-325, 493-97. Defendants argue that the former injuries were not plausibly caused by their actions and would be time barred in any case, though they decline to support either of these contentions with reasoning or law. They also argue that Hardwire's allegations about Defendants' subpar work on the Kosciuszko Bridge are conclusory, again providing no support.

None of these arguments are convincing. Regarding the post-2015 projects Hardwire claims it lost out on, several allegations in the Complaint describe

14

actions by Freyssinet Defendants or Ebaugh, armed with trade secrets Hardwire alleges Freyssinet Defendants provided him, that interfered with Hardwire's chances of winning the contracts. *See, e.g.*, Compl. ¶ 325(b) ("In November and December 2016, the [Infrastructure Armor] / Freyssinet team was working on bids for a project in Washington, D.C. In connection with that work, Mr. Ebaugh provided a proposal for the Freyssinet Defendants' use, which utilized Hardwire's Armor Recipes and Integration Designs. Moreover, Mr. Ebaugh again compared the armor pricing against the Hardwire Proposal"); ¶ 325(f) ("In 2019, Mr. Ebaugh, supported by Freyssinet, caused significant issues with a family of bridge projects in New York, resulting in unusual security protocols and procurement methods that caused Hardwire to lose the business"). Nor is it clear how claims based on these actions are untimely, considering they describe injuries that occurred within four years of this lawsuit.

Likewise, Hardwire's claims centering on the reputational damage done to the sector by Defendants' poor installation on the Kosciuszko Bridge are far from conclusory. The Complaint provides extensive descriptions and photographs describing the alleged shortcomings in Defendants' work on the Bridge. *See* Compl. ¶¶ 300-310. Defendants ask the Court to look exclusively at Hardwire's description of the resulting injury as recited in its state business law claims. While this allegation alone may be found conclusory, the Complaint must be read "as a

whole, rather than piecemeal" at the pleading stage. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 190 (2d Cir. 2012) (internal quotations omitted). These claims are therefore not time barred as a matter of law.

### 5. Hardwire's Breach of Contract Claim

Hardwire's state law breach of contract claim is subject to Maryland's three-year limitations period because it is shorter than New York's six-year statute of limitations. Md. Code Ann., Cts. & Jud. Proc. § 5-101; N.Y. C.P.L.R. § 214(4). Under the Maryland rule, the statute of limitations period runs from when Hardwire "knew or reasonably should have known of the wrong." *Am. Gen. Assur. Co. v. Pappano*, 822 A.2d 1212, 1219 (Md. 2003). Defendants rely solely on the familiar argument that Hardwire should have known of Defendants' alleged misappropriation by February 2015, when they learned that Defendants had won the Kosciuszko Bridge contract. But this argument has already been addressed and rejected. The Court therefore declines to find that Hardwire's breach claim is untimely as a matter of law.

### 6. Hardwire's Fraud and Civil Conspiracy Claims

The parties agree that Hardwire's state law fraud and civil conspiracy claims are governed by New York's statute of limitations, which is the "greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have

16

discovered it." N.Y. C.P.L.R. § 213(8). Under the New York scheme, Hardwire's claim would either need to have accrued after December 13, 2015 or Hardwire must show that it did not and could not have discovered the fraud before December 14, 2019. It is Hardwire's burden to show "that the fraud could not have been discovered before the two-year period prior to the commencement of the action." *Hemmerdinger Corp. v. Ruocco*, 976 F. Supp. 2d 401, 408 (E.D.N.Y. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007)).

Defendants' argument that the fraud claim is untimely is again based on their assertion that Hardwire should have known of the alleged wrongdoing by February 2015, which the Court has repeatedly rejected above. Hardwire's fraud claim centers on its allegations that Defendants coaxed trade secrets from them under the guise of considering Hardwire's bid for the Kosciuszko Bridge shielding work, while actually planning to have Ebaugh underbid them. The associated injury is again the loss of the Kosciuszko Bridge contract. Hardwire alleges that this scheme continued until "February 2015." Compl. ¶ 352. However, this allegation does not necessarily show that Hardwire knew or should have discovered it at that date. Accordingly, nothing on the face of the Complaint shows that the fraud claim is untimely.

"The statute of limitations for civil conspiracy is the same as that for the underlying tort." *Brady v. Lynes*, 2008 WL 2276518, at *9 (S.D.N.Y. 2008) (citing

*Schlotthauer v. Sanders,* 545 N.Y.S.2d 197, 199 (App. Div. 1989)). Since Defendants' timeliness argument against the fraud claim fell flat, so too must their attack on the civil conspiracy count.

## B. Plausibility

Defendants also attack the substance of several claims in Hardwire's complaint, insisting that they are insufficiently pleaded and must be dismissed. For the reasons described below, all of Defendants' challenges are rejected, save for their attack on Hardwire's claim under section 2 of the Sherman Antitrust Act, which is dismissed with prejudice.

### 1. Trade Secret Disclosure in Hardwire's Bid for the Kosciuszko Bridge Project

Defendants first attack the allegations underlying Hardwire's federal and state trade secret claims—primarily Hardwire's allegation that its Kosciuszko Bridge bid proposals transmitted trade secrets to Defendants. Specifically, Hardwire alleges that the bid proposals it submitted to the Freyssinet Defendants contained Integration Designs and Armor Proposals. Defendants argue that it is not plausible that these bid proposals contained trade secrets because the contents of bids cannot constitute trade secrets as a matter of law.

A trade secret is "a process or device for continuous use in the operation of the business," usually not including "the amount or other terms of a secret bid for a contract." Restatement (First) of Torts § 757 cmt. b (October 2022 Update). But no

18

caselaw indicates that information contained in bids is disqualified from trade secret status. *See Geo Grp., Inc. v. Cmty. First Servs.*, Inc., No. 11-CV-1711 CBA, 2012 WL 1077846 (E.D.N.Y. Mar. 30, 2012) (noting that a "bid proposal itself" can be "protectable as a trade secret"). Even if the secrets contained in Hardwire's 2014 bid proposals are not considered trade secrets, the Complaint alleges disclosure and misappropriation by Defendants at several other junctures. *See* Compl. ¶ 371 (alleging use and disclosure of trade secrets for other bridge projects in 2016, 2017, and 2018).

Defendants also argue that this allegation is contradicted by assertions in Hardwire's complaint from its earlier Maryland lawsuit against Ebaugh (the "Maryland Complaint"). Specifically, the Maryland Complaint alleged that Hardwire "did not provide detailed proprietary information regarding its armor recipe or integration methods" to the Freyssinet Defendants. Mem. in Supp. of Motion to Dismiss, Dkt. No. 39 at 19. Defendants insist that this contradicts Hardwire's claim that the Freyssinet Defendants "provided [Ebaugh with] Hardwire's proprietary Integration Designs." Compl. ¶ 17(c). Hardwire counters that this communication with Ebaugh was made in August 2014, after the Complaint alleges Hardwire had provided Defendants with their trade secrets.

Indeed, the Complaint describes several exchanges of confidential information in the spring and summer of 2014, which was before the

communication addressed in the excerpt of the Maryland Complaint. *See, e.g.*, Compl. ¶¶ 141-50, 161-63 (alleging the exchange of confidential information between Hardwire, Ebaugh, and the Freyssinet Defendants between March and June of 2014). Furthermore, the communication Defendants highlight from the Maryland Complaint only concerns Integration Designs, not other trade secrets, including the Armor Proposals. Defendants also fail to explain how this contradiction regarding the exchange of the Integration Designs renders the Complaint's allegations regarding the bid proposals null. Finally, several other allegations of disclosure and misappropriation in the Complaint are stated to have occurred through 2019. Therefore, even to the extent the Maryland Complaint does contradict allegations in the Complaint, this contradiction does not render Hardwire's trade secrets claims implausible.

### 2. Hardwire's DTSA Claim

The DTSA, which took effect on May 11, 2016, creates a private right of action for the misappropriation of trade secrets and added said misappropriation as a predicate act for the purposes of the RICO statute, inter alia. Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, May 11, 2016, 130 Stat. 376, 376-82. It covers the "acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means," and "disclosure . . . without express or implied consent by a person who" acquired it through

"improper means." 18 U.S.C.A. § 1839(5). Importantly, the DTSA is not retroactive—it creates liability only for "misappropriation . . . for which any act occurs on or after the date of the enactment of [the] Act." *Id.* at 381-82. However, this encompasses "pre-enactment conduct if the misappropriation continues after the enactment date." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15 CIV. 211 (LGS), 2021 WL 1553926, at *5 (S.D.N.Y. Apr. 20, 2021).

Defendants argue that Hardwire's DTSA claim should be dismissed because it seeks to impose liability for misappropriation that took place before the DTSA's enactment on May 11, 2016, again highlighting the Kosciuszko Bridge proposals Hardwire sent to Defendants in 2014. As discussed above, the Complaint alleges continuing acts of misappropriation beyond the Kosciuszko Bridge proposals in 2014, including use and disclosure occurring after May 11, 2016. Defendants label these allegations "vague and conclusory," but they contain factual matter, including time periods and specifics about the projects Defendants pursued, sufficient to survive a motion to dismiss. Mem. in Supp. of Motion to Dismiss, Dkt. No. 39 at 19; *Iqbal*, 556 U.S. at 678; *see* Compl. ¶ 325(d)-(e) (alleging Defendants' use of Armor Recipes in a Middle Eastern project in 2017; use of Armor Recipes and Integration Designs in a proposal for 2018 bridge project); Compl. ¶ 412 (describing misuse and disclosure as a portion of Hardwire's DTSA claim); Compl. ¶¶ 462, 470 (alleging the misappropriation is "continuing, to this

21

day" in connection with bridge proposals). Hardwire also claims to have further

identifying information about the specific bridge construction projects in question,

which it says it has omitted from the Complaint out of concerns for security.

Compl., P. 74, n.7. Because Hardwire states plausible misappropriation allegations

that stretch beyond 2016, its claims are not ineligible for coverage under the DTSA

as a matter of law. *See Tesla Wall Sys., LLC v. Related Companies, L.P.*, 2017 WL

6507110, at *10 (S.D.N.Y. Dec. 18, 2017) (denying a motion to dismiss because,

among other reasons, the complaint alleged the "misappropriation of [plaintiff's]

trade secrets are ongoing").

### 3. Hardwire's RICO Claims

Defendants attack Hardwire's federal RICO allegations on the basis that

they have failed to properly allege predicate acts. To state a RICO claim, a plaintiff

must allege "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of

racketeering." *United States v. Allen*, 155 F.3d 35, 40 (2d Cir. 1998) (quoting

*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985)). Allegations must "plead

at least two predicate acts, show that the predicate acts are related, and that they

amount to, or pose a threat of, continuing criminal activity." *Democratic Nat'l*

*Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 442 (S.D.N.Y. 2019). Hardwire's

RICO claim is based on predicate criminal acts related to Defendants' alleged

DTSA violations, as well as related acts of mail and wire fraud.

First, Defendants argue that Hardwire's claims of DTSA violations cannot serve as RICO predicates because the conduct they described occurred before the DTSA's enactment date. A plaintiff must plead violations that occurred after the enactment date to allege them as a RICO predicate act. *Democratic Nat'l Comm.*, 92 F. Supp. 3d at 442-43 ("[A]lleged violations of [18 U.S.C. § 1832] can serve as predicate acts only for offenses occurring after May 11, 2016"). Hardwire's allegations related to the Kosciuszko Bridge contract are likely excluded from being RICO predicate acts, as they occurred before May 11, 2016. However, the Court has already noted above that the Complaint states DTSA violations occurring after the law's enactment date.

Defendants also argue that Hardwire's RICO claim fails because Hardwire does not allege the wire and mail fraud predicates with particularity or as a pattern of racketeering. Fraudulent acts alleged as RICO predicates must be pled with particularity under the requirements of Federal Rule of Civil Procedure 9(b). Accordingly, a plaintiff must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Brookhaven Town Conservative Comm. v. Walsh*, 258 F. Supp. 3d 277 (quoting *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999)). Allegations against multiple defendants must include these details for each separate defendant.

23

*Id.* (citing *Colony at Holbrook, Inc. v. Strata G.C., Inc.*, 928 F. Supp. 1224, 1231 (E.D.N.Y. 1996)). Allegations of a pattern of conduct must include "at least two" predicate acts, which must be "related" and "amount to or pose a threat of continued criminal activity," *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017).

To support their argument, Defendants yet again ask the Court to disregard the allegations in the Complaint occurring after the bidding process for the Kosciuszko Bridge project, an argument which has been repeatedly rejected.[2] Defendants also assert that their continuing use of the same trade secrets originally disclosed during the Kosciuszko Bridge bidding process cannot constitute separate predicate acts.

Courts are split on whether the "ongoing use" of the same misappropriated trade secrets can constitute multiple predicate acts "absent other acts of

---

[2] Defendants also invoke the Maryland Court's ruling on a jurisdictional issue in Hardwire's previous lawsuit against Ebaugh, though they do not argue that that decision precludes any of Hardwire's claims. Accordingly, the Court declines to analyze a decision regarding different allegations lodged against a different defendant that concerns different conduct than the Complaint in the instant case.

racketeering." *ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 697 (E.D.

Tex. 2020). One court reasoned that the

> theory that 'ongoing use' of trade secrets can somehow constitute *two*
> predicate acts under RICO is entirely unsupported and illogical," and
> "would turn a single trade secret misappropriation claim into a RICO
> offense every time a defendant violated the DTSA and then did not
> immediately stop their allegedly unlawful use of the trade secrets.

*Attia v. Google LLC*, No. 17-CV-06037-BLF, 2018 WL 2971049, at *18 n.15

(N.D. Cal. June 13, 2018) (emphasis in original); *see also Magnesita Refractories*

*Co. v. Tianjin New Century Refractories Co.*, No. 1:17-CV-1587, 2019 WL

1003623, at *11 (M.D. Pa. Feb. 28, 2019) (holding that the disclosure and use of

the same trade secrets in advertising can support only one predicate DTSA

violation); *but see Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting*

*Grp.*, No. CV 16-2499, 2017 WL 1105648, at *12 (E.D. Pa. Mar. 24, 2017)

(holding that "dozens of DTSA violations" utilizing the same stolen secrets, along

with the "threat that the DTSA violations will continue" alone are "sufficient to

constitute a pattern of racketeering activity").

However, the court need not resolve this issue here because Hardwire's

allegations are sufficient to plead a pattern of racketeering activity when combined

with the Complaint's mail and wire fraud allegations. This is because a RICO

plaintiff "can mix-and-match predicate acts in an attempt to identify a pattern of

racketeering activity that has both 'continuity' and 'relatedness.'" *Reich*, 858 F.3d 55, 59 (2d Cir. 2017).

Defendants argue that Hardwire's fraud claims are conclusory and lack particularity because they fail to specify which of Defendants' statements were fraudulent and where and when they were made. Hardwire specifies that the alleged fraud occurred through mail and email, and includes the states and countries they were sent to and the months in which they took place. Compl. ¶ 464-67. Some of these emails are attached to the Complaint as exhibits. *See* Compl. at Ex. Y (June 14, 2016 email between Freyssinet, Inc. and Ebaugh regarding work on Kosciuszko Bridge); Ex. Z (July 21, 2017 email between Freyssinet, Inc. and Ebaugh regarding work on the second phase of Kosciuszko Bridge). Hardwire also alleges that Defendants transmitted trade secrets via the mail through bids sent to Texas in September 2016, Washington, D.C. in November and December 2016, the Middle East in June 2017, and internationally in 2018. Compl. ¶ 464-67. Hardwire has therefore sufficiently specified the statements and circumstances under which they were made as required by Rule 9(b). *See* Fed. R. Civ. P. 9(b).

These alleged predicate acts are also subject to independent pleading requirements for mail and wire fraud, under which a plaintiff must allege "(1) the existence of a scheme to defraud, (2) the defendant's knowing participation in the scheme, and (3) the use of wire, mail, or television communications in interstate

commerce in furtherance of the scheme." *Curtis & Assocs., P.C. v. L. Offs. of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 168 (E.D.N.Y. 2010), *aff'd sub nom. Curtis v. L. Offs. of David M. Bushman, Esq.*, 443 F. App'x 582 (2d Cir. 2011) (internal quotation omitted). Defendants do not challenge Hardwire's satisfaction of these requirements; however, the Court opts to continue with a brief analysis so as to comply with the Second Circuit's admonition to closely scrutinize fraud-based RICO predicate allegations. *See Reich*, 858 F.3d at 59. The above cited portions of the Complaint relating to Freyssinet, Inc.'s post-2015 bid proposals easily satisfy the third requirement, while Hardwire's allegation that Defendants "utilized the income and profits derived from the pattern of racketeering" in order to "fund and operate [Ebaugh's business] for the illegal purpose of, among other things, unlawfully competing against Hardwire" satisfy the former two. Compl. ¶ 428.

Finally, Defendants' alleged predicate acts are also sufficiently continuous and related to constitute a "pattern" of racketeering activity at the pleading stage. The conduct alleged in the Complaint occurring between 2016 and 2018 stretches for more than two years, the standard for establishing a continuous pattern in the Second Circuit. *Democratic Nat'l Comm.*, 92 F. Supp. 3d at 445 ("In the Second Circuit, two years is generally required [to establish a pattern]"). A nexus between predicate acts is sufficient to establish relatedness when said acts "have the same or

similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240. Here, Hardwire satisfactorily identifies itself as a common victim of Defendants' scheme to steal its trade secrets and compete with its business by continually using the secrets in bids for bridge projects. *See* Compl. ¶ 428.

### 4. Hardwire's Antitrust Claims

The Complaint lodges claims in counts nine and ten under the first and second sections of the Sherman Antitrust Act for undertaking an unreasonable restraint on trade and attempted monopolization, respectively. For the reasons described below, Hardwire's section 1 claim survives, while its claim under section 2 must be dismissed.

#### i. Injury Alleged

Defendants attack both of Hardwire's Sherman Act claims on the basis that Hardwire fails to allege an adequate injury and therefore lacks standing. Hardwire's antitrust claims are based on allegations that Defendants "are utilizing the competitor's confidential information, including their cost and pricing information, installation mechanisms, and design to replicate their competitors' bids at lower prices," resulting in "Hardwire and other armor shielding contractors [being] unable to compete because the Freyssinet Defendants have fraudulently

obtained confidential information and are utilizing said information to further their exclusivity arrangement." Compl., ¶¶ 599, 619.

Second Circuit courts subject injuries alleged by private antitrust plaintiffs to a three-part test. A plaintiff must first "identify the practice complained of and the reasons such a practice is or might be anticompetitive." *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 94 (2nd Cir. 2019). The examining court then considers "how the practice identified by the plaintiff put the plaintiff in a worse position," and "compare[s] the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Id.* A claim is valid only if it alleges a "competition-reducing aspect or effect of the defendant's behavior," *Harner v. Allstate Ins. Co.*, No. 11-CV-2933 CS, 2012 WL 12326459, at *9 (S.D.N.Y. Sept. 7, 2012) (quoting *Primetime 24 Joint Venture v. Nat'l Broad. Co.,* 219 F.3d 92, 103 (2d Cir. 2000)), or an "adverse effect on competition market-wide," *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.,* 129 F.3d 240, 244 (2d Cir. 1997). The purpose of these requirements is to "ensure[] that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place," and to "prevent[] losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990).

Defendants point out that Hardwire describes itself as the "sole armor provider" for the armor shielding industry before it faced competition from Defendants, and argue that the injury identified by Hardwire is simply having to compete with Defendants in a market it previously monopolized. Compl. ¶¶ 39, 297, 596-97 (referring to Hardwire as "the exclusive supplier" in "the market space" and "the industry's go-to, sole armor provider"). In response, Hardwire highlights its allegations that Defendants stole information from other competitors and that their behavior reduced competition. These include allegations that Ebaugh and Defendants listened to "confidential calls with competitors in order to steal the information being provided" by them, as well as emails in which Freyssinet, Inc. personnel communicated "the scope/quotation for the shields" from a non-Hardwire competitor that was to be used in Ebaugh's Kosciuszko Bridge bid, undercutting their bids. Compl. ¶¶ 610, 170, 589.

While the Complaint does take issue with the Defendants' entrance into the marketplace for bridge shielding armor, Hardwire's antitrust allegations do not rest on the fact that they faced newfound competition, but rather their allegations of anticompetitive bid-undercutting. Their admission that they were the sole provider of bridge shielding before Defendants' Kosciuszko Bridge bid therefore does not necessarily prevent them from pleading a valid injury. Defendants argue that undercutting bids does not necessarily disqualify them from adequately pleading

30

an antitrust injury. *See Atl. Richfield Co*, 495 U.S. at 340 ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.") However, whether or not Defendants' prices were predatory is a question of fact that is better suited for a later stage of litigation.

### ii. Hardwire's Attempted Monopolization Claim

Hardwire's claim under section 2 of the Sherman Antitrust Act alleges that Defendants engaged in an exclusive partnership with Ebaugh's firm, Infrastructure Armor, "intended to restrict competition in the market and unlawfully attempt to obtain a monopoly at the expense of Hardwire and others." Compl. ¶ 604-05. Section 2 attempted monopolization claims must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651 (2nd Cir. 2015) (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993)).

Defendants argue that Hardwire's Complaint fails on the third prong because it does not allege any facts that support Defendants' dangerous probability of achieving market power. "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that

market," including "defendant's economic power in that market" *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Courts can infer a dangerous probability of success in the presence of "anticompetitive conduct" and "proof of monopoly power," *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 74 (2nd Cir. 1988), the latter of which can itself be inferred when the targeted business occupies "a predominant share of the relevant market," *Fort Wayne Telsat v. Ent. & Sports Programming Network*, 753 F. Supp. 109, 112 (S.D.N.Y. 1990). However, Courts "consider a variety of factors in addition to defendant's market share, including the strength of competition, barriers of entry, and the probable development of the market." *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 579 (S.D.N.Y. 2011) (internal quotation omitted). A plaintiff need not plead that a defendant has a majority of market share, but it must plead facts about its activity in the market and the market itself sufficient to infer a probability of monopolization. *Id.* at 578.

Hardwire alleges anticompetitive conduct and a specific intent to monopolize. *See* Compl. ¶ 594 ("Defendants . . . conspired together to steal Hardwire's (and others) technical designs, specifications, and pricing"); Compl. ¶ 618 ("Defendants . . . have armed (and continue to arm) themselves with unlawfully obtained confidential and proprietary information that is being used to exclude competition"). However, Hardwire does not allege any facts as to

32

Defendants' market power or facts about the market itself from which one could infer a probability of monopolization. Hardwire does not allege what portion of market share Defendants account for, nor can it describe any contracts Defendant actually won at Hardwire's expense. *Cf. Fort Wayne Telsat*, 753 F. Supp. at 112 (deeming third element satisfied by inference where plaintiff alleged that defendant was "by far the largest sports programming service"); *Bayer Schering Pharma AG*, 813 F. Supp. 2d at 580 (finding probability of monopolization insufficiently pleaded even where plaintiff alleged that defendant accounted for "approximately half of all oral contraceptive sales in the United States" and that the industry is "mature and is dominated by a small number of large producers."). Because Hardwire pleads no facts from which to infer a dangerous probability that Defendants could monopolize the market for bridge shielding, its attempted monopolization claim fails and must be dismissed. Hardwire does not request leave to amend its section 2 claim and declined an earlier opportunity to amend its Complaint. Accordingly, the Court declines to sua sponte grant leave to amend.

Finally, Defendants argue that Hardwire's state law unfair competition claim must be dismissed because it rests on the same allegations as its trade secret and antitrust claims. Defendants do not specify which aspects of which allegations they refer to. Given this ambiguity, and because Defendants' motion is denied in

relation to most of Hardwire's trade secret and antitrust claims, the Court rejects

Defendants' request to dismiss Hardwire's unfair competition claim.

### III.

For the foregoing reasons, Defendant's motion to dismiss is GRANTED

with respect to Hardwire's attempted monopolization claim under section 2 of the

Sherman Antitrust Act. Accordingly, count 10 of the Complaint is dismissed with

prejudice. Defendant's motion is DENIED with respect to all other counts.

**SO ORDERED.**

    __ /S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
February 8, 2023